## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JOHN DOE**, Plaintiff, <br><br> v. <br><br> **UNIVERSITY OF ROCHESTER**, Defendant. | **Civil Action No.** |

## COMPLAINT

John Doe, by his counsel, files this Complaint against the University of Rochester ("UR" or "the University") for sex-based discrimination in violation of 20 U.S.C. § 1681 (commonly known as Title IX), breach of contract, breach of the covenant of good faith and fair dealing, negligence, and violation of the New York State Human Rights Law. In support of his Complaint, John alleges as follows:

**Table of Contents**

*INTRODUCTION*..................................................................................................................4

*PARTIES*..............................................................................................................................9

*JURISDICTION AND VENUE*.............................................................................................9

*STATEMENT OF FACTS*....................................................................................................10

    **What Happened Between John and Jane**................................................................10

    **The Incidents Are Investigated** ..............................................................................13

      *The Notice of Allegations* ........................................................................................13

      *Jane's alleged incapacitation* ..................................................................................15

      *How Jane and John ended up alone with J.L. and D.S.*............................................17

      *The alleged initial choking* ......................................................................................18

      *The removal of Jane's shirt*......................................................................................19

      *The alleged biting* ....................................................................................................20

      *The additional choking and "bruises"*....................................................................21

      *The removal of Jane's jeans*.....................................................................................21

      *The "not shaved" discussion* ...................................................................................22

      *The "get on my level" remark* ..................................................................................23

      *The first instance of sexual intercourse*...................................................................24

      *The second instance of sexual intercourse* ..............................................................25

      *Digital penetration and third instance of sexual intercourse* .................................26

      *How the encounter ended* .........................................................................................27

      *John's Interview* .......................................................................................................28

      *Jane's Bizarre Claim That J.L. Was Almost Sexually Assaulted That Night, Too* ...........30

      *The following day* ....................................................................................................31

      *The Other Witnesses*.................................................................................................32

      *J.L.'s Two Very Different Interviews with the Investigators* ....................................33

      *D.S.'s Interview*........................................................................................................37

      *A.M.'s Interview*.......................................................................................................38

      *S.R.'s Interview*........................................................................................................39

      *I.F.'s Interview*.........................................................................................................40

      *A.S.'s Interview*........................................................................................................40

    **The Preliminary Investigation Report**..................................................................41

    **The Final Investigation Report** .............................................................................42

    **The Hearing**.............................................................................................................52

      *Opening Statements* .................................................................................................52

      *Jane's Testimony* .....................................................................................................55

      *John's Testimony*......................................................................................................58

      *D.S.'s Testimony* ......................................................................................................59

      *A.M.'s Testimony* .....................................................................................................60

      *J.L.'s Testimony* .......................................................................................................61

    **The Outcome**...........................................................................................................62

    **The Appeals**.............................................................................................................72

**UR's Title IX Training Materials**..................................................................................**73**

**UR's Sexual Misconduct Policies and Procedures**..................................................**80**

**History of Title IX and Gender Bias at UR**...............................................................**84**
*Pressure from the Federal Government* ...................................................................84
*The "Me Too" Movement and Negative Title IX Publicity at UR*....................................87

*CAUSES OF ACTION* .........................................................................................*100*

**COUNT ONE: VIOLATION OF TITLE IX (20 U.S.C. § 1681)**......................................**100**

**(Deliberate Indifference)**......................................................................................**100**

**COUNT TWO: VIOLATION OF TITLE IX (20 U.S.C. § 1681)** ....................................**102**

**(Erroneous Outcome)**............................................................................................**102**

**COUNT THREE: BREACH OF CONTRACT**...............................................................**105**

**COUNT FOUR: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR
DEALING**..............................................................................................................**108**

**COUNT FIVE: NEGLIGENCE**..................................................................................**109**

**COUNT SIX: VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW** .........**111**

**(New York State Human Rights Law § 296(4))** .......................................................**111**

**INTRODUCTION**

1.     Most alleged sexual assaults happen behind closed doors, so any disagreement about what happened usually comes down to "he said, she said."  If you're lucky, maybe you have some text messages, too.  But that's usually it.

2.     Not so here.  Here, there were two other people in the room—two eyewitnesses hooking up in a bed just a few feet away from John Doe and Jane Roe, who were both freshmen at the time.[1]  And neither of them—one of whom was one of Jane's *best friends*—saw or heard anything bad happen that night.

3.     Here is a photo of the two beds, positioned as they were that night:



---

[1] John Doe and Jane Roe and pseudonyms for the plaintiff/accused and his accuser, respectively.

4.      Not only did neither of those people see or hear anything bad happening, in a room with low lighting and where no music was playing, but Jane herself would also later admit that right in the middle of the alleged assault, she got out of bed, walked across the room, and told her friend… *that she was worried John was going to judge her because she hadn't shaved her vaginal area.*

5.      Jane would also later admit that she then voluntarily climbed back into bed with John, at which point, according to her, he *continued* to assault her while she repeatedly told him no and pushed him away—none of which the two witnesses lying just a few feet away either saw or heard.

6.      Finally, a witness (A.M.) who saw Jane in the dorm common room immediately after the encounter said that Jane and J.L. "were laughing and joking around and stuff," and when A.M.—on whose bed Jane had just hooked up with John—asked them why, Jane replied, "Oh, you'll figure out."

7.      Then there was Jane's constantly changing story about what happened in the room that night.  Sometimes she said that both she *and* her friend had been assaulted— something the friend herself never claimed—while other times she said it was just her. Sometimes Jane said the encounter was nonconsensual because she never gave affirmative consent, while other times she said it was because she was too drunk. Sometimes Jane said that she repeatedly told John to stop, while other times she said she was too scared to say anything.

8.      Two months after their encounter, Jane reported John to the Title IX Office at the University of Rochester (hereinafter "UR" or "the University"). The ensuing process proceeded to involve more conflicts of interest than a legal ethics exam.

9. Jane's advisor was attorney Morgan Levy, who had served as UR's Title IX coordinator from 2012 until she resigned under pressure in September of 2020.

10. The Title IX Coordinator who oversaw John's process—Julia Green—had, upon information and belief (including their respective LinkedIn profiles) served as Ms. Levy's outside counsel during the latter's tenure.

11. Attorney Rachel Koegel, whom Ms. Levy trained as her immediate successor as Title IX Coordinator, would later preside over and deny John's appeal.

12. And Ms. Koegel's immediate successor—attorney Kate Nearpass—helped hire Ms. Green (Ms. Nearpass's immediate successor), *and* was Ms. Koegel's law partner at the time Ms. Koegel denied John's appeal of the process Ms. Green had overseen.

13. So to sum up: Jane's advisor 1) used to be the University's Title IX coordinator, 2) was succeeded in that position by the person who would later chair the panel denying John's appeal (Ms. Koegel), and 3) once served as outside counsel to Ms. Green, the Title IX coordinator overseeing Jane's complaint—and someone Ms. Koegel's law partner helped hire.

14. Given that tangled web of Jane-favoring connections, it may thus come as little surprise that Ms. Green and her investigators repeatedly broke the rules for Jane and Ms. Levy and failed to conduct anything close to a fair investigation. UR would proceed, among other things:

- to investigate John for things it never charged him with, in direct contravention of its own rules;

- to refuse to give John 10 days to review and comment on all evidence before the hearing, in direct contravention of its own rules;

- to prohibit John from hearing Jane's opening statement *from the hearing* until *after* the hearing decision was issued, making it impossible for him to cross-examine her on it;

- to fail to interview multiple obvious exculpatory witnesses, including:

  - a man Jane hooked up with mere hours before hooking up with John;
  - a friend she spoke with the very next day about what happened; and
  - two witnesses who would have corroborated Jane pushed everyone out of the room while keeping John inside with her (something she would later repeatedly deny).

- to ignore a host of contradictions told by Jane on nearly every part of her story, as explained in detail below.

15. The case concluded with a completely incoherent set of findings. In chronological order, John was found *responsible* for "aggressive[ly] kissing and biting" of Jane's neck; *responsible* for choking her; *not responsible* for the extended sexual intercourse that followed; *responsible* for digitally penetrating Jane twice (after he "adjusted his body" while fingering her); and then *not responsible* for having sex with her from behind right after that.

16. The hearing officer never explained—nor could anyone—how someone might consent to intercourse after having been nonconsensually bitten and choked, then *not* consent to being fingered right after that consensual intercourse, then consent *again* to intercourse right after the nonconsensual fingering.

17. By the end of the hearing, Jane had contradicted herself and the evidence in so many ways that the hearing officer could not rely on her testimony as the basis for concluding that these acts were *nonconsensual*. Among other things:

- Jane had claimed that John and his friend, D.S., had schemed to get her and her friend, J.L., alone in D.S.'s room. But witnesses testified, and the hearing officer was compelled to find, that Jane in fact had slammed the door on several other students—so that the four of them could be alone together.

- Jane had claimed that the incident ended when she asked D.S. to kick John out of the room and D.S. complied. But witnesses testified, and the hearing officer was compelled to find, that it ended when John got off the bed, went to the bathroom, and never came back.

18. The hearing officer could not, therefore, make Jane's say-so the basis for concluding that the biting, choking, and fingering were nonconsensual. So to find John responsible for those things, he simply flipped the burden of proof—placing the burden on John to show that he *had* obtained consent, rather than on Jane to show he had *not*. These are two very different things.

19. To wit: As all schools do, the University's Title IX Policy states that accused students are "presumed not responsible" unless and until a "preponderance of evidence" affirmatively shows they violated the Policy.  In other words, just as in criminal court, the accused does not have to prove his innocence.

20. Not so in this case, however: here, the hearing officer never actually pointed to any evidence suggesting that the biting, choking, and fingering were nonconsensual. Rather, he said he found them nonconsensual because of "the *lack* of evidence demonstrating affirmative consent" (for the biting), "*no* evidence that affirmative consent was obtained" (for the choking), and, with respect to the digital penetration, no statement at all as to what suggested that act was nonconsensual (emphasis added).

21. John, in other words, had not been *presumed* innocent; he had to *prove* himself innocent—which, in a clear violation of the Title IX Policy, the hearing officer found he had failed to do.

22. Unfortunately, given the immense national pressure UR had been under in recent years to be harder on men accused of sexual assault and to treat female accusers with kid gloves, such a result was hardly surprising.

23. And the result would have been doubly unsurprising to anyone who bothered to read the almost comically biased materials that UR used to train its investigators and adjudicators, which included the following:

    a. The assertion that it was "rare" for a person to lie or falsely accuse someone of sexual assault;

    b. An excerpt from an article entitled "Repeat Rape by College **Men**" (emphasis added) stating that "research" suggests that "about two-thirds of college rapists are repeat offenders, who account for the great majority of rapes (over 90%), and that about one-fourth of college rapists admit to committing rapes over multiple years of college;," while failing to cite a *single source* for this remarkable statistic;

    c. The advice that complainants "need to be truly heard and understood" and that investigators should not "jump to conclusions," while not saying the same about respondents; and

    d. The observation that "investigation/adjudication is a system designed by lawyers" that has resulted in "deep, universal dissatisfaction."

24. Because he was completely innocent, and because UR conducted a biased disciplinary process that willfully ignored a veritable mountain of evidence showing he was, John now comes to this Court for redress.

## PARTIES

25. Plaintiff John Doe is, and at all times relevant to this Complaint has been, a citizen of the State of New York.

26. Defendant University of Rochester, located in Rochester, New York, is a private university that receives federal funding.

## JURISDICTION AND VENUE

27. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because John's claims arise under federal law, namely Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88.

9

28.    This Court also has supplemental jurisdiction over John's state-law claims under 28 U.S.C. § 1367 because those claims are so closely related to his federal law claim as to form the same case or controversy under Article III of the United States Constitution.

29.    Venue properly lies in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

### What Happened Between John and Jane

30.    On November 18, 2024, one of Jane's best friends, J.L., came to visit her at UR. The two women pre-gamed and went to a fraternity party.

31.    At the party, J.L. kissed student R.R., while Jane went to student A.D.'s bedroom and made out with him—something John was never permitted to ask about.  After Jane and A.D. finished making out, A.D. told Jane he was feeling sick, so they parted ways. Jane and J.L. decided to leave, only to discover that they couldn't get inside Jane's dorm because she had lost her keys.

32.    So Jane and J.L. decided to go back to the party. When they got there, Jane noticed that A.D. was still at the party hanging out with people even though he had told her he was sick. So she and J.L. tried to meet other people.

33.    She and J.L. eventually met John and his friend D.S.

34.    John was a freshman on a varsity sports team, and Jane knew who he was because they had a class together. John said that he did not remember ever having met Jane.

35.    Jane danced with John and they exchanged social media information, but John paid little attention to her, instead trying to flirt with her friend J.L.

36.    J.L., however, started making out with D.S. The four of them—Jane, John, D.S., and J.L.—then left the party to go get food. On the walk, John saw three other female students and invited them to come along.

37.    Jane told one of the three new female students that she wasn't interested in John anyway because he was short. And she told J.L. that John wasn't her type.

38.    The group ultimately made its way to D.S.'s bedroom, where D.S.'s roommate A.M. joined them. D.S. and J.L. continued to hit it off while Jane sat next to them, while John chatted with Jane and the three new female students.

39.    At one point, presumably because he wanted to be alone with J.L., D.S. indicated to A.M. that he wanted everyone to leave. So John, A.M., and the three female students headed towards the door, but at the last minute, Jane got up and slammed the door on everyone *but* John—leaving just her, John, J.L., and D.S. alone in the room.

40.    John took the hint and went to the other bed in the room, where he and Jane began hooking up while D.S. and J.L. hooked up in the other bed.

41.    John and Jane started making out and took their clothes off. Jane then went over to J.L. and expressed concern that she hadn't shaved and was worried John was going to judge her. J.L. assured her that John wouldn't care, so Jane went back over to him where she proceeded to ask him to get a condom.

42.    They had sex, which D.S. saw portions of, and when they were done, John made a poor decision he would come to deeply regret: He got out of bed, said he was going to use the bathroom, and never came back. After John left, Jane excitedly said to J.L. and D.S., "I just had sex with [John Doe]!"

11

43.     Shortly thereafter, Jane and J.L. left to walk back to Jane's room. They passed A.M., the student on whose bed Jane and John had just had sex, and Jane laughingly apologized to him. A confused A.M. asked what she was sorry for and she retorted, "Oh, you'll figure it out."

44.     Jane and J.L.'s actions after leaving the dorm were no more consistent with an alleged sexual assault than their laughing on the way out: that night, D.S. sent J.L. a picture of John getting yelled at by A.M. for having sex in his bed. J.L. responded, "Is [A.M.] giving John a talking to" followed by a worried-face emoji. D.S. responded that he was and J.L. said, "**[Jane] was worried about that**…Welp praying for him n you"—a bizarre message to send if Jane had, as she would later claim, literally run over to J.L. in bed, asked her to kick John out of the room, and told her that she had just been raped.

45.     The next morning, J.L. left Jane to go party at another university with another friend.

46.     It wasn't until Jane was left alone that she began to reconceptualize the previous night as negative—an understandable reaction, given that John had ghosted her and the reasonable fear that word might get out that Jane (who was just a freshman) had hooked up with one male student at a party, left that party to go home with a different male student, and had sex with that male student while two other people hooked up just a few feet away.

47.     So Jane asked J.L. to come back to UR, which she did.

48.     That day, Jane and J.L. returned to A.M.'s room to get a camera Jane left in there and learned that A.M was very upset about her having sex in his bed and they even saw him making fun of her to one of his friends in the hallway.

49.    That day, Jane told J.L. that John had assaulted her, and J.L. took Jane at her word—despite all of the evidence to the contrary, most notably the fact that *J.L. had been in the room the entire time and had neither heard nor seen anything suggesting that.* She accompanied Jane to speak with her friend I.F., get a rape kit done, and make a police report—and ended up regurgitating what Jane said to these people in J.L.'s later Title IX interview, passing the details off as her own memories despite her actually not remembering anything due to her inebriation that night.

50.    J.L. also helped Jane gather evidence for her complaint. She would go on to admit at the hearing that while doing so, she deleted certain messages she had sent to D.S. from that night about Jane and John's encounter.

51.    Two months later, on January 19, 2024, Jane reported John to the Title IX Office.

### The Incidents Are Investigated

### *The Notice of Allegations*

52.    On January 25, 2024, the Title IX Office sent John a written notice charging him with sexual harassment and sexual assault under the "University of Rochester Title IX Policy ("Title IX Policy," *see* Ex. 1)," the "Student Sexual Misconduct Policy (SSMP)," and the "Student Code of Conduct (Code of Conduct)." The notice alleged that Jane had "state[d] through words and express[ed] through actions multiple times that she was uncomfortable and/or did not want to proceed."

53.    **Neither D.S. nor J.L., who were lying in bed together just a few feet away from John and Jane, would ever say they heard any such words or saw any such actions.**

54.     The notice then launched into a litany of extreme allegations—again, not a *single one of which* D.S. or J.L. would ever say they witnessed.  It claimed that John:

    a.  "Aggressively kissed and bit Jane's neck and nipples to the point of pain and bruising;

    b.  Choked Jane multiple times, causing her to become dizzy;

    c.  Penetrated her vagina with a condom on his penis without affirmative consent, did not stop even though Jane communicated she was in physical pain, and continued nonconsensual penetration of her vagina with his penis until the condom fell off;

    d.  Put on another condom and again penetrated Jane's vagina with his penis without affirmative consent, continuing until the second condom broke;

    e.  Penetrated Jane's vagina with his penis without a condom and without affirmative consent, then ejaculated inside of her without consent;

    f.  Digitally penetrated Jane's vagina without affirmative consent, at which point she turned her body toward the wall in an attempt to physically prevent him from continuing;

    g.  Adjusted his body and resumed nonconsensual digital penetration of Jane's vagina;

    h.  Penetrated Jane's vagina with his penis from behind, without a condom, and without affirmative consent;

    i.  Paused penetration to bite Jane['s] buttock, hit her buttock with an open hand, and then resumed nonconsensual penetration of her vagina with his penis, causing Jane significant pain."

55.     Neither D.S. nor J.L. would ever say they heard Jane cry out in pain or give any indication whatsoever that something bad was happening; D.S. would say only that he could tell they were having sex, and J.L. would say she didn't see or hear anything at all.

56.     And when Jane walked across the room to tell J.L. she was worried John would judge her because she hadn't shaved—by which time, according to Jane, John would already have bitten her face and neck, held her down as he bit her nipples, choked her,

and removed her pants as she tried to "squirm away," all as she asked him to stop—she did not say or do anything suggesting, in the slightest way, that anything bad was happening with John.

57.     The notice UR sent to John was entirely about whether Jane had given affirmative consent through her words or actions; the allegations said nothing about Jane's having allegedly been incapacitated (*i.e.*, too drunk to consent to sexual activity).  Yet in a clear violation of both its own policies and the 2020 Title IX regulations that govern these proceedings, UR nonetheless proceeded to investigate John for that, too.

58.     Jane would go on to tell a lot of different people about what she claimed happened that night.  The stories she told would vary wildly from one person to the next.

### *Jane's alleged incapacitation*

59.     In the earliest versions of her story, Jane would claim that what happened between her and John was nonconsensual due to her alleged incapacitation from alcohol, not because she told him "no" or otherwise failed to give affirmative consent.

60.     On November 18, 2023, she told her friend I.F. that she was "pretty intoxicated" and John had given her multiple shooters throughout the night. But as John testified, he did not give Jane *any* shooters that night, as the party did not allow alcohol.

61.     On November 19, 2023, Jane told Officer Nicholas Taskett from UR Public Safety that she had consumed "large amounts of alcohol" that night.

62.     On November 19, Jane told a Sexual Assault Nurse Examiner that she was intoxicated.

63.     On November 19, she told Rochester Police Department Officers Chloe Hooper and Jackie Shuman that she had consumed six to eight shots of alcohol that night.

15

64.     But two months later, when Jane reported the incident to the Title IX, she said literally nothing about alcohol or incapacitation.  Instead, she claimed only what was outlined above—that she had failed to give affirmative consent (or sometimes said no) to what happened that night.

65.     Then, during her interview with the investigators on February 7, 2024, she flip-flopped—saying both that "the alcohol was starting to wear off" and also that she was "obviously intoxicated" and "very out of control."

66.     In a follow up email to the investigators on July 8, 2024, Jane walked that back a little—this time saying that she wasn't out of control, but rather "drunk and intoxicated, not sober, laughing at nothing," and just a 5 on a 10-point intoxication scale.

67.     Clearly confused about whether Jane was claiming to have been incapacitated, the investigators emailed her on July 8, 2024 asking, "Can you also clarify whether your level of intoxication impacted your capacity to consent to any of the alleged conduct?"

68.     It took two more emails from the investigators before Jane finally responded on July 22, 2024—and refused to answer the question: "I feel that I have already shared a plethora of information regarding my level of intoxication that night. So I'd respectfully request that you accept my answers already given in the interview, and my answers to the follow up questions already submitted as my response."

69.     Seven months later, by the time she came to the hearing, Jane finally answered the question—asking the hearing officer in her opening statement (which, as will be discussed below, wasn't shared with John until after he was found responsible) to "please note the volume of alcohol [J.L.] and [Jane] drank within hours of the incident," arguing

that she was not in a state where she "could have knowingly agreed to any plan that involved sexual consent." In other words—that she was incapacitated.

70. Yet just 37 minutes into the hearing, she walked that back yet again in response to a question from the hearing officer: "I wouldn't say I was incapacitated, I knew what I was doing and my memory wasn't affected by it."

71. By the time she gave her closing statement, Jane had finally abandoned the incapacitation argument once and for all, not mentioning alcohol once and stressing that her claimed memory lapses were due only to the passage of time.

72. Neither the investigators nor the hearing officer ever bothered to confront Jane about these flip-flops—they were not mentioned even once in the investigators' final report, and the hearing officer never asked her about them.

### *How Jane and John ended up alone with J.L. and D.S.*

73. Jane also lied to UR about how she wound up hooking up with John—falsely claiming that John and D.S. had schemed to get her and J.L. alone with them.

74. Jane claimed that she and J.L. were hanging out on D.S.'s bed planning to just watch a movie with the male students, when John and D.S. huddled up and then kicked everyone else out of the room over Jane's and J.L.'s protests.

75. But as the other witnesses and even Jane herself eventually made clear, that's not what happened. According to D.S., John, A.M., and the only one of the three female students who was interviewed, *Jane* was the one who pushed the three female students and A.M. out the door and then slammed the door on them, leaving her and John inside—showing that it was Jane who had schemed to wind up alone with John, not vice-versa.

76.    After seeing the evidence showing that she had clearly lied about this, Jane backed off this story at the hearing. She now claimed to have supported the female students' leaving but claimed not to remember if she "played a role in them leaving."

### *The alleged kissing*

77.    After the four of them were left alone, J.L. and D.S. started making out, while Jane and John ended up on A.M.'s bed just a few feet away.  Still not wanting to admit she was interested in John, Jane claimed that the only reason she stayed in the room and sat on the other bed with John was to not "cock block" (her words) J.L. and make sure J.L. was safe—despite the fact that even the best wingmen don't typically stay to watch their friends hook up.

78.    Jane admitted that, at one point, she did begin consensually kissing John. That's what she told Rochester Police Department Officers Hooper and Shuman, Title IX investigators Sarah Shah and Senovia Moncada, and the hearing officer.

79.    But she wasn't always consistent about that. She told the SANE nurse that her immediate reaction when they started kissing was, "Oh, this is what is happening, I have to make out with him," and that John was kissing her "very aggressive[ly]" and "being bitey." And in a written deposition she gave to Officers Hooper and Shuman, she didn't mention the consensual initial kissing whatsoever and just said John was kissing her like he was "trying to bite [her] face off."

### *The alleged initial choking*

80.    Jane would also claim that, out of nowhere and—again—with one of her best friends just a few feet away, John started to choke her right as they began making out.

81.    And once again, she said different things to different people.

82.     She said nothing whatsoever about choking to Officer Taskett.

83.     She told the SANE nurse that John did choke her and that she told him it was making her lightheaded, but she said nothing about telling John to stop. In fact, she said she just "shut down."

84.     She told Detectives Hooper and Shuman that in addition to choking her, John also bit her neck, that she asked him to stop choking her, and that he didn't listen.

85.     But during her interview with the investigators, she didn't mention this initial choking or her protest, and when asked, couldn't remember if the choking started before her shirt came off.

86.     And at the hearing, Jane went back to saying that she didn't actually tell John to stop—she said, "initially it was a brief thing, so I didn't clock it." She never explained, and was never asked, how it could have made her "lightheaded" (as she told the SANE nurse) if it had been "a brief thing."

87.     Neither J.L. nor D.S. would later say they heard any choking sounds or ever heard Jane asking John to stop.

88.     Neither the investigators nor the hearing officer ever confronted Jane about these changes in her story, nor were they mentioned in the outcome letter.

### *The removal of Jane's shirt*

89.     Jane also told different stories about how her shirt came off, which she acknowledged was early in the encounter.

90.     She told the police that John took her shirt off, she told the investigators that she took her own shirt off, and she said at the hearing that she didn't know *who* took her shirt off.

91.    Jane also changed her story about whether her shirt came off consensually.

92.    She told the SANE nurse that John asked if he could take her shirt off and she said okay. She told the investigators that when John asked to take her shirt off, she "was fine with it getting to that point." And when asked by the hearing officer whether her shirt came off consensually, she said yes.

93.    But there was a problem with admitting that her shirt came off consensually—namely, that this would have happened right after (according to Jane) John choked and bit her *without* her consent.  So it would have made little sense for her to consent to having her shirt removed—or certainly for her to have removed it herself—following such an attack.

94.    So when John's advisor pointed this out while cross-examining her, Jane—for the first time—backtracked and said that "upon reflection," her shirt actually was *not* removed consensually.

95.    Neither the investigators nor the hearing officer ever confronted her about these changes in her story, nor was it mentioned in the outcome letter.

### ***The alleged biting***

96.    Jane also claimed that John repeatedly bit her neck and nipples, although when and how this happened changed from one telling to the next.

97.    Moreover, in her interview with the investigators, Jane actually backed off this claim entirely—repeatedly noting that John was just a teethy kisser but not that he actually bit her: "I don't think he closed his mouth all the way. It wasn't a bite, but it was very much teeth involved, like 'This kind of hurts.'…. It was just very teethy and aggressive kissing. It's weird to me. I don't usually use teeth when I kiss someone."

98.    Neither J.L. nor D.S. heard or saw this happen, and the SANE report stated that there were "no injuries noted" on her breasts.

99.    The outcome letter would go on to find John responsible for biting Jane's neck despite Jane's own admission that John had never actually bitten her.

### *The additional choking and "bruises"*

100.    Jane said that, after the initial choking started, John continued to choke her throughout their encounter. Once again, neither D.S. nor J.L. saw or heard anything corroborating that.

101.    Jane's story about this also changed constantly.

102.    She told the SANE nurse that John choked her while she was on top of him—to the point that her vision became blurry, she stopped being able to breathe, and she had to physically push him off. She said he choked her *10 different times* and on a scale of 1 to 10, with 10 being "crushing," she rated the pressure a 7.

103.    She told Officer Hooper a much different story.  In this version, she said that while *John* was on top of *her*, he began choking her again and she physically pushed his hands away and said, "I don't want you to do this, please be more gentle."

104.    Neither J.L. nor D.S. testified that they heard or saw any of this.

105.    The photos Jane herself submitted showed only faint marks that appeared at most to be light hickeys, which she could have received just as easily from A.D. earlier that night.

### *The removal of Jane's jeans*

106.    Jane said that after the biting and the choking and her removing her own shirt, her jeans came off.  But she told very different stories about how that happened, too.

107.    Jane told the SANE nurse that John tried to pull them off and she responded, "No, there's other people in the room," to which John responded that it was okay because they were hooking up as well. She said he then just took them off.

108.    Neither D.S. nor J.L. testified to hearing this exchange.

109.    In her written deposition, Jane said that John pulled her pants off after she *repeatedly* said she wasn't ready and didn't want to do this—which, again, neither D.S. nor J.L. heard or saw.

110.    In her interview, she backtracked—now saying she was "pretty sure" John unbuttoned her jeans but didn't know if he took them off or if he asked her to take them off.

111.    At the hearing, Jane said she didn't remember how her jeans came off.

112.    These inconsistencies were not addressed in the final investigation report or the outcome letter.

### *The "not shaved" discussion*

113.    According to ***Jane herself***, *after* John had choked and bitten her; *after* her shirt had come off; and *after* her pants had come off, she then got out of bed, walked over to J.L.—who was in the middle of hooking up with D.S.—and told J.L. that she had not shaved her vaginal area and was worried that John would judge her for that.

114.    Although Jane never used the words "vaginal area"—instead just saying that she had not "shaved"—that is clearly what she meant from the context: She was wearing only her underpants when she walked over to J.L.; she told the investigators, "I had not planned to hook up with anyone, so I didn't get ready to get with anyone. I remember being very, very uncomfortable about that, too. I remember literally going over to [J.L.'s]

22

bed and being like, 'I can't do this. I haven't gotten ready for this.'"; one of the investigators responded by noting that Jane had "gestured" as she'd said that and told Jane that while she had gotten the "gist" of what Jane had said, she wanted to clarify what Jane meant when she said she wasn't "ready," to which Jane responded, "I hadn't shaved, and that made me very uncomfortable."

115.    **When she went over to J.L., Jane never said anything about having just been choked or bitten, about her shirt and pants coming off without her consent, or suggested in even the slightest way—to one of her *best friends*—that anything bad was happening with John.**

116.    Jane said that J.L. reassured her that John wouldn't care if Jane hadn't shaved, so she got back into bed with John.

117.    Finally, Jane added that when she told John she hadn't shaved, John responded, "I didn't shave either, it's fine."

118.    That's the story that Jane herself told the SANE nurse, the investigator, and the hearing officer.  But in her written deposition for the police, she didn't mention getting out of bed at all. Then, in her *interviews* with the officers, she said she ran over to J.L. because she was "worried" and "uncomfortable," but didn't tell them that it was because she hadn't shaved.

### *The "get on my level" remark*

119.    Jane then told a strange story that in the middle of their hookup, John took out either a bottle of Southern Comfort alcohol or a shooter (as with so many other things, she was inconsistent about which) and told her she needed to "get on my level." But she was all over the board about when this supposedly happened.

120.    Jane told Officers Hooper and Shuman that it happened after John (consensually) took her shirt off and bit her nipple, but before her pants came off.

121.    In both her written deposition and in her interview, Jane said this happened *after* her pants came off, before they had sex, and after she told him repeatedly she "did not want to do this" (which, again, neither J.L. nor D.S. ever heard).

122.    And she didn't say anything about this at the hearing.  Neither the investigation report nor the hearing officer mentioned it or addressed Jane's changing story about it.

### *The first instance of sexual intercourse*

123.    Next, Jane says she and John had sex. And again, she just could not keep her story straight.

124.    Jane told the SANE nurse that John pulled her underwear to the side but didn't take them off, then tried to have sex with her while she was either on her side or face down (the SANE report notes the positions used as "V on top of A, V on side, V proned," and describes that Jane reported John telling her to get on top after this interaction). She said she asked John to get a condom, which he did and then said she should get on top of him.   But then, she said, they had trouble with insertion, so John fingered her instead— while she was still on top of him.  She said that all of this took about 20 minutes, after which she got either on her side or face down, and they began having sex.

125.    Jane told Officer Hooper that John actually *removed* her underwear, that she "begged" him to use a condom, and that they started having sex while John was on top of her—nothing about her ever being on top or John fingering her.

126.    Then, in her interview, Jane went back to saying that John pulled her underwear to the side and fingered her before they started having sex. She said she asked him to get a

condom and then, on her own accord, moved on top of John so she could have more control, at which point John initiated having sex—a total reversal from what she told the SANE nurse about being on her side or face down when he initiated sex.

127.   Jane also said in her interview that while she was straddling him, John somehow managed to remove her underwear entirely—which would have been physically impossible—and tried to initiate sex. She claimed she then got off of him, said "that's too painful, I can't do this" (which, again, neither J.L. or D.S. said they heard), and then lay on her back.

128.   Finally, at the hearing, Jane didn't mention the initial alleged fingering at all. And she claimed, for the first time, that she remembered being "pinned down" by John before she got on top of him.

### *The second instance of sexual intercourse*

129.   Jane told a similarly inconsistent story about the second time they had sex that night.  Her most material inconsistencies had to do with the condom.

130.   Jane told the SANE nurse that at some point while they were having sex the first time, the condom fell off, and Jane asked John to get another. She said he did and that they continued having sex until that condom broke, too.  Jane said that when that happened, John then ejaculated inside her without her consent.

131.   In her interview, Jane said for the first time that when the condom broke, John asked her if she was on birth control—and that when she said she was, he refused to get a third condom and intentionally ejaculated inside of her.

132.   At the hearing, Jane said for the first time ever that John "freaked out" when he realized the condom had broken and that she had to reassure him that she had an IUD—

which is what John had said from the start and belied Jane's initial claims that she had to

beg John to use a condom and that he intentionally ejaculated inside her after the condom

broke.

133.    The panelists never asked Jane why she would have felt compelled to assuage the

pregnancy-scare concerns of someone who had just been violently assaulting her.

### *Digital penetration and third instance of sexual intercourse*

134.    Jane claimed that the sexual contact continued even after John ejaculated—

something that John repeatedly denied.

135.    She told the SANE nurse that John kept "trying" to finger her, that he moved her

onto her side, then penetrated her with his penis, and that he slapped and bit her butt.

136.    She did not explain, and was never asked, how it would be physically possible to

bite someone's butt while having sex with them.

137.    Jane told Officer Shuman that John fingered her (as opposed to just trying to) but

didn't mention intercourse after the digital penetration or being hit or bitten on the butt.

138.    Jane told Officer Hooper that John fingered her, that she moved *herself* onto her

side, and that he then penetrated her again while he bit her butt.

139.    In her written deposition, Jane combined it all: she said that John fingered her,

that she moved herself onto her side, that John both fingered her *and* had intercourse with

her, and that he also hit and bit her on her butt.

140.    In her interview, Jane said that John fingered her and claimed that she verbally

objected, saying, "Stop. You're hurting me." (Neither J.L. nor D.S. would say they heard

this.) She said John responded by shooting her a look like "Don't tell me what to do

here," then continued fingering her. Jane said she tried to physically get away from him

26

by turning her body to the side—the opposite of what she told the SANE nurse. She said he then bit her butt and that—despite earlier saying John was unable to see her face in this position—said that she stared at him with a look on her face like "What is going on?" when this happened. Finally, she said she turned back towards John and *pushed* him away.

141.    At the hearing, Jane said that she remembered he bit her butt and then resumed penetrating her. She then looked at her interview summary and said, "Oh, in my testimony, it says that he hit me." She said that she eventually told John she was in pain and couldn't do this anymore, which neither J.L. nor D.S. would say they heard.

142.    Jane never produced evidence of bite marks on her butt. And J.L. and D.S. would never say they heard a slap, as they would have if John had hit Jane's butt.

143.    Neither the investigation report nor the outcome letter addressed these inconsistencies.

### *How the encounter ended*

144.    In most of her accounts, Jane said that John—despite having ejaculated—asked her for oral sex, she said no, and that she went over to J.L.'s bed (which was just a few steps away), said she wanted to leave, and asked D.S. to kick John out of the room. She said that D.S. then, without asking any questions, kicked John out of the room over John's objection. John and D.S. both said this never happened.

145.    In most of her accounts, Jane added that after John left the room, she told J.L. that the encounter did not "feel good," that she "felt like [she] was being raped," and told D.S. to "tell his friend not to bite people." D.S. testified that she never said either of those

27

things, nor did J.L. or Jane produce any text messages or other evidence supporting these remarkable assertions.

146.    Jane also said in her interview that she immediately told J.L. everything that happened after they left the room. But J.L. contradicted that, telling the investigators that "that night we really didn't talk more about it.  We walked back to her room and we just fell asleep."  Neither the investigators nor the hearing officer would press Jane or J.L. on this inconsistency, nor would the hearing officer mention it in his decision letter.

147.    Moreover, A.M. testified that he was sitting in the dorm's lounge and saw Jane and J.L. laughing and joking while on their way back to Jane's dorm. He said that Jane even laughingly apologized to him, and when he asked what she was apologizing for, she laughed and said "Oh, you'll figure it out."

148.    A.M. did indeed figure it out, realizing when he got back to his room that there were sex stains on his bedsheets.

149.    S.R. (one of the three female students Jane had kicked out) had gone home by that time, but the two other female students (who had also been there when Jane slammed the door on everyone earlier in the night) were in the lounge with A.M. when that exchange with Jane happened.  Yet the investigators refused to interview them despite both parties' request that they do so, saying they were irrelevant and would provide only cumulative information.

### *John's Interview*

150.    In his interview, John described a garden-variety college hookup—which was corroborated by the two people in the bed just a few feet away, who would confirm that they did not hear or see anything bad happen in the room.

28

151.   John said that as everyone was leaving the room to give J.L. and D.S. some privacy, Jane slammed the door on A.M. and the three female students before John could get out.

152.   Although John could not remember all of the details of what became a fairly uneventful hook-up, he said that Jane was a receptive and consenting participant throughout. He said she never asked him to be gentler or stop doing something, and never said or looked like she was in pain.

153.   The investigators—who, as will be detailed below, had been trained to believe that victims are often "polite" to "unwanted sexual advances [or] dominant or aggressive people" and that doubting what the complainant says can "cause lies"—repeatedly pressed John on why Jane would have falsely accused him. John said he didn't know.

154.   John told the investigators that he and Jane had kissed and touched each other but he couldn't remember the exact foreplay that was involved. He couldn't remember if he kissed her neck or breasts, or if he touched her neck. He said he wouldn't have choked her—that, if anything, it would have been at most a light hand placement. He denied digitally penetrating her, biting her, or hitting her.

155.   John said he remembered that Jane took her own shirt and pants off and asked him if he had a condom, to which John responded by asking her to hand him his wallet, which was on the nightstand.  Jane did so, and John took out and put on a condom.

156.   John said they then had sex in various positions, he changed the condom mid-way through, and they continued having sex until he ejaculated, at which point he realized the second condom had broken. When he started panicking, Jane told him not to worry because she had an IUD. After they talked for a little bit, John asked her if she wanted to

29

have sex again, and she said no. So they both got up and put their clothes on. John then went to the bathroom and then went back to his own dorm room without saying goodbye to Jane. He said D.S. didn't say anything to him before he left.

***Jane's Bizarre Claim That J.L. Was Almost Sexually Assaulted That Night, Too***

157.   Another theory Jane initially put forth but quickly abandoned was that J.L. had almost been raped that night, too. She told Public Safety Officer Taskett that J.L. "was about to be sexually assaulted herself by undergraduate student [D.S.]" She told Officer Taskett that because J.L. was only visiting from another school, J.L. did not want to report her own attempted sexual assault.

158.   Jane didn't tell the SANE nurse, Detective Hooper, Detective Schuman, or the investigators that J.L. was almost assaulted. In fact, she told the UR investigators that J.L. was "consensually getting with someone in a bed."

159.   The flip-flopping continued at the hearing: during her opening statement (which John did not see until after the decision came out), she claimed that both she and J.L. were so drunk that neither of them "could have knowingly agreed to any plan that involved sexual consent." Yet she also said that J.L. was lucky because "D.S. was someone who ultimately understood that she did not consent to further sexual activities" (which makes no sense, given that J.L. and D.S. had oral sex). And at the hearing, Jane said she was "well aware of how comfortable J.L. was [with D.S.]" because J.L. was relaxed, smiling, and communicating with ease such that she knew D.S. and J.L. were "both consenting."

160.    The investigators never mentioned Jane's flip-flopping about J.L.'s alleged assault in their final investigation report and it was not mentioned at all in the outcome letter finding John responsible.

161.    Nor did anyone ask Jane why, if she was in the middle of being assaulted by John, she was able to pay attention to whether J.L. was consenting, or point out that if Jane was able see all of that from the bed she was on, then J.L. would have had equally as clear a view of Jane's bed—and, of course, never noticed anything wrong.

162.    If John had been given access to Jane's opening statement at the time required by the policy—to wit, at the start of the hearing—then his advisor could have cross-examined Jane on all of this flip-flopping.  But because he didn't see it until after the decision came out, he never had that chance.

### *The following day*

163.    According to J.L., J.L. left the next morning to go party with another friend at a different university—an odd thing to do if her best friend had just confided that she had been raped.

164.    Jane claimed she had bruises on her neck for more than a week. The pictures she submitted into evidence showed faint marks on her neck at most resembling light hickeys, which could just as easily have come from her hookup with A.D.

165.    Moreover, during her interview, Jane was swiping through pictures she took that night and accidentally showed the investigator a picture that she took outside her dorm room at 4 a.m.  She said, "This is the night of, it's 4:00 AM and I can't get in the building. Yeah, sorry, I forgot about this."

166.    It is unclear whether Jane submitted this photo into evidence or why she was casually taking a picture of her and/or J.L. after she was supposedly assaulted. The investigator didn't ask her any questions about it.

167.    A.M. also told the investigators that after Jane left, he took a picture of himself on her camera, which she had left in the room, and noticed photographs of Jane and John happy with one another that night. Upon information and belief, Jane never submitted into evidence the photograph A.M. took, despite telling the investigators that she had submitted all of the photos on her camera.

168.    Jane also submitted a screenshot of the Snapchat conversation between D.S. and J.L. from that night. In that message, J.L. told D.S. that Jane was worried A.M. would get mad at John and that J.L. was "praying" for him.  The screenshot also shows that a message was deleted, and J.L. admitted at the hearing that she deleted that message before taking a picture of it for Jane to submit as evidence. She claimed she could not remember what the message said.

### The Other Witnesses

169.    John, D.S., J.L., A.M., S.R. (one of the female students whom Jane closed the door on) and I.F. (Jane's friend who she spoke to the day after the incident) were interviewed as part of the investigation. The investigators refused to interview the other two female students who Jane had kicked out of the room and who saw her laughing in the dorm lounge right, calling them "cumulative" and thus not "relevant."

170.    In her interview, Jane said that the day after her SANE exam, she went to her childhood home and told her "friend from home" what happened to her. The investigators

never asked for that friend's name or what Jane told that friend, and never interviewed that friend.

171.    The investigators also never interviewed A.D., whom Jane had engaged in some sort of sexual activity with in his bedroom earlier in the night of this incident. They never even asked Jane whether A.D. had kissed her neck or given her hickeys, which could have explained the marks on her neck.

172.    The investigators also never interviewed the SANE nurse, Officer Hooper, Officer Shuman, or Officer Taskett.

### J.L.'s Two Very Different Interviews with the Investigators

173.    J.L. gave two very different interviews to the investigators—the first one devoid of many details about what supposedly happened in the room that night, and the second absolutely packed with them.  Neither the investigators nor the hearing officer would ever ask J.L. how her memory could have improved so much from one interview to the next, whether she had shared her first interview transcript with Jane, or whether she and Jane had discussed her testimony between her first and second interviews.

### The First Interview

174.    In addition to being in the room the whole time that Jane was with John, J.L. was also with Jane when she spoke to people during the earliest stages of the case.  She was with Jane when she spoke with I.F. the next day, attended Jane's SANE exam, and was with her when she spoke with Officer Shuman.

175.     Many witnesses confirmed that J.L. was very intoxicated that night. At the hearing J.L. admitted, when asked whether her memory was affected by the alcohol, that she was "definitely out of it" and didn't "remember much."

33

176.    J.L. repeated Jane's improbable story that they both did five shots before going to the party.

177.    J.L. explained that Jane had "kissed" another male student at the party. She said she couldn't find Jane at one point, that I.F. helped her look for her, and that they found her in that male student's bedroom, "just talking."

178.    J.L. said that Jane complained to her that John hadn't talked to Jane all night.

179.    J.L. said she didn't remember certain details of the night and said that she was more drunk than Jane.

180.    J.L. repeated Jane's false story that John and D.S. had ushered everyone else out of the room over Jane and J.L.'s protests, proving she was willing to lie for Jane.

181.    J.L. told the investigators that while she and D.S. were hooking up, Jane came over and said she wasn't shaved. Although she couldn't remember much else about what Jane said, she claimed that the exchange lasted for *5 to 10 minutes*—which neither D.S., John, nor Jane corroborated (and which also makes little sense).

182.    J.L. said that she and Jane were "huddled over" during this conversation, so D.S. was not a part of it. But Jane had said in her interview that, while she was standing there, J.L. asked D.S. if guys cared about girls being shaved to help assure Jane, and that D.S. said no. (At the hearing, J.L. said she couldn't recall if this happened.)

183.    J.L. said she didn't notice anything bad happening while she and D.S. were hooking up.

184.    J.L. claimed that later on, Jane came over a second time and asked her to ask D.S. to kick John out and that, without even asking why, J.L. did so.  (D.S. and John both deny this.) She said John protested that he wanted to stay in the room but that D.S. told him,

34

"no, just get out." She didn't mention this exchange at the hearing when questioned by the hearing officer and brought it up only when Jane's advisor specifically pressed her on it. She never explained why D.S. supposedly was willing to kick John out without being given any explanation why.

185.    J.L. claimed that after John left but while D.S. was still there, Jane "was like, 'That did not feel good.  That did not feel consensual.'  She said to me, 'I felt like I was being raped,' is what she said to me." D.S. denied ever hearing anything like this. And at the hearing, J.L. said she actually couldn't remember the exact words Jane used in this moment.

186.    J.L. said that she, Jane, and D.S. *all* started "freaking out" and saying how much they all *regretted* what they'd just done—not that any of them had been *assaulted* (bolded emphasis below added):

> We kept just saying, "I'm going to kill myself. I'm going to kill...." All of us. All three of us were like, "Fuck." I think we could all tell that... I think [D.S.] and **I realized that what we did was [*sic*] we shouldn't have done stuff together,** and then **we realized that [Jane] and [John] shouldn't have done things together**. We realized that was just **not a good situation**. We were all like, "We're going to kill ourselves. We're going to kill ourselves." We just kept saying it over and over and over again.

187.    J.L. also said Jane told D.S., "tell your friend not to bite people"—something else D.S. would deny. And she said she saw Jane take A.M.'s sheets off the bed and thought she saw her put them in a hamper—something that is far more consistent with her feeling guilty for having dirtied someone's sheets than having just been *assaulted*.

188.    J.L. said that she and Jane went back to Jane's dorm and went to sleep, and that J.L. left the next morning to go see another friend at a different local school.

189.    J.L. claimed that after she left UR, Jane subsequently texted her and then called her and said, "That really did not feel good. I have bruises all over my neck. I really didn't like that situation." Yet neither J.L. nor Jane ever submitted that alleged text message to the investigators.

190.    J.L. then returned to UR and would later claim to have seen Jane's nipples bruised, swollen, and with broken skin—none of which would be noted in the SANE report from later that day finding no injuries on Jane's breasts.

191.    J.L. told the investigators that she couldn't remember what Jane told her about penetration or the use of condoms, other than that she knew Jane asked John to use a condom.

The Second Interview

192.    J.L. was then interviewed a second time—and suddenly claimed to recall a whole bunch of details that she hadn't mentioned during her first interview.

193.    Despite having said the first time that she couldn't remember what Jane had told her about penetration, she *started out* this interview by now claiming to remember that Jane had told her that it was really dry and hurt, that she still had her underwear on while he was on top of her, and she asked him to put on a condom not because she wanted to have sex, but "It was more of a like, 'If you're going to do this, you should put on a condom.'"

194.    She also claimed to recall Jane's telling her that they also switched positions—with John "forcing" Jane on top because insertion wasn't working (a notable difference from Jane saying she decided to get on top to be in more control).

195.    J.L. wasn't asked what prompted this supposed change in her memory in between her first and second interviews.

196.    J.L. also added that she remembered that John "aggressively" fingered Jane with two or three fingers—something Jane herself never even said. When asked if Jane told her anything about hitting, J.L. said yes but that she couldn't remember.

197.    At the hearing—16 months after the incident and 10 months after her interview—J.L. said for the first time that she recalled that John gave her two shooters at the party, in an attempt to bolster Jane's ever-changing incapacitation theory.

### D.S.'s Interview

198.    D.S. told the investigators a much different story than J.L. did. He said that John and Jane were talking to each other earlier in the night and that he thought they were flirting. Like everyone but Jane and J.L., he said Jane was the one who shut the door on everyone as they left, "almost rushing" them out. He said he could hear Jane and John talking on the bed, could hear the bed moving, could see them having sex, and did not see or hear anything alarming whatsoever.

199.    At the hearing, D.S. confirmed that there was no music playing in the room that night and that blue and purple LED lights were on and strung around the ceiling and the walls. He explained that he was receiving oral sex from J.L., so he was semi-upright facing John and Jane's bed the entire time with a clear view of what was going on—and that he did not see any choking or anything that signaled even the slightest bit of distress:

> We didn't have sex and most of the time she was giving me a blowjob. So I was kind of lying back and I can kind of see the room when it was happening.... I didn't hear anything specific. But I remember hearing them talking. If something was alarming, I definitely would've... It would've caught onto me.

200.    D.S. recalled that John later mentioned to him that one of the condoms broke. He said John did not say anything about fingering Jane.

201.    D.S. did not recall Jane ever walking over to him and J.L. and asking J.L. to ask D.S. to kick John out. Rather, he recalled that the encounter ended when John said he was going to the bathroom and never came back.

202.    D.S. told the investigators that Jane never said the word "rape" before she left, or said "tell your friend not to bite people," as Jane had claimed. He instead recalled her saying, happily, something like, "I just had sex with [John Doe]," which he also testified about at the hearing. D.S. also said that two months later, Jane approached him at a party and said out of the blue, "I think [John Doe] raped me." D.S. said that "because it was so random and out of the ordinary," he "was like, 'What are you talking about? You can't just go around saying that.' And then I walked away in disbelief."

### A.M.'s Interview

203.    A.M. told the investigators that the plan was for everyone, including John, to leave the room so that D.S. and J.L. could hook up. Because he left first, he didn't see how everyone else left. But he said that one of the female students who left behind him said that Jane had just closed the door in her face.

204.    He also told the investigators that the next time he saw Jane was in the dorm lounge about an hour later. Jane and J.L. "were laughing and joking around and stuff," and when they saw him head towards his room, "[T]hey're kind of saying, 'Hey, sorry.' [Jane] said that a bunch and I was like, 'Why? What happened?', kind of thing because I was just very confused because at this point, I had no idea what happened. So she was like, "Oh, you'll figure out…."

38

205.    A.M. said that he then went back in the room, saw that D.S.'s sheets were now on his bed, and asked D.S. what happened.  When D.S. told him that John and Jane had hooked up on his bed, he was upset, so he went and confronted John angrily about it. John explained that he hadn't really wanted to hook up with Jane and that it had been a mistake to do so, but that he did it because he was trying to be a good wingman to D.S. in his effort to hook up with J.L.

206.    A.M. said that when John later learned what Jane was accusing him of, he was "really shocked" and "kind of freaking out."

207.    A.M. said he couldn't remember which specific acts John confirmed to him had happened but did specifically remember that John said he asked Jane to have sex a third time, that she said no, and that he respected that.

208.    A.M. confirmed that he never heard that D.S. asked John to leave and that he heard about D.S. being shocked when Jane approached him at a party months later accusing John of rape.

### S.R.'s Interview

209.    S.R. confirmed in her interview that she was not close with either John or Jane and that Jane had said "okay bye" and shut the door on her and the other two female students as they left.  She said that John had called Jane "ugly" earlier in the night and said he wasn't interested in her—thus helping explain why he'd rudely left without saying goodbye after they'd finished hooking up.

210.    S.R. also said that the only lights on when everyone was hanging out were the LED lights, which were "bright enough.  It wasn't like it was dark, but the main light, I think the LED lights were green or something, or blue."

### *I.F.'s Interview*

211. The investigators didn't interview I.F. until after they issued the preliminary investigation report, and they failed to share her transcript with the parties (in violation of UR's policy) until it appeared in the final investigation report.

212. I.F. confirmed that J.L. was more drunk than Jane, just as J.L. herself said. . She said that she found J.L. alone at the party and spent time helping J.L. find Jane, which they eventually did, and that Jane "seemed okay," "wasn't stumbling or anything," and "was coherent and all of that."

213. I.F. said that the next day, Jane and J.L. came to her room. Jane (falsely) told her that John and D.S. had crafted a plan to get Jane and J.L. alone together, proving how quickly she started lying to others about what happened.

### *A.S.'s Interview*

214. Finally, the investigators interviewed A.S.—but not until *after* they issued the final investigation report. A.S. said that he witnessed an argument between A.M. and John later that night about John's having sex on A.M.'s bed.

215. The investigators repeatedly asked A.S. whether he had spoken with John about the case—something they never once asked J.L. during her second interview, when she suddenly remembered far more details about what she claimed Jane had told her than she had during her first interview.

216. A.S. said he talked to John after he received the notice of allegations and John was shocked by the allegations because he felt everything was consensual. A.S. said that John was "crying" when he told him about the allegations and that "there was no kind of

signal that something went wrong that night or like he did something he wasn't supposed to. It all seemed to me it was just a normal sexual intercourse."

## The Preliminary Investigation Report

217. On November 27, 2024, Title IX Coordinator Julia Green emailed John that the preliminary investigation report would be issued soon. But with the last day of classes approaching on December 9th and finals starting right after that, "practically speaking, the timing is challenging. For context, typically we would avoid having parties review evidence or a report during reading days or finals…. Given the imminence of reading days and finals, the typical path would be to hold the process until after your finals are over, or even until after winter break."

218. At the same time, she said she understood that "the parties may prefer to move forward so that this case can be resolved," so she asked John what his preference would be.

219. John's advisor responded that he would be in a homicide trial starting on December 2 for 2-3 weeks, so said he preferred to go with the "typical path" that Ms. Green herself had suggested: waiting until after winter break to release the preliminary investigation report.

220. Then, rather than simply acknowledge that request and follow the "typical path" that she herself had suggested, Ms. Green responded with inexplicable hostility and changed her position entirely. She now said that "[a]n advisor's unavailability is not good cause to extend the timeline for a month" and that she would "release the report on Thursday, 12/5," with responses due on December 16th—two days before the end of the exam period.

221. John then responded that he, too, preferred Ms. Green's original suggestion that she wait until after winter break to release the report.

222. Ms. Green was essentially unmoved. She still released the preliminary investigation report on December 5th—meaning that the review period would run well into John's exams and his advisor's homicide trial—but extended the response deadline to… Christmas Eve. Because his trial ended on December 21st, that would ultimately give John's advisor only three days to work on it with him.

### The Final Investigation Report

223. The Final Investigation Report was issued on January 21, 2025—almost a year to the day after John was issued the notice of allegations on January 25, 2024. Neither the investigators nor the Title IX Coordinator ever explained why the investigation was delayed beyond the 45-day requirement outlined in the policy.

224. The final report included a new transcript from an interview with I.F. that had taken place on January 7, 2025, as well as the three reports from the police officers who spoke with Jane. Despite the fact that the University's Title IX policy gave the parties the opportunity to "inspect and review *all* directly relevant evidence gathered" and "ten days to provide a written response regarding the report for the investigator to consider *before the report is finalized*" (emphasis added), the report was finalized before John was allowed to review or respond to this new evidence.

225. The University never told John why he was not permitted to review or respond to this additional evidence before the final report was issued.

226. Moreover, despite the fact that the 2020 Title IX regulations (34 C.F.R. § 106.45(b) (5)(vii)) state that the investigator must "[c]reate an investigative report that

42

fairly summarizes relevant evidence and, at least 10 days prior to a hearing...send to each party and the party's advisor, if any, the investigative report in an electronic format or a hard copy, for their review and written response," the University initially told John that he was not allowed to respond to the final report.

227.   On February 5, 2025, Ms. Green emailed John, "In my experience, parties often decide to highlight their concerns about the final investigation report in their opening and/or closing statements at the hearing."

228.   In an email the next day, Ms. Green doubled down on her misreading of the federal regulations, inaccurately characterizing the rule as follows: "The plain text of the regulations only provides for one opportunity to review the evidence and the investigation report....  In fact, the regulations only require an institution to share an investigation report for review and written response ten days before a decision is made through a hearing or otherwise, and notably don't require an institution to share the final investigation report with parties before a hearing, let alone well in advance to give the parties time to prepare as we have done here."

229.   Only after John's advisor threatened litigation was John given the required 10 days to respond to the report, which he did.

230.   The report claimed that I.F. wasn't initially interviewed because she did not have enough firsthand knowledge of the allegations—even though she was one of the very first people Jane supposedly spoke with the next day.

231.   The report noted the specific dates that most of the evidence was submitted to the investigators—but was curiously silent about when Jane submitted the newly added

43

police reports. Nor did the investigators explain why Jane was permitted to submit evidence after the deadline to do so had passed.

232. The report also showed how little evidence the investigators had actually tried to gather from Jane. The only time they asked her to submit any evidence whatsoever was at the end of her interview: "I know you showed us a couple of photos, you mentioned text messages. I will set up a box file so that you can easily just drag and drop whatever relevant documents, text messages you'd like to share with us." There is no indication anywhere in the report that they specifically requested, or followed up with Jane even once about, any of the following:

   a. Her text messages from the night of the incident (save for that one fleeting request);
   b. Her text messages in the days following the incident;
   c. Her text messages with J.L. between J.L.'s first (vague) interview and her second (incredibly detailed) interview; or
   d. Any of her text messages with J.L. at all, including the text she claimed to have sent J.L. the next day before saying, "That really did not feel good. I have bruises all over my neck. I really didn't like that situation."

233. The report stated that the investigators did not interview the two other female students who Jane had kicked out of the room and who would have seen her laughing in the dorm lounge right after the encounter—because they would only provide "cumulative information obtained from A.M. and S.R." and were thus "not relevant." The only one of those three female students they did interview was S.R.—who wasn't even in the lounge at that point and thus (unlike the other two) couldn't testify about how Jane was acting right after she left John's room.

234. The report next outlined what happened at the fraternity party. It incorrectly noted that Jane spent the entire night with John's roommate, A.S., who wasn't even at the party.

44

It also failed to mention that before hooking up with John, Jane had also hooked up with A.D.—which could have been where she got the hickeys.

235.    The report failed to mention that I.F. had to help J.L. find Jane after she disappeared into a bedroom with A.D.  Instead, it simply quoted I.F. as saying she didn't spend much time with Jane at the party and credulously quoted Jane as saying she would never have left J.L. alone at a school she didn't go to—even though that is *precisely* what Jane did.

236.    The report failed to mention that Jane added John on social media while they were at the party, undermining her contention that she was never very interested in him.

237.    As to what happened during the encounter, the report included investigator Sarah Shah's distorted diagram of the room, which misleadingly made it look like the beds were so far apart from each other that it would have been hard for D.S. and J.L. to hear or see what was going on, as opposed to (as the photo shows) how they were *actually* positioned:



238.    So even though John submitted that photo as evidence, and the investigators could have pasted it into their report just like they pasted other photos in their report, they instead chose to use a deeply misleading diagram that they themselves created.

239.    Worse yet, *neither of the investigators had even been in the room*. The final report says that Ms. Shah based the diagram not on what all of the witnesses said, but solely "on the layout description provided by [Jane] during her interview" and that it was "during her interview confirmed by Jane" (*not* by anyone else).

240.    Nowhere in the policy does it say that investigators are allowed to create and submit evidence like they did with the diagram.

241.    The report also summarized what J.L. said in her two interviews without mentioning her highly unusual shift from remembering almost nothing Jane told her (the first interview) to suddenly recalling a whole host of details (the second interview).

242.    As for Jane's narrative of events, the report simply picked one of the many versions of her story and recounted it as though it were the only one she had told. It said nothing about any of the many other versions; it falsely presented her narrative of events as a single, consistent story.

243.    The report, for instance quoted Jane as saying that her nipples "really hurt" hurt the next day, but left out that she'd also claimed they were red and swollen—because the SANE report found no such injuries or abnormalities on her breasts.

244.    The report also said that Jane couldn't recall how her jeans came off—failing to mention that she told Officer Hooper that John pulled them off as she tried to squirm away and told the SANE nurse that John pulled them off after she told him not to.

245.    The report further said that Jane claimed John pulled her underwear to the side and digitally penetrated her—failing to mention that she told the police officers that John *completely removed* her underwear and told them literally nothing about his digitally penetrating her at this point in the interaction, prior to the sexual intercourse.

246.    The report then said that at this point, Jane got on top of John—failing to mention that she never told the police that.

247.    The report furthermore said that Jane *walked* over to J.L. and D.S., despite the fact that she told Officer Shuman that she literally *ran*.

248.    The report also said that Jane claimed that she "tried" to say sorry to A.M. afterwards—failing to mention that A.M. said she did apologize, profusely *and while laughing*.

249.    The report inaccurately said that Jane reportedly dropped J.L. off at *home* the following day—when J.L. was actually on her way to go party at another nearby college, something no one would do if her best friend had just said she'd been raped.

250.    The report failed to mention the friend from home with whom Jane said she spoke the next day and who the investigators never bothered to interview.

251.    The report then proceeded to assess each party's and witness's credibility in a clearly biased way.

252.    With respect to Jane, it said she provided "the most specific details" about what happened, warmly calling her "candid" and "helpful." Instead of addressing the many ways that Jane had been inconsistent on what, *if anything*, she told John about wanting to stop, the report simply stated, "While Jane stated several times that she communicated to John that she did not want to engage in or like certain acts, Jane *struggled to articulate* how she made this clear to [John] verbally…." (emphasis added).  Not "told conflicting stories"—"struggled to articulate."

253.    Among the statements Jane made that the investigators characterized as "strugg[ling] to articulate" her supposed lack of consent—not a *single one of which* D.S.

47

or J.L. heard her say that night from just a few feet away—were: "This is a lot. Chill out," "Be more gentle," "I don't want you to do this," "No, there's other people in the room," "I don't want to do this," "We shouldn't be doing this here," "That's too painful, I can't do this," "Why is this happening? You weren't interested in me throughout the entire night. You didn't pay attention to me. I never really wanted this to happen," and "Stop. You're hurting me."

254.    And instead of addressing any of the many inconsistencies in Jane's narrative, the report simultaneously claimed that "given [her] alcohol consumption, it is possible that her memory may have been impaired" *and* that her "recollection of events, as stated close in time to the encounter, to DPS officers and hospital personnel are mostly consistent with what was reported to Investigators"—two things that cannot be true at the same time, and neither of which was actually supported by the evidence.

255.    Literally the *only inconsistency* the report noted in Jane's credibility section dealt with how Jane's shirt came off and whether *that* was consensual. And despite claiming that it would assess each person's credibility in part based on whether their story made sense, the report didn't mention anything about why Jane would have consensually taken off her shirt *after* John had just bitten and choked against her will, as she claimed in one of her tellings.

256.    The report also contained the following remarkable statement: "Given that Jane did not and does not have a relationship with the respondent, there is no information to suggest that she is biased against the respondent"—ignoring all of the evidence showing that Jane had pursued a largely indifferent John all night and finally hooked up with him, only to have him leave for the bathroom and never come back as soon as they finished

48

hooking up, which would certainly have given her reason to dislike him and want to get back at him.

257.    Notably, the report did not give John—who also didn't "have a relationship" with Jane—the same treatment when evaluating *his* credibility.  The very first thing it mentioned was that he gave his testimony in a "tentative and short manner," that he "did not recall much information," and that he sometimes had to "take breaks to speak with his advisor" during the interview.

258.    The report thus credited Jane for providing more details—even though those details often contradicted both each other and what the witnesses said—and discredited John because he couldn't remember everything about an unremarkable sexual encounter that had happened months earlier.

259.    The report was also quick to claim that John's testimony "was contradicted, not only by Jane and J.L., but by [John's] friends"—while entirely failing to mention all the ways that Jane's testimony conflicted with *her* friends.

260.    It concluded, for example, that while John said he and Jane had been flirting, *some* witnesses said they weren't—and held that against John's credibility. But it didn't similarly acknowledge that *other* witnesses confirmed they *were* flirting. It did not mention that D.S. (who was with them all night) said he thought they were flirting; that S.R. and J.L. recalled talking with Jane earlier in the night about whether she was interested in John; or that A.M. said that when he got to the room, he actually thought Jane and John were together.

261.    The report proceeded to mischaracterize A.M.'s testimony and said that "A.M. recalled [John] discussing that he fingered Jane, touched her neck, and 'tapped' her

butt"— even though A.M. was unclear about what John said happened and said that John had just been trying to understand what Jane might have been basing some of her allegations on (such as whether, if he'd hypothetically tapped her butt during sex, she might have called that "hitting").

262.    The report also stated as fact that "the documentation gathered also corroborates Jane's claim that she had bruising on her neck after her sexual encounter with John"— even though the pictures showed only faint marks that at most resembled light hickeys that could have just as easily been caused during her earlier hookup with A.D.

263.    The report then flipped the burden of proof on its head by stating that because John "clearly understands the seriousness of these allegations and the potential consequences of this process," he "may not have been forthcoming with all of the details he remembered."

264.    As for J.L., one of Jane's best friends and the person who was mere feet away from Jane and John the entire time they were hooking up?  The report simply repeated the following sentence *verbatim* six different times: "[J.L.] did not observe or hear any of the alleged conduct that night because music was on and it was dark."  It stated the latter two things as facts, even though both D.S. and John said that no music was playing; even though S.R. had characterized the LED lights as "bright enough" and said "[i]t wasn't like it was dark"; and even though the report contained a photo of what the room looked like lit up by the LEDs:



265.    The report also omitted the fact that J.L. left the following morning to go party at another school, despite Jane's having allegedly just told her that she'd been raped.

266.    And instead of noting that J.L. said in her first interview that she didn't remember anything specific that Jane had told her, then claimed to remember a whole host of very specific details during her second interview, the report simply said, "J.L. did not offer much reliable testimony" and "could not remember more specific details."

267.    As to D.S., the report *discredited* him because his "responses were very similar to [John's]"—twisting *corroboration* into *collaboration*. It said that D.S. anticipated topics before investigators asked about them, such as the fact that D.S. said Jane never approached him and J.L. in bed—even though D.S. was completely upfront with the investigators that John had asked him if he remembered that after John's interview. Yet when J.L. added a bunch of specific details that she claimed to have forgotten in the first interview and denied getting from Jane, the investigators gave her a pass.

268.    The report also failed to mention that Jane told Officer Taskett that J.L. was about to be assaulted that night, something J.L. herself never claimed.

51

269.    The report took a similarly unbalanced approach to evaluating whether friendship with the parties lent itself to bias.  It discounted A.M.'s credibility because he played on the same sports team as John and accompanied him to an early Title IX meeting, but it took a much different approach with Jane's friends: "Despite J.L.'s relationship with Jane, Investigators found J.L. to be honest," and "While I.F. is friends with Jane, the investigation did not reveal information to suggest that I.F. withheld or fabricated information that supported Jane."

270.    After the Final Investigation Report was issued on January 21, the investigators finally interviewed A.S. They gave the parties his interview transcript on February 14 and gave them three days to respond in writing—both violations of the policy, which stated that the parties would be able to review all evidence *before* the final investigation report was finalized and be given *ten* days to respond to anything in it.

### The Hearing

#### *Opening Statements*

271.    Before the hearing, the Title IX Coordinator sent John a "Pre-Hearing Meeting Agenda."  It stated that the complainant could make an opening statement up to ten minutes in duration or could decline to give an opening statement. It said nothing about her being allowed to give that statement—again, her *opening* statement—at any other time.

272.    John was also provided a document entitled "Title IX Formal Hearing Script." That document stated that the hearing officer would say on the record:

> Each party will now have an opportunity to describe their experience
> related to the allegations in an opening statement. Your opening statement,
> if any, may not exceed ten (10) minutes in length. The Title IX
> Coordinator will be keeping track of time and will unmute audio to give

you a one-minute warning when your ten minutes is coming to an end. The parties should send their opening and closing statements, if any, to Christine at the close of the hearing. They will be added to the Box file and I may consult them during my investigations.

273.    The hearing was held on February 24, 27, and 28, 2025.

274.    At the hearing, Jane declined to give a verbal opening statement but asked to submit one in writing—in clear violation of the Formal Hearing Script, which measured the length of opening statements in minutes, thus clearly contemplating verbal delivery. (Otherwise, there would have been a page or word limit.)

275.    John asked the Title IX Coordinator and the hearing officer for a copy of Jane's opening statement so that he could review it and so that his advisor could potentially question her about something she said in it. But the Title IX Coordinator refused to share it, reasoning that because opening statements are "optional," and because the rules required the parties to send their statements at the close of the hearing, he had no right to see it unless he needed it for an appeal.

276.    In clear violation of the Formal Hearing Script, John was thus only provided a copy of Jane's opening statement after he was found responsible.

277.    As a result, John's advisor was unable to cross-examine Jane about any of the following things she said in her opening statement:

   a.  **That her primary goal going into the night of this incident was for "J.L. to have fun, to feel welcome, and—most importantly—to stay safe the entire time."** This was in some tension with the fact that she ditched J.L. without warning to go hook up with A.D. and that J.L. had to find I.F. (a stranger) to ask for help in locating Jane.

   b.  **That Jane said D.S., John, and A.M. were "scheming for D.S. to lose his virginity" and thus that "John decided to keep [Jane] occupied."** This was in some tension with the fact that multiple witnesses said *Jane* pushed the female students and A.M. out of the room and slammed the door shut,

keeping her and John inside.

c. **That Jane said "neither J.L. nor [Jane] were in a sober state (please note the volume of alcohol she and I both drank within hours of the incident) where we could have knowingly agreed to any plan that involved sexual consent."** This was in some tension with I.F.'s statement that Jane "seemed okay," with Jane's statements that J.L.'s own encounter was consensual, with Jane's failure to claim incapacitation during her intake meeting, and with her refusal to respond to the investigators about that when asked directly.

d. **That her role was simply to be a wing woman.** This was in some tension with both J.L. and S.R.'s testimony that they had spoken to Jane about whether she was interested in John and Jane's own's admission that she exchanged social media contact information with John at the party.

e. **That she did not consent to her pants being removed.** This was in some tension with the fact that in her interview and at the hearing, Jane said she couldn't remember if she removed her pants herself.

f. **That John inserted himself into her without a condom and deliberately ignored her requests when he ejaculated inside her without her consent.** This was in some tension with her subsequent admission at the hearing that John freaked out when he realized the condom had broken and that she actually had to calm him down by telling him she had an IUD.

g. **That she "tried to get away by talking to J.L."** This was in some tension with the fact that she went over to J.L. in the middle of both of their sexual encounters, complained only about not having shaved, and then climbed back into bed with John—which is hardly consistent with wanting to "get away" from him.

h. **That she was questioned for a total of *48 hours* by public safety, the police, and the Title IX Office.** This was a clear lie: her Title IX interview lasted just 2 hours and 44 minutes, and given that she opted not to press criminal charges, there is simply no way that the police questioned her for more than 40 hours.

i. **That all of her statements about the incident during the investigation were "remarkably consistent."** That, too, was a provable lie—but John never had the chance to question her about it or anything else she said in her opening statement.

278. By contract, both the Hearing Officer and Jane's advisor asked John questions about his opening statement.

*Jane's Testimony*

279.    After John made his opening statement, Jane was the first person to testify. One of the first lines of questioning from the hearing officer focused on how much Jane had to drink that evening—even though the notice of allegations said nothing about incapacitation and focused solely on affirmative consent.

280.    Jane answered some of the questions posed to her but responded to the vast majority by claiming that she couldn't remember anymore and that whatever she said in her interview was the correct answer.

281.    Several times, while a question was pending, Jane would ask to take a break before answering and would be given one.  The hearing officer even went so far as to tell Jane that if, after hearing a question, she needed to take a break to review her prior statements, she was more than welcome to do so.

282.    The hearing officer did not extend that courtesy to John. In fact, when he asked John if he remembered having a specific conversation with S.R., and John said no and asked to see the page of the report where that was referenced, the hearing officer said, "[I]f you don't remember having the conversation, then I'm not going to show you the transcript."

283.     And sure enough, after taking a break, Jane would repeatedly return with a very specific answer to the question posed.

284.    For example, when asked if she saw people drinking at the party, Jane took a break. When she returned, she said, "I just wanted to say, I gave a lot of statements directly after this happened to the SANE nurse, to public safety, and in my public safety report. And I just want to say that I'd like to give more weight to those because I feel like

those are the most accurate depictions of what happened that night because it's been a long time."

285. And when John's advisor asked why, in contravention of her claim that John had bitten and bruised her breasts, the SANE report noted no swelling or injuries on her breasts, Jane took another break. Upon returning, she pointed specifically to pages 12, 21, and 24 of her SANE report where *she told* the nurse she had marks on her breasts—as if *telling* the SANE nurse she had marks had anything to do with whether the SANE nurse actually *saw* any marks.

286. The hearing officer never asked Jane whether she spoke with her advisor during the break or instructed her not to speak with her advisor while a question was pending.

287. The hearing officer also never pressed Jane on any topic that would have seriously undermined her credibility, focusing only on side issues that were only tangentially relevant.

288. For example, he asked her an open-ended question about her claim to have gone back to her dorm room to take a shot mid-way through the party, but he never confronted her with I.F.'s testimony that this couldn't possibly have happened because she witnessed Jane being locked out of her dorm and then run back to the party.

289. And when Jane admitted to the hearing officer that she couldn't "sternly" deny that she didn't shut the door on everyone walking out of the room—an almost-admission that she'd repeatedly lied about that—he simply moved on. He neither confronted her with her prior statements or about how this almost-admission belied her repeated claims to have had no interest whatsoever in John.

290.    Finally, when Jane claimed that the only reason she stayed in the room was to safely facilitate J.L.'s hookup, he didn't press her on that at all—failing to ask about any of the evidence showing her interest in John or why she would have monitored this hookup but not J.L.'s two hookups with R.R. and D.S. earlier that night.

291.    On cross-examination, John's advisor attempted to ask Jane about her hookup with A.D. earlier in the night—which was clearly relevant both because that could have been where she got the hickey-looking marks on her neck and because Jane may have been motivated to label one of her two hookups in the same night as "nonconsensual" in order to protect her reputation.  But the hearing officer would not allow the question, saying that "the specific nature of the relationship" with A.D. wasn't relevant.

292.    When John's advisor asked how long Jane was in A.D.'s room—which was clearly relevant to 1) the marks on her neck, 2) the credibility of her claim that she was primarily concerned with keeping J.L. safe, and 3) the fact that she stayed in the room with John not because she was interested in him, but because she didn't want to leave J.L. alone—the hearing officer cut him off and deemed the question irrelevant.

293.    When, during her (verbal) closing statement, Jane finally discussed her relationship with A.D. and what she supposedly did with him in his room, the hearing officer sat silent and allowed this new information to come into the record.

294.    When John's advisor tried to ask Jane what she thought John might have reasonably interpreted from her request that he get a condom—which was clearly relevant to whether John reasonably thought she was consenting to sex—the hearing officer said it wasn't relevant.

*John's Testimony*

295.   After Jane finished testifying, the hearing officer started to question John.

296.   He questioned John at length about whether he or anyone else brought alcohol to the party, whether he saw Jane drinking a shooter, what the route to walk back to the dorm was, and what he observed about her intoxication level—all of which went to the uncharged allegation that Jane was incapacitated and had nothing to do with affirmative consent.

297.   The hearing officer also asked John how everyone left the room and whether Jane played a role in that—putting the lie to the investigators' earlier contention that testimony from the other two female students who'd been rushed out the door wasn't relevant.

298.   The day concluded before Jane's advisor could cross-examine John, so her cross examination was set to begin at the next hearing date in two days. Jane's advisor asked the hearing officer if she could have a recording of the hearing officer's questioning of John to prepare for her cross-examination. The hearing officer said he would consider that request.

299.   The next day, Title IX coordinator Julia Green emailed John saying that his request to review Jane's opening statement was denied, but that "[g]iven the two-day break in the hearing and to ensure efficiency in Thursday's hearing session, we plan to share with [the hearing officer] and both parties and their advisors the recording or written transcript of [the hearing officer's] initial questioning of Respondent from the end of the day on Monday."

300.   John's advisor was not afforded the same luxury—he was given no transcript and only 13 minutes to prepare after the hearing officer finished questioning Jane.

301.    On cross-examination, the hearing officer allowed Jane's advisor to ask John whether he had ever in his life consumed an excessive amount of alcohol, how much alcohol it has taken for him to reach a certain level of intoxication on prior occasions, whether he had ever in his life "blacked out" from alcohol, and whether he had been drinking beer or liquor when he blacked out in the past—none of which was relevant to the question before the hearing officer.

302.    John was also asked about how he could tell if someone else was intoxicated—yet another question that sought to find evidence for an uncharged incapacitation finding.

### D.S.'s Testimony

303.    D.S. testified next.

304.    One of the hearing officer's first lines of questioning was about whether John had been drinking and whether there was alcohol kept in D.S.'s room—which would go to incapacitation, not affirmative consent.

305.    The hearing officer asked D.S. how everyone came to leave the room, again highlighting the relevance of that topic.

306.    He questioned D.S. about what specific conversations D.S. had with John about the investigation, when John told him certain facts, and whether he and John spoke before or after the complaint was issued—something he never asked J.L., who had been with Jane during the SANE exam, when she spoke with police, when she spoke with I.F., and undoubtedly had spoken with her other times as well.

307.    During cross-examination, Jane's advisor asked D.S. to look through his phone to see if he had sent any text messages to A.M. on the night of the incident. The hearing officer correctly interjected that it would be improper to allow new evidence to be

admitted in the middle of the hearing, given that the deadline for submitting evidence had long since passed (and moreover, that both UR's Title IX policy and the federal Title IX regulations require that parties be given 10 days to respond to the evidence before a hearing).

308. But right after saying that, the hearing officer went off the record. When he returned, he instructed D.S. to email him the text messages.

309. John's advisor objected that he felt the hearing officer's first decision was correct and asked why the hearing officer changed his mind. The hearing officer stated (incorrectly and rather nonsensically) that the Title IX rules on evidence restriction are intended to apply only to the parties themselves, not to witnesses—so "if a witness comes in with additional information that either wasn't fully developed during the investigation, my feeling is, let's get it out there and let everybody have an opportunity to see it."

310. The text message was from D.S. to A.M., saying that he was bringing a female student back to the room.

### A.M.'s Testimony

311. A.M. testified next. Like D.S., he was asked by the hearing officer how everyone left the room that night and if Jane closed the door on them.

312. A.M. also testified that he knew some of what Jane was alleging in part because John had read him the notice of allegations when he received it and he had attended John's initial meeting with the Title IX Office as John's support person.

313. A.M. explained that John was "very, very, very emotional" during the conversation where he told A.M. about the allegations, and that John was "shocked and trying to process what happened and what the Title IX Office was saying happened."

314.    And indeed, it was clear that A.M. hadn't spoken much with John about the incident, given that he repeatedly referred to Jane by the wrong name at the hearing and had to be corrected.

### *J.L.'s Testimony*

315.    J.L. was the last witness to testify. As he had with the other witnesses, the hearing officer almost immediately focused on how much Jane had had to drink that night—even though there was no incapacitation charge against John.

316.    J.L. told the hearing officer that Jane came over to her in bed and "said she hadn't shaved and that she doesn't ever really do anything if she's not shaved." In response to questions from John's advisor, she said she didn't hear anything occurring between John and Jane on the other bed. She said she did not hear anything that sounded like a slap or a hit. She said she looked over a few times at them and didn't see anything that caused her concern. She also never said that the room was too dark for her to see John and Jane.

317.    J.L. also admitted in response to questioning from John's advisor that she had deleted relevant evidence during the investigation.  She said that the day after the incident, she and Jane were taking pictures of things they felt would be relevant to this investigation, including of the Snapchat messages between J.L. and D.S. about A.M. yelling at John that night. The Snapchat picture shows that someone actually deleted one of the messages between D.S. and J.L.  J.L. admitted that she had not Snapchatted with D.S. prior to the night in question and that the message was deleted between November 17 and November 18, before she took a picture of the messages to submit as evidence. She claimed she couldn't remember what it said or why she deleted it, and the hearing officer never asked her about it.

**The Outcome**

318.     On April 11, 2025, UR sent John the hearing officer's determination letter.  In chronological order (and highlighting how little sense this sequence of events actually makes), he found John *responsible* for the "aggressive kissing and biting" of Jane's neck; *responsible* for choking her; *not responsible* for three different counts of nonconsensual sexual intercourse (for stopping and starting after the condom fell off once and broke once); *responsible* for digitally penetrating Jane twice (after he "adjusted his body" while fingering her); and then *not responsible* for having sex with her from behind right after that.

319.     On its face, this finding made no sense, and the hearing officer never explained how someone might consent to intercourse after having been nonconsensually bitten and choked, then *not* consent to being fingered right after that consensual intercourse, then consented again to intercourse right after the nonconsensual fingering.

320.     This was 442 days after the notice of allegations and 42 days after the conclusion of the hearing.

321.     Neither the investigators nor the Title IX Coordinator ever told John why the investigation and adjudication process was delayed beyond the 75-calendar-day timeline dictated by the policy or why he wasn't provided the outcome within 21 calendar days of the hearing, as also dictated by the policy.

322.     The hearing officer began by outlining the allegations against John and said that he specifically considered the mid-hearing text he'd ordered D.S. to submit.

323.     The hearing officer then moved on to address Jane's alcohol consumption.  While he found that she was not incapacitated, he nonetheless credited her highly implausible

story about how much she'd had to drink—finding that she had taken "about 5 shots of Fireball liquor" (33% ABV) "over the course of an hour and forty-five minutes" before going to the party.

324.    According to Alcohol.org's online BAC calculator (to which the National Institute on Alcohol Abuse and Alcoholism's website links), a 125-pound female  would have had a BAC of approximately .17 or above, which is more than twice the legal driving limit in New York, and which Alcohol.org says would lead to the following symptoms: "You may be feeling nauseous at this point, possibly even vomiting. Your reflexes can be slow, and you're likely staggering and slurring your words. You're probably going to experience impaired sexual functioning and your mental capacities may be clearly reduced."  Yet the hearing officer nonetheless found that Jane "felt the effect of the alcohol on the way [to the party] but was still in control of herself," and "did not have any difficulty walking, wasn't incapacitated,…and was 'socially comfortable.'"

325.    The hearing officer then found the following:

   a.   That Jane consensually kissed John;

   b.   That Jane's shirt was taken off consensually (the finding didn't specify who took it off);

   c.   That Jane's jeans somehow came off (the finding doesn't specify who took them off, whether it was consensual, and whether it was forcibly done over Jane's protests);

   d.   That John nonconsensually choked Jane, but not to the point of dizziness as she'd claimed (without explaining why it wasn't crediting that aspect of Jane's claim);

   e.   That John nonconsensually bit Jane's neck, but did not bite her nipples as she'd had claimed;

63

f.  That John nonconsensually digitally penetrated Jane, but the hearing officer said he did not have enough evidence to determine when or how many times this happened;

g.  That notwithstanding that Jane *hadn't* consented to any of the violent conduct to which she'd just been subjected, Jane *did consent* to having intercourse with John twice—despite her repeated and emphatic claims that she'd said "no";

h.  That he could not find that John and Jane had sex a third time, despite Jane's claiming that they did *and* that John intentionally ejaculated inside her at the end;

i.  That the encounter ended when John said he had to go to the bathroom and never returned (failing to mention, and thus clearly not crediting, Jane and J.L's allegation that right after John left, she told J.L. and D.S. that she "felt like [she had] just been raped" and asked D.S. to kick John out); and

j.  That Jane was seen laughing about the sexual encounter to A.M. minutes after she left the room.

326.  The hearing officer then made the following incoherent credibility finding with respect to Jane (emphasis added):

> In general, over the course of the hearing and questioning, the decision-maker found [Jane's] manner of responding to the questioning to be **somewhat** evasive at times. In the decision-maker's opinion, [Jane's] **tendency to be evasive** was **somewhat detrimental to her overall credibility** as it gave the impression that [Jane]was **avoiding the questioning [*sic*] posed** and being **less than forthright**. **This credibility assessment should not be construed to imply that [Jane] was being deceitful.** However, it was the decision-maker's opinion that the **perceived evasiveness distracted from her overall credibility**.

327.  The hearing officer did not explain why—given that he had called Jane "evasive" three times in the span of three sentences, accused her of "avoiding the question[s] posed," and found that she had been "less than forthright"—he nevertheless did not want to "imply that [Jane] was being deceitful."  Instead, he just waved all of those things aside as "distract[ing] from her overall credibility"—as if there were a difference between credibility and *overall* credibility.

328.    Given the hearing officer's evident willingness to bend over backwards to avoid calling Jane a liar, it is thus little surprise that he failed to address how and even whether any of the following claims that Jane had made about that night affected her credibility:

a.    That John was encouraging her to drink throughout the night, and even gave her two shooters at the party, which would have meant she'd had an impossibly high 8 shots that night;

b.    That John gave her more alcohol in the middle of their sexual encounter and told her to "get on [his] level," something that he denied and that J.L. and D.S. said they never saw or heard;

c.    That J.L. was about to be raped in the room at the same time Jane was;

d.    That John and D.S. had crafted a plan to get J.L. and Jane alone, huddled up together in the room, and then kicked everyone else out of the room over Jane and J.L.'s protests;

e.    That Jane played no part in kicking the female students out of the room and just quietly sat on the bed waiting to watch a movie with her friend;

f.    That John choked Jane to the point of dizziness and causing her vision to be blurry;

g.    That the choking, neck-biting, and verbal protests happened before Jane consensually took her shirt off;

h.    That John bit Jane's nipples and held her down as he did it;

i.    That J.L. looked at Jane's nipples the next day and saw they were swollen and had broken skin (contradicting the SANE nurse's evaluation);

j.    That after John said that, he turned Jane on her side and had sex with her again against her will;

k.    That after ejaculating, John had sex with Jane a third time, and that when she asked him to use a condom, he said "I'm not wasting another condom on you," something neither J.L. nor D.S. heard;

l.    That the third intercourse ended because Jane said she couldn't do it anymore, and John said, "Can you at least put it in your mouth for 2 minutes?", something neither J.L. nor D.S. heard;

65

    m.   That John hit and bit Jane's butt as she said "I do not want to do this," something neither J.L. nor D.S. heard; and

    n.   That Jane "ran" over to J.L. before John left the room, and told her she felt liked she had just been raped, and had D.S. kick John out of the room over John's protests that he wanted to stay.

329.    The hearing officer noted that both parties had "minor variations" in their accounts but claimed that those variations were not "significant" or "substantive" and thus did not affect his credibility analysis.  Here are some of the "minor variations" in Jane's story that the decision failed to address:

    a.   That Jane said at the hearing and to the investigators that the removal of her shirt was consensual, but had told the SANE nurse and the police officers that she had been bitten and choked and told John to stop *before* her shirt came off;

    b.   That Jane had been inconsistent about whether John forcibly took her jeans off or whether she had done that herself—which the hearing officer summarized thusly: "Thereafter, their respective layers of clothing came off nearly simultaneously, including Jane's jeans";

    c.   That in some of her reports, Jane never mentioned digital penetration before intercourse, other times said it happened once during the whole encounter, and other times said it was twice—which the hearing officer misleadingly summarized as if she'd been consistent all along: "Jane reported that John engaged in nonconsensual digital penetration of her vagina throughout the encounter at various times."

    d.   That Jane told the SANE nurse that John forced her on top of him but told the investigators she climbed on top of him voluntarily to gain more control of the situation.

    e.   That Jane told the investigator that after the second condom broke, John said "I'm not wasting another condom on you" when she asked him to get a new one, but then said at the hearing that John actually "freaked out" after the condom broke and she had to calm him down.

330.    The variations in John's story that the hearing officer referred to paled in comparison to the variations in Jane's.

331.     The hearing officer also "deemed to be most central to the allegations at issue" the testimony not of J.L. or D.S., who were just a few feet away when all of this happened, but of *A.M.*—because John had supposedly admitted to him after seeing the notice of allegations that he'd fingered Jane.

332.     The hearing officer did not address the fact that A.M.'s memory of what John had actually told him was very fuzzy, in that he told the investigators both "I think he fingered her" and "I know he fingered her, and then I think he did have sex." The hearing officer also failed to mention that A.M.'s memory could have been influenced by his having served as John's support person during his first meeting with the Title IX Office to review the allegations—meaning that he would have heard everything Jane alleged and could have confused what she claimed with what John had told him.

333.     He also found, in one single sentence, that all non-party witnesses were credible without explaining why—or mentioning the highly exculpatory testimony that so many of them had given, most notably J.L. (didn't see or hear anything nonconsensual), D.S. (same), and A.M. (saw Jane laughing about the hookup right afterwards).

334.     And despite having found John more credible than Jane (saying that he "appeared to testify candidly and with a greater degree of confidence in answering the questions posed, either by the decision-maker or under cross-examination," and calling him "generally credible"), the hearing officer proceeded to inexplicably find *against* him for the neck biting, choking, and two instances of digital penetration—*but not the two instances of sexual intercourse that happened in the middle of those things*.

335.     The hearing officer found John *not responsible* for biting Jane's nipples because there were "no objective observations of such injuries" documented in the medical

records—yet failed to go a step further and consider whether Jane and J.L. might have just made this up.

336.    The hearing officer found John *not responsible* for the first two instances of sexual intercourse despite Jane's claim that she told John she didn't want to because, as he drily noted, "[Jane's] requests on two separate occasions that [John] get and use a condom is contrary to the assertion that she verbally objected to sexual intercourse."

337.    The hearing officer found John *not responsible* for the third instance of sex because Jane and John's stories conflicted and there was no evidence to break the tie.

338.    The hearing officer found John *not responsible* for biting and hitting Jane's butt because "there was no corroborating evidence of auditory or visual observations from the other parties in the dorm room at any time"—in other words, the two people who were lying in a bed just a few feet away never saw or heard anything like this.

339.    And, in the closest he ever came to saying that her allegation also made no sense, he added that John "offered plausible testimony regarding the physical difficulty that would be associated with biting [Jane's] buttock if they had been engaged in sexual intercourse in the positions as alleged"—given that it is indeed hard to bite someone's buttock if you are currently having sex with them.

340.    The hearing officer also found John *not responsible* for having sex with Jane without a condom, given John's emotional reaction upon learning that the condom had broken and Jane's immediate effort to reassure him by saying she also had an IUD. In other words, the hearing officer credited John's testimony on this point despite its being wholly inconsistent with Jane's story—yet didn't hold this against her broader credibility.

341. The hearing officer then proceeded to find John responsible for several of the allegations, but as to *each* of them, he explained only why he believed the actions—biting, choking, and digital penetration—*occurred*. He gave no explanation as to why the evidence showed they were also *nonconsensual*. Instead, he found John responsible because John had not *affirmatively proven* they were consensual.

342. The hearing officer found John *responsible* for "aggressively" kissing and biting Jane's neck because "testimonial and objective medical proof" showed that "touching, kissing, and biting of Jane's neck did occur." He failed to explain why he did not believe the marks were consensual hickeys or might have come from her earlier hookup with A.D. He said instead that "the lack of evidence demonstrating affirmative consent" was the basis for finding John responsible (for the biting).

343. The hearing officer also said he based that determination on Jane's "nearly contemporaneous reporting to medical staff," yet never mentioned that that same "nearly contemporaneous reporting to medical staff" also claimed there was nonconsensual sexual intercourse, which he found John *not* responsible for.

344. The hearing officer found John *responsible* for choking Jane, but not for long enough to make her dizzy.

345. As he had with the hickey allegations, the hearing officer also said he based that determination on Jane's "nearly contemporaneous reporting to medical staff"—again failing to explain why that would not also require him to credit Jane's testimony in that same report about nonconsensual sexual intercourse, too.

346. The hearing officer also failed to mention that Jane didn't mention choking at all to Officer Taskett.

347. The hearing officer also stated inaccurately that John had admitted to choking Jane and that there was "no dispute" this occurred—which was simply false.

348. In his interview, John said he actually could not remember if he touched Jane's neck at all and that if he did, he wouldn't have choked her. He said that, if anything—and again while noting that he didn't remember doing it and doubted he would have done it—it would have been a light hand placement.

349. Then at the hearing, John said, "[A]t no point did I choke Jane in our entire interaction." And as he had in his interview, he added that although he didn't remember touching her neck at all, at most it would have been "a gentle hand placement or placement for leverage that she may have misrepresented to investigators as choking…but at no point did I ever choke her."

350. The hearing officer also failed to mention that neither J.L. or D.S. saw or heard any evidence of choking.

351. And as with the hickey allegation, the hearing officer addressed the choking allegation in a vacuum—never answering the question of why, if John had nonconsensually choked Jane, she would have failed to mention that when she left the bed to complain to J.L. about not having shaved, then proceeded to get back into bed with John and have consensual sex with him twice.

352. Nor did the hearing officer address how finding that John had nonconsensually choked Jane could be reconciled with his own factual finding that, at the end of the encounter, Jane and J.L. were "laughing after exiting the room."

70

353.    As with the biting, the hearing officer's only stated basis for finding that the alleged choking was *nonconsensual* was to flip the burden of proof by stating that there was "no evidence that affirmative consent was obtained."

354.    The hearing officer also found John *responsible* for nonconsensual digital penetration—even though he was unable to say when or even how many times it happened: "[T]here was insufficient information to determine by a preponderance how many times and in what sequence this digital penetration occurred."

355.    Because Jane said this happened and John denied it, the hearing officer broke the tie by relying on A.M.—a non-eyewitness whose testimony he somehow deemed the "most central to the allegations at issue."

356.    The hearing officer stated that John must have fingered Jane because "A.M. learned from John that he had fingered Jane on the night in question."

357.    But the hearing officer failed to note that John described the entire encounter as *consensual*—meaning that his testimony could not possibly be used to break a tie as to whether the fingering, if it happened at all, was *not* consensual.

358.    Moreover, the hearing officer failed to mention that A.M.'s memory of what John had actually told him was clearly fuzzy, or that he could have been confused given that he attended John's first in-person meeting with Title IX, as explained above.

359.    The hearing officer failed to mention that neither D.S. nor J.L. saw digital penetration occur, that D.S. said John never mentioned anything about it, and that I.F. said she couldn't recall what Jane told her it.

360.    The hearing officer failed to explain how *nonconsensual* digital penetration could be reconciled with Jane's behavior (laughing and joking with A.M.) immediately after the

71

encounter. His decision gave no reason at all supporting the conclusion that the digital penetration, if it occurred, was *nonconsensual*.

361.   Finally, the hearing officer suspended John for one year and said that he did so in part because John was already on probation—failing to mention that the probation was imposed for a conduct violation that happened *more than a year* after the encounter with Jane, that related only to hosting parties (hardly a capital offense in college), and that applied to everyone who lived in John's six-man suite.

### The Appeals

362.   John and Jane both filed timely appeals.

363.   John appealed on the following grounds: that the investigators and the hearing officer had improperly barred him from looking into Jane's hookup with A.D. earlier that night, which could have been where she got the hickeys; that the hearing officer misapplied the preponderance standard; that the Title IX Coordinator had a conflict of interest, in that she previously was a partner at the same law firm where Jane's grandfather had once been a partner; that the 75-day deadline to resolve the case was violated; that he was wrongly denied access to Jane's opening statement, given that she was allowed to submit it at the end of the hearing and he was not allowed to review it until after he was found responsible; that the investigators erred by not interviewing the two other female students who Jane kicked out of the room and whose testimony would have undermined Jane's false denial of having done that; and that the sanction was too harsh.

364.   Jane's appeal argued that the sanction was too lenient; that the hearing officer did not apply credibility standards equally; that he didn't give enough weight to the SANE

and police reports; that he improperly analyzed each act in isolation rather than looking at the encounter as a whole; that he did not take into account the effect fear could have had on Jane; and that the investigators failed to interview the two other female students who had been in the room.

365.    John responded to Jane's appeal and Jane responded to John's appeal.

366.    A three-member appeals panel chaired by Rachel Koegel—who had been trained by Roe's advisor and was her advisor's successor as the Title IX coordinator—denied both appeals.

## UR's Title IX Training Materials

367.    The outcome in John's case was affected by UR's gender-biased manner of training its Title IX staff.

368.    Senovia Moncada, the lead investigator in John Doe's case, was hired as a "Lead Equal Opportunity & Title IX Investigator" in January of 2022.

369.    Upon information and belief, Ms. Moncada, as well as Rachel Koegel, the Director of Investigation who would later deny John's appeal, attended UR's spring 2023 trainings for the Title IX staff.

370.    In the spring of 2023, UR trained[2] its Title IX staff on how to conduct appropriate investigations and urged them to "consider the impact of trauma," which can cause "fragmented memory and non-linear order of events." The training noted that there is "no right or wrong way to respond" to trauma.

---

[2] https://system.suny.edu/media/suny/content-assets/documents/sci/posted/SCI-Slides---Day-2-Part-three.pdf.

371.    In another spring 2023 training,[3] the UR staff was told they could *assume that any allegations were true* and assess whether there was a risk of *reoffending* when deciding whether it was appropriate to offer the respondent informal resolution in any given case: "One potential guidepost: if allegations are true, would it be appropriate for accused to remain on campus (on-going threat to campus community → gravity of the alleged offense, repeat offender, risk of repeating, weapons, minor victim, etc.)."

372.    In the most shocking spring 2023 training,[4] however, UR trained its staff on the "neurobiology of sexual assault," which was focused almost entirely on using neurobiology as a way to plug any holes in a complainant's story.

373.    Despite the entire purpose of the Title IX process being to make a determination about whether someone is actually a victim, the training assumed all complainants were victims by (1) repeatedly referring to them as such, and (2) noting that it was specifically teaching about nonconsensual encounters where either the respondent didn't realize what he was doing was nonconsensual or actually knew it wasn't and proceeded anyway.

374.    The training explained 1) why complainants don't always fight, yell or otherwise resist or leave; 2) why complainants can have memory gaps; 3) why complainants can have memories that are inconsistent or contradictory; and 4) why complainants can struggle to recall the sequence of what they can remember.

375.    The training said it was "rare" for a person to lie or falsely accuse someone of sexual assault. It trained the staff on the fact that many people "freeze" as a "survival

_____

[3] https://system.suny.edu/media/suny/content-assets/documents/sci/posted/Spring2023_Informal-Resolution-Training.pdf.
[4] https://system.suny.edu/media/suny/content-assets/documents/sci/posted/Spring2023_Neurobiology-Trauma.pdf.

74

reflex" during sexual assaults and tried to debunk the idea that "fight or flight" are normal responses to a sexual assault: "Most people don't fight or flee while being sexually assaulted," the training said.

376. The training went on to say that stress and fear impair the prefrontal cortex. It explained that as a "self-protection habit," complainants are often "polite, passive [or] submissive" to "unwanted sexual advances [or] dominant or aggressive people."

377. Examples of the "polite" things a complainant might say in response to a sexual assault included, "my boyfriend will be angry," "you've got a girlfriend," and "I have to leave soon." In what it deemed as a reasonable way to describe a sexual assault, the training gave the example of a victim saying, "I tried to be as polite as possible," "I wanted to not cause a conflict," "I didn't want to offend him," and "I felt like I was frozen."

378. To illustrate this, the training—which was for cases involving college students—used pictures of young children about to be physically abused.

379. The training said paralysis caused by the "perception of inescapability" is "not uncommon in sexual and non-sexual assaults." It cautioned investigators about making judgments on the facts that a complainant "did not resist, [] attempt to escape, [] scream, *[or was an] active participant*" (emphasis added)—**as if being an *active participant* in a sexual encounter would not reasonably suggest to a respondent that a complainant was consenting.**

380. The training then showed an excerpt from an article entitled, "Repeat Rape by College Men"—not by rapists in general—which stated that "research" suggests that "about two-thirds of college rapists are repeat offenders, who account for the great

majority of rapes (over 90%), and that about one-fourth of college rapists admit to committing rapes over multiple years of college."

381. The training did not cite a single source for this remarkable statistic.

382. The training said complainants "need to be truly heard and understood," and thus encouraged investigators to not "jump to conclusions."

383. It did not encourage investigators not to "jump to conclusions" about respondents.

384. As to the fact that complainants can have memory gaps, the training encouraged investigators to just focus on getting the "the central details" from the complainants because complainants can have trouble encoding details during an assault.

385. It said that stress—such as during a Title IX interview—impairs retrieval of "weakly encoded" memories, so "very stressed or traumatized victims cannot recall everything recorded in their brains, no matter how good and gentle the interview."

386. The training did not similarly encourage investigators to get only the "central details" from respondents or to be "gentle" during the interview.

387. It also alleged, without citing any evidence, that "recall can get better over time" to explain the fact that a complainant might recall something at a second or third interview that they explicitly didn't recall in the first interview.

388. The details of a complainant's attack are "highly vulnerabl[e] to distortion," said the training, so investigators should just get the "gist." In other words, the central detail that the complainant was raped is something *not* likely to be distorted, but the specific details of what she said and what the alleged perpetrator did *would* be reasonably distorted due to stress and trauma, and so should not be asked about. The training stated,

"Lots of details missing, even some central details? **Gist still there**" (emphasis in original).

389.    It did not say anything about only the "gist" being important when it came to respondents.

390.    If a complainant had been drinking a low or moderate amount of alcohol before an alleged assault, the training explained that their encoding of context would be impaired, but not their encoding of sensations. So complainants might remember how they felt (*e.g.*, scared), but not specific details of an assault (*e.g.*, what the respondent actually did).

391.    The training did not say anything about the effect of alcohol on respondents.

392.    If a complainant consumed a "severe" amount of alcohol or drugs, their context and sensation encoding can be impaired, but "fear/horror/pain can 'break through' severe alcohol/drug effects"—another spin on the "recovered memory" myth that has been disproven by science for decades.[5]



---

[5] *See generally* ELIZABETH LOFTUS & KATHERINE KETCHAM, THE MYTH OF REPRESSED MEMORY (1994); Harlene Hayne, Elizabeth Loftus, & Maryanne Garry, *On the Continuing Lack of Evidence for Repressed Memories*, BEHAVIORAL AND BRAIN SCIENCES 29(5), 521-22 (2006); G.A. Bonanno, *The Illusion of Repressed Memory*, BEHAVIORAL AND BRAIN SCIENCES 29(5), 515-516-22 (2006).

393. According to the training, if a complainant only remembers a "fragment" of a memory, that's because there was usually fear, horror, or pain occurring. And interviewers shouldn't even push for *a sequence of events* because that can actually "create inconsistent memories" and "even lies":




Interviewer pushing for peripheral details or sequence, asking leading questions…

Can CREATE inconsistent memories

Interviewer doubting and disbelieving…

Can CAUSE inconsistencies, even lies

394. The training ended by citing to an article entitled, "Why Incomplete Sexual Assault Memories Can Be Very Reliable," which stated that such memories are "understandable—if we learn the basics of how memory works and we genuinely listen to survivors."

395. The training did not say anything about listening to respondents, or indeed say anything at all about how best to interview them.

396. Upon information and belief, Julia Green was hired as UR's Title IX Coordinator on or around June 21, 2023.

397. In the summer or fall of 2023 (the PowerPoint itself says summer, while the UR website says fall), UR conducted another training[6]—this time training its Title IX staff on how to resolve cases through restorative justice rather than through the formal

---

[6] https://system.suny.edu/media/suny/content-assets/documents/sci/posted/Fall2023_Restorative-Justice.pdf.

investigative process. Upon information and belief, Ms. Green, Ms. Moncada, and Ms. Koegel attended the training.

398.    The training often referred to complainants as "survivors," "victims," or the "harmed party," and to respondents as "offenders."  It noted that "investigation/adjudication is a system designed by lawyers" that has resulted in "deep, universal dissatisfaction."

399.    It explained that restorative justice is a system designed to bring together "everyone affected by wrongdoing" because "traditional investigative/adjudicative processes can often be incompatible with needs of victims/survivors."  It did not say that such processes can be "incompatible" with the needs of respondents.

400.    The investigative process, it said, has the "potential for re-traumatization" of survivors and is "reluctan[t] to expose offender[s] to severe disciplinary sanctions." It does not say anything about the effect of the investigative process on respondents.

401.    The training criticized the investigative model because "when an assailant is charged with a crime, the first thing they're told is to deny guilt – which is exactly the opposite of what many survivors want."

402.    The training did not mention that sometimes people who are charged with crimes deny guilt because they are innocent.

403.    The training presented data allegedly posted on the University of San Diego's Center for Restorative Justice citing a "Holland & Cortina 2017 Survey at Midwestern University" that in 2017, 34% of a population of female students were sexually assaulted, but only 2% filed formal complaints. What the training did not reveal is that that study was explicitly gendered (it sought input only from female students, and excluded two

participants who later came to identify as men) and accepted on faith its participants' claims to have been assaulted.

404.     The training encouraged restorative justice as a way to "mitigate trauma" by "offering victim-centered methods of accountability…where victims' voices are placed center stage."

405.     The training did not say anything about the importance of listening to, or even valuing at all, respondents' voices.

406.     It encouraged facilitators who are considering whether restorative justice is appropriate in any given case to assess whether the respondent, *but not the complainant*, is participating in good faith.

407.     The training concluded with a presentation on how to ensure respondents actually take responsibility for their actions. It said that "accountability . . . means encouraging offenders to understand the impact of their behavior—the harms they have done—and urging them to take steps to put things right as much as possible."

408.     Nowhere in the entire training was it suggested that a respondent might actually not have done something he was accused of doing. Nor does it suggest anywhere that complainants can fabricate stories, or can simply be mistaken about in their memories about what may have occurred.

### UR's Sexual Misconduct Policies and Procedures

409.     Upon information and belief, when John enrolled at UR and paid tuition, he and UR became mutually bound by the promises outlined in the "University of Rochester Title IX Policy ("Title IX Policy")," the "Student Sexual Misconduct Policy (SSMP),"

and the "Student Code of Conduct (Code of Conduct)" all of which are published on UR's website and provided to students upon matriculation.

410. The Title IX Policy makes certain contractual promises to UR's students about how the university will handle complaints of sexual misconduct reported by students.

411. The Title IX Policy states that it complies fully with Title IX of the Education Amendments of 1972 and applies to all members of the UR community, including students and staff.

412. The Title IX Policy designates Julia Green as the Title IX Coordinator.

413. Among other things, the Title IX Policy prohibits all instances of sexual harassment and sexual assault, which are defined in Section IV of the policy.

414. The Title IX Policy states that accused students are "presumed not responsible" and may be found responsible only if "a preponderance of the evidence" shows that a violation has occurred.

415. The Title IX Policy dictates that the procedures outlined in Section VI will be used to investigate and adjudicate complaints of sexual misconduct.

416. When a formal complaint is made, the Respondent will be given written notice that details "the allegations of sexual harassment…with sufficient details known at the time" to allow the Respondent "to prepare before any initial interview."

417. The written notice will be provided to parties "as soon as practical and within seven [calendar] days after receipt of the Formal Complaint."

418. "If, during the investigation, the University decides to investigate additional allegations not included in the initial notice…it will give notice of additional allegations and the other relevant policies to the Parties."

419. Investigations will be conducted by individuals with "appropriate training and experience investigating allegations of Sexual Harassment."

420. The Title IX Policy also states, "While the University is responsible for gathering sufficient evidence about the allegations in the Formal Complaint to reach a determination of responsibility, Parties may discuss the allegations, speak to potential witnesses, and gather evidence if they choose."

421. It further dictates that "[e]ach Party is expected to provide the investigator with any evidence they wish to be considered within ten days after receiving the Written Notice [] notifying the Party of the Formal Complaint."

422. The Title IX Policy also states that:

> Before the investigator has completed the investigative report, each Party will be given the opportunity to inspect and review all directly relevant evidence gathered, whether or not the University intends to rely on it at the hearing. The investigator will ensure evidence is shared in hard copy or electronic format and each Party has ten days to provide a written response regarding the evidence to the investigator for the investigator's consideration.

423. The Title IX Policy promises that "[a]fter the period for Party evidence review has ended, the investigator prepares a report fairly summarizing the relevant evidence gathered and shares a copy of the report with each Party…Each Party has ten days to provide a written response regarding the report for the investigator to consider before the report is finalized."

424. The Title IX Policy mandates that evidence of a Party's sexual history or prior sexual behavior shall not be deemed relevant unless it is "offered to prove that someone other than the Respondent committed the alleged Sexual Harassment."

425.    Hearings are conducted by a Hearing Officer who determines responsibility and sanctions. Advisors may cross-examine Parties and witnesses and, after each question is asked, the Hearing Officer will rule on whether the question is relevant. The Title IX Policy also mandates that "[t]here is no opportunity to object or further argue about the appropriateness of a question after the Hearing Officer has made and communicated its decision regarding the relevancy of a question."

426.    The Title IX Policy dictates that the Hearing Officer will make a finding based on a preponderance of the evidence and will issue his findings within twenty-one calendar days of the conclusion of the hearing. And it allows each Party to submit an impact statement for the Hearing Officer's consideration when the Hearing Officer is deliberating on a sanction.

427.    The Title IX Policy states that the entire investigation and adjudication is "typically resolved within seventy-five days of the filing of the Formal Complaint." Investigations themselves should be completed within 45 calendar days. If the investigation is not completed within 45 days, "the investigator notifies the Parties of the delay and the expected date upon which the investigation will be completed."

428.    The Title IX Policy also states that "all rules and restrictions relating to the conduct of hearings, appeals, interviews, and witness gatherings apply equally to both Parties."

429.    Moreover, "[a]ll Parties have equal opportunity to present witnesses, fact and expert, and other inculpatory and exculpatory evidence."

430.    Investigators, Hearing Officers, and Title IX Coordinators are evaluated for potential conflicts of interest or general bias and are precluded from participation in the process if conflicts of interest or bias are found to exist.

431.    Anyone accused of violating the policy is presumed not responsible until a determination is made at the conclusion of the process.

432.    According to the policy, "If a delay is expected, all Parties are given written notice explaining the delay, the reason for the delay and the period of time the delay will last. Delays are only permitted if reasonable and for good cause. Examples of permitted delays include 'the impossibility of a Party, a Party's advisor, or a witness to be present.'"

433.    The Title IX policy also states that the materials used to train Title IX Coordinators will be available on the University website for seven years.

## History of Title IX and Gender Bias at UR

434.    UR has been under a growing amount of pressure to take action against male respondents—or risk facing severe public backlash—ever since the inception of the #MeToo movement.

### *Pressure from the Federal Government*

435.    The pressure on UR began back in 2011 when the Education Department's Office for Civil Rights (OCR) issued a "Dear Colleague Letter" (DCL), which governed the ways schools were to enforce Title IX and address claims of sexual assault on their campuses.  That letter sounded a "call to action" and instructed universities to "minimize the burden on the complainant" in reporting sexual misconduct to the university—citing

the later-debunked statistic that "1 in 5 women are victims of completed or attempted sexual assault while in college."[1]

436.    Upon the DCL's issuance, then-Vice President Biden touted the letter's enforcement regime in explicitly gendered terms, championing a culture that would teach "all you guys in the audience, no matter what a girl does, [it's] never okay to touch her without her consent."[7]

437.    Catherine Lhamon then became the head of OCR in 2013 and continued pressing this victim-centered agenda.[8]  Under her guidance, OCR published a document titled *Questions and Answers on Title IX and Sexual Violence* on April 29, 2014.[9] That document encouraged universities to adopt a trauma-informed approach to resolving sexual misconduct complaints, urging them to hold hearings that do not inflict "additional trauma" on the complainant or "revictimiz[e] them."[10]

438.    An OCR press release notified the public that, on May 1, 2014, Ms. Lhamon would be speaking at the culmination of an event titled, "Walk a Mile in Her Shoes," "an event that will raise awareness about sexual assault and highlight men's roles in preventing sexual violence."[11]  And in August 2015 she would tell another national media

---

[1] https://obamawhitehouse.archives.gov/sites/default/files/dear_colleague_sexual_violence.pdf.
[7] https://www.youtube.com/watch?v=Mud-pQ-NZWU.
[8] Out of office during the first Trump Administration, she reclaimed the position in October of 2021.
[9] https://www.ed.gov/media/document/questions-and-answers-title-ix-and-sexual-violence-33916.pdf.
[10] *Id.*
[11] "U.S. Assistant Secretary for Civil Rights Catherine E. Lhamon to Visit Two California Universities to Highlight Successes in Addressing Community Responses to Sexual Assault" (available at https://www.ed.gov/news/mediaadvisories/us-assistant-secretary-civil-rights-catherine-e-lhamon-visit-twocalifornia-universities-highlight-successes-addressing-community-responsessexual-assault, last visited January 25, 2018).

publication, "'We don't treat rape and sexual assault as seriously as we should.'"[12]

"There is 'a need to push the country forward,'" she said in August 2015, echoing the same sentiment.[13]

439.    In October 2016, in a story on OCR's Title IX campaign, one media outlet stated:

> Lhamon says she is frustrated.  As she sat in her Washington, D.C. office during an interview with SI.com, she said she couldn't help but to think about the women who are suffering every day.[14]

440.    "It's nice when you carry the big stick of the federal government," she would say again in October 2016, leaving no doubt that the threat of having one's federal funding yanked remained very real.[15] "Do not think it's an empty threat," she had told a group of university administrators back in July 2014.[16]

441.    It was against this backdrop that UR was thrust into the center of a national media frenzy during the "Me Too" movement, beginning in March 2016. Since then, UR has been under repeated pressure for allegedly mishandling claims of sexual misconduct.

---

[12] D.S. G. Savage and Timothy M. Phelps, "How a little known education office has forced far-reaching changes to campus sexual assault investigations," LOS ANGELES TIMES (August 17, 2015) (available at http://www.latimes.com/nation/lana-campus-sexual-assault-20150817-story.html, last visited January 25, 2018).
[13] *Id*.

[14] Scooby Axson, "Explaining Title IX and how sexual assaults are prosecuted on college campuses," SI.com (October 21, 2016) (available at https://www.si.com/college-football/2016/10/20/title-ix-sexual-assault-explained, last visited January 25, 2018).
[15] *Id*.

[16] *See, e.g.*, Rachel Axon, *Feds Press Colleges on Handling of Sex Assault Complaints*, USA TODAY (July 14, 2014), http://www.usatoday.com/story/sports/ncaaf/2014/07/14/college-sexual-assaults-dartmouth-summit/12654521/ (last visited January 25, 2018); Robin Wilson, *2014 List: Enforcer*, THE CHRON. OF HIGHER EDUCATION (Dec. 15, 2014), http://www.chronicle.com/article/Enforcer-Catherine-E-Lhamon/150837/ (last visited January 25, 2018); Tyler Kingkade, *Colleges Warned They Will Lose Federal Funding For Botching Campus Rape Cases*, THE HUFFINGTON POST (July 14, 2014), http://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html (last visited January 25, 2018).

### *The "Me Too" Movement and Negative Title IX Publicity at UR*

442.    UR enrolls approximately 6,000 undergraduate students, far fewer than the nation's largest universities. But it found itself at the dead center of the "Me Too" movement when graduate students Celeste Kidd and J.L. Cantlon accused UR Professor Florian Jaeger of sexual harassment in March of 2016. Their accusations were one of the stories that sparked the whole #MeToo movement. They quickly became "icons of the national #MeToo movement,"[17] landing themselves on the front cover of *Time* Magazine with Taylor Swift, Ashley Judd, Alyssa Milano, and Tarana Burke (the founder of the #MeToo movement).[18] They were dubbed the "Silence Breakers" and named the 2017 *Time* Persons of the Year.[19]

443.    Before Kidd and Cantlon rose to fame, Kidd and another professor had lodged internal complaints against Professor Jaeger.[20] UR investigated and cleared Professor Jaeger of wrongdoing in both cases.[21] But then, seven complainants, including Kidd and

---

[17] Justin Murphy, *UR Settles Federal Sexual Misconduct Lawsuit for $9.4 Million*, DEMOCRAT & CHRONICLE (March 27, 2020), https://www.democratandchronicle.com/story/news/education/2020/03/27/university-rochester-federal-sexual-misconduct-lawsuit-settlement-9-4-million-jaeger-kidd-cantlon/2916365001/ (last visited October 15, 2025).

[18] Edward Felsenthal, *TIME's Person of the Year: The Silence Breakers*, TIME, https://time.com/magazine/us/5055335/december-18th-2017-vol-190-no-25-u-s/ (last visited October 15, 2025).

[19] *Id*.

[20] S.R. Scoles, *The University of Rochester Sexual Harassment Case Is Complicated—And That's the Point*, WIRED (Sept. 27, 2017), https://www.wired.com/story/the-university-of-rochester-sexual-harassment-case-is-complicatedand-thats-the-point/#:~:text=7%3A00%20AM-,The%20University%20of%20Rochester%20Sexual%20Harassment%20Case%20Is%20Complicated%E2%80%94And,especially%20when%20they%20go%20public. (last visited October 15, 2025).

[21] *Id*.

Cantlon, banded together and filed an EEOC complaint in August 2017 disputing UR's investigation and findings and claiming UR had retaliated against them.[22]

444.    In a September 2017 *Mother Jones* article that was the first to launch the situation at UR into the public sphere, a letter from the one of the complainants to the UR Board of Trustees was made public.[23] It stated, "The present situation must be viewed as a colossal failure of UR leadership at all levels."[24] It claimed that 71% of female field scientists had experienced sexual harassment and quoted a UR spokesperson as saying that the complaints against Professor Jaeger were "largely based on hearsay" and that UR would be "fully prepared to respond to these allegations in a court of law."[25]

445.    The story was then picked up by, among other outlets, the *New York Times*, the *Washington Post*, CBS, NBC, and the *Huffington Post*.[26]

---

[22] *Id*.

[23] Madison Pauly, *She Was a Rising Start at a Major University. Then a Lecherous Professor Made Her Life Hell*, MOTHER JONES (Sept. 8, 2017), https://www.motherjones.com/politics/2017/09/she-was-a-rising-star-at-a-major-university-then-a-lecherous-professor-made-her-life-hell/ (last visited October 15, 2025).

[24] *Id*.

[25] *Id*.

[26] https://www.nytimes.com/2017/09/15/nyregion/rochester-university-sexual-harassment.html

https://www.nytimes.com/2018/01/11/nyregion/exonerated-university-president-resigns.html

https://www.washingtonpost.com/news/speaking-of-science/wp/2017/11/22/400-professors-boycott-university-of-rochester-urging-students-not-to-attend/

https://www.washingtonpost.com/national/national-digest-university-of-rochester-settles-retaliation-lawsuit/2020/03/27/b12c285e-6b1c-11ea-abef-020f086a3fab_story.html

https://www.cbsnews.com/news/university-of-rochester-professor-florian-jaeger-sexual-harassment-allegations/

446.    In response to the national attention UR was beginning to receive, UR President Joel Seligman sent a campus-wide email urging them to "consider these allegations for what they are: assertions that remain unproven despite two thorough investigations."[27] He added, "Allegations are not facts, and as we saw in *Rolling Stone's* withdrawn story about sexual assault at the University of Virginia, even established media outlets can get it wrong."[28]

447.    President Seligman was widely condemned for sending this email and held a public town hall a few days later to apologize for it, calling his reference to the *Rolling Stone* article "foolish and unnecessary."[29] He promised to hire an independent investigator to look into the claims that UR had retaliated against the complainants.[30]

---

https://www.huffpost.com/entry/11-women-accuse-university-of-rochester-professor-of-sexual-harassment_n_59b7decfe4b09be416581b4c

https://www.nbcnews.com/storyline/sexual-misconduct/universities-face-metoo-movement-over-sexual-harassment-n833171

https://www.chronicle.com/article/what-happens-when-sex-harassment-disrupts-victims-academic-careers/

https://gazettenet.com/2017/12/28/universities-face-metoo-movement-14576001/.

[27] Christina Cauterucci, *"An Example of the System Gone Awry,"* (Sept. 14, 2017), SLATE, https://slate.com/human-interest/2017/09/university-of-rochester-professors-alleged-sexual-harassment-of-students-shows-the-murkiness-of-campus-policy-on-faculty-student-relationships.html (last visited October 15, 2025).
[28] *Id.*
[29] James Goodman, *UR President Joel Seligman Apologizes for Comment in Sexual Harassment Case*, DEMOCRAT & CHRONICLE (Sept. 15, 2017), https://www.democratandchronicle.com/story/news/2017/09/13/ur-president-joel-seligman-apology-sexual-harassment-claims/660545001/ (last visited October 15, 2025).
[30] *Id.*

448. But President Seligman refused to fire Professor Jaeger, despite repeated requests that he do so.[31] Speakers at the town hall literally swore at President Seligman and demanded the firing of Morgan Levy, UR's then-Title IX Coordinator.[32] One student at the town hall claimed that Ms. Levy told her that "it was not uncommon for less powerful women to seek out more powerful men for sexual relationships, similar to how poor women sometimes enter into a relationship with a rich man for economic benefit."[33] President Seligman responded that he would not fire Ms. Levy without an investigation or evidentiary basis and added, "This is not rule by mob, guys."[34]

449. The very next day, on September 13, 2017, roughly 200 students and faculty protested, carrying signs stating, "U of R Supports Sexual Misconduct But Not Victims" and the like.[35] They now called for the firing of both President Seligman and Ms. Levy.[36] That same day, one student announced that she would go on a hunger strike until UR

---

[31] Vivian Wang, *Sexual Harassment Charges Roil Elite University Department*, NY TIMES (Sept. 15, 2017), https://www.nytimes.com/2017/09/15/nyregion/rochester-university-sexual-harassment.html (last visited Oct. 15, 2025).

[32] Justin Trombly, *Seligman Faces Hundreds as Campus Outrage Peaks*, CAMPUS TIMES (Sept. 13, 2017), https://www.campustimes.org/2017/09/13/seligman-faces-town-hall-sexual-harassment/ (last visited Oct. 15, 2025).

[33] *Id*.

[34] *Id*.

[35] James Goodman, *UR Student Criticism of Handling Sexual Harassment Allegations Mounts*, DEMOCRAT & CHRONICLE (Sept. 13, 2017), https://www.democratandchronicle.com/story/news/2017/09/13/florian-jaeger-joel-seligman-ur-target-of-student-protest/662408001/ (last visited October 15, 2025).

[36] *Id*.

fired Professor Jaeger.[37]  A petition for the termination of Professor Jaeger began circulating and received nearly 40,000 signatures.[38]

450.    Below are pictures from the protest where students called for the resignation of President Seligman and Title IX Coordinator Morgan Levy:



451.    On September 15, 2017, the *Campus Times*—UR's school newspaper—published an Op-ed stating, "If you carefully consider the President's argument for due process for Jaeger, you'll realize how faulty it is."[39] It published a second one a few days later saying that President Seligman "is clearly no stranger to linguistic manipulation" and that his sentiments—including "his apparent belief that there are 'victims on both sides'"—were reminiscent of "modern fascism" and fit "this mold to a Trumpian T."[40] Criticizing

---

[37] Lauren Peace, *What We Know: University of Rochester Sexual Harassment Case*, DEMOCRAT & CHRONICLE (Dec. 9, 2017), https://www.democratandchronicle.com/story/news/2017/12/08/university-rochester-sexual-harassment-case-what-we-know-ur/928463001/ (last visited Oct. 15, 2025).
[38] https://www.change.org/p/university-of-rochester-remove-and-reevaluate-sexual-harrassment-policy.
[39] Reefat Aziz, *Breaking Down Seligman's Bad Arguments*, CAMPUS TIMES (Sept. 15, 2017), https://www.campustimes.org/2017/09/15/217142/ (last visited Oct. 15, 2025).
[40] Bea Klebe, *Seligman Comforts the Comfortable*, CAMPUS TIMES (Sept. 18, 2017), https://www.campustimes.org/2017/09/18/seligman-comforts-comfortable/ (last visited Oct. 15, 2025).

President Seligman's statements about UR's commitment to remain impartial, the article advocated for a complainant-biased approach to such allegations:

> Neutrality in the face of catastrophe only serves to bolster the power of the perpetrator, solidifying their ability to oppress. Seligman is comforting the comfortable by afflicting the afflicted. What other conclusions are we left to draw about the opinions of a man who, in the face of overwhelming evidence and the power of a judicial system predicated on preponderance, shrugs his shoulders and mutters something about due process?[41]

452.    On September 18, the Linguistic Society of America released a letter in response to the situation at UR saying, "[S]tudents and colleagues are telling many of us that they have come to expect sexual harassment to be a 'normal' and unavoidable part of academic life."[42] The letter was signed by 1,100 professors and academics in the U.S. and from two dozen other countries.

453.    On September 19, 2017, despite having exonerated Professor Jaeger of any wrongdoing in the initial internal investigations, UR succumbed to the public pressure and placed him on leave effective immediately.[43] The student on a hunger strike then ended her protest.[44]

454.    UR then appointed Mary Jo White, a former U.S. Attorney and the former chair of the Securities and Exchange Commission, to conduct an independent investigation into

---

[41] *Id.*

[42] https://embed.documentcloud.org/documents/4063701-LSA-Open-Letter/.

[43] Lauren Peace, *What We Know: University of Rochester Sexual Harassment Case*, DEMOCRAT & CHRONICLE (Dec. 9, 2017), https://www.democratandchronicle.com/story/news/2017/12/08/university-rochester-sexual-harassment-case-what-we-know-ur/928463001/ (last visited Oct. 15, 2025).

[44] *Id.*

the allegations in the EEOC complaint.[45] It would reportedly go on to cost UR $4.5 million.[46]

455.    According to the *Washington Post*, while the investigation was still ongoing in November, 400 professors around the world signed a letter advising students not to attend UR because of how UR mishandles sexual harassment claims.[47] The *Post* quoted a student calling for the termination of President Seligman, rather than allowing him to resign."[48]

456.    On December 6, Kidd and Cantlon—the complainants against Jaeger—appeared on the cover of *Time* Magazine, as described above.[49]

457.    Two days later, the complainants filed a lawsuit in federal court against UR and President Seligman alleging both defamation and violations of Title IX and Title VII.[50] The complaint accused UR of covering up the complaints and retaliating against the complainants.[51]

---

[45] *Id.*

[46] Katie Herzog, *How an Academic Grudge Turned Into a #MeToo Panic*, REASON (Mar. 14, 2022), https://reason.com/2022/03/14/how-an-academic-grudge-turned-into-a-metoo-panic/?nab=1 (last visited Oct. 15, 2025).

[47] John Guarino, *400 Professors Boycott University of Rochester, Urging Students Not to Attend*, N.Y. TIMES (Nov. 22, 2017), https://www.washingtonpost.com/news/speaking-of-science/wp/2017/11/22/400-professors-boycott-university-of-rochester-urging-students-not-to-attend/ (last visited Oct. 15, 2025).

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] Justin Murphy, *UR Settles Federal Sexual Misconduct Lawsuit for $9.4 Million*, DEMOCRAT & CHRONICLE (March 27, 2020), https://www.democratandchronicle.com/story/news/education/2020/03/27/university-rochester-federal-sexual-misconduct-lawsuit-settlement-9-4-million-jaeger-kidd-cantlon/2916365001/ (last visited October 15, 2025).

458.    In January 2018, Mary Jo White's investigation concluded.[52] She released her investigative report, which—just like UR's first two internal investigations—exonerated Professor Jaeger and found that UR did not retaliate against the complainants.[53]

459.    Nevertheless, the same day the report was released, UR President Joel Seligman was forced to resign.[54] He apologized for supporting Professor Jaeger's promotion from associate to full professor (which happened while Jaeger was under investigation) even though Seligman had been exonerated.[55]

460.    President Seligman then told one media outlet, "This matter to some degree was tried in the court of public opinion and the court of public opinion is very different than due process"—a comment that the complainants claimed "hurt [their] credibility and made women who have experienced sexual harassment very nervous about coming forward."[56]

---

[52] *Id*.

[53] *Id*.

[54] Justin Murphy, *UR Settles Federal Sexual Misconduct Lawsuit for $9.4 Million*, DEMOCRAT & CHRONICLE (March 27, 2020), https://www.democratandchronicle.com/story/news/education/2020/03/27/university-rochester-federal-sexual-misconduct-lawsuit-settlement-9-4-million-jaeger-kidd-cantlon/2916365001/ (last visited Oct. 15, 2025).

[55] Scott Jaschik, *Error Seen in Promoting Accused Professor*, INSIDE HIGHER ED (Oct. 1, 2017), https://www.insidehighered.com/quicktakes/2017/10/02/error-seen-promoting-accused-professor (last visited Oct. 15, 2025).

[56] Adam Chodak, *Hidden Chapter: The Florian Jaeger Case and Its Aftermath*, ROCHESTER FIRST (Jan. 6, 2023), https://www.rochesterfirst.com/adam-interviews/hidden-chapter-the-florian-jaeger-case-and-its-aftermath/ (last visited Oct. 15, 2025).

461.    After President Seligman's resignation, UR hired an interim president who created UR's Office of Equity and Inclusion and updated UR's policy on discrimination and harassment.[57]

462.    In April 2018, news outlets were still reporting on this case, noting that Professor Jaeger had returned to teaching from his leave.[58] UR, in response to that pressure, issued a public statement apologetically saying, "As an employer as well as an institution of higher education, we must make decisions based on our policies and our principles. One of those principles is that people can learn and improve throughout their lives"— implying that Professor Jaeger—who had been exonerated in *three different investigations*—was actually guilty.[59]

463.    Meanwhile, in the spring of 2018, yet another report of sexual misconduct by a UR professor was picked up by the national news.[60] This time, medical student Katia Kaplan-List sued both UR and Professor Johan Blickman, accusing him of raping and drugging her, asking her to roleplay that she was a child patient and he was molesting her, asking her to have sex with his dog, and even attempting to involve her boyfriend in

---

[57] Justin Murphy, *UR Settles Federal Sexual Misconduct Lawsuit for $9.4 Million*, DEMOCRAT & CHRONICLE (March 27, 2020), https://www.democratandchronicle.com/story/news/education/2020/03/27/university-rochester-federal-sexual-misconduct-lawsuit-settlement-9-4-million-jaeger-kidd-cantlon/2916365001/ (last visited Oct. 15, 2025).

[58] Justin Murphy, *Florian Jaeger: UR Professor Who Triggered Harassment Crisis Set to Resume Teaching in the Fall*, DEMOCRAT & CHRONICLE (Apr. 3, 2018), https://www.democratandchronicle.com/story/news/2018/04/03/florian-jaeger-return-university-rochester-bcs/482158002/ (last visited Oct. 15, 2025).

[59] *Id.*

[60] Justin Murphy, *Prominent URMC Professor Johan Blickman Accused of Drugging, Raping Resident*, DEMOCRAT & CHRONICLE (Mar. 1, 2018), https://www.democratandchronicle.com/story/news/2018/03/01/johan-blickman-urmc-sued-raping-drugging-student/380584002/ (last visited Oct. 15, 2025).

murdering his ex-wife.[61] The *Democrat & Chronicle* and local Rochester news outlets reported that Professor Blickman allegedly blackmailed Ms. Kaplan-List by threatening to share nude photographs of her if she ever reported him.[62]

464.    The lawsuit sought $30 million from UR.[63]

465.    It was reported that UR had previously investigated the relationship between Ms. Kaplan-List and Dr. Blickman back in 2016 and had found that it was consensual and not in violation of any policy.[64] Learning from its experience of failing to immediately place Professor Jaeger on leave, however, UR put Professor Blickman on leave when it received the complaint she filed against him in court.[65]

466.    Earlier that same year, the *Campus Times* issued an article entitled: "*They didn't dare: Junior's sexual assault hearing violated UR policy, appeal board orders another.*"[66] The article explained how a student reported a sexual assault (which happened while she was on the top bunk of a bed with a male student while other people were in the room), and UR later found the respondent not responsible.[67] The student accused UR of "botch[ing] her hearing" by considering evidence of her anxiety and depression medication at the hearing, as well as by telling her she wasn't allowed to have a lawyer

---

[61] *Id.*

[62] *Id.*

[63] *Id.*

[64] Justin Murphy, URMC Professor Blickman Counter-Sues, Calls Rape Claim 'Malicious, False and Salacious,' DEMOCRAT & CHRONICLE (Mar. 12, 2018), https://www.democratandchronicle.com/story/news/2018/03/12/johan-blickman-counter-sues-katia-kaplan-list-over-urmc-rape-claim/417124002/ (last visited Oct. 15, 2025).

[65] *Id.*

[66] Justin Trombly & Jackie Powell, '*They Didn't Care:' Junior's Sexual Assault Hearing Violated UR Policy, Appeal Board Orders Another*, CAMPUS TIMES (Jan. 12, 2018), https://www.campustimes.org/2018/01/12/juniors-sexual-assault-hearing-violated-ur-policy-appeal-leads-to-another/ (last visited Oct. 15, 2025).

[67] *Id.*

act as her advisor.[68]  The article named Morgan Levy as the Title IX Coordinator to whom this student reported her claim and quoted Ms. Levy as saying errors in the process are extremely rare.[69]

467.    In August 2018, the *Campus Times* condemned UR for making two students pay for damages after they spray-painted "I was raped here" in front of seven fraternity houses on campus.[70]

468.    When the current president, Sarah Mangelsdorf, was inaugurated in October 2019, she said continuing UR's commitment to equity and inclusion was one of her top priorities.[71]

469.    In March of 2020, UR settled the lawsuit with Kidd and Cantlon, paying them a whopping $9.4 million.[72]

470.    UR then issued a public statement stating that UR commended the complainants for "bringing forward their concerns about sexual harassment" and stated that "[t]he impact of the plaintiffs' efforts has resulted in real improvement to the University processes and resource allocation for current and future prevention, investigation and

---

[68] *Id.*

[69] *Id.*

[70] Shweta Koul, *Students Spray-Paint Frat Quad with Anti-Rape Message*, CAMPUS TIMES (Aug. 13, 2018), https://www.campustimes.org/2018/08/13/students-spray-paint-frat-quad-with-anti-rape-message/ (last visited Oct. 15, 2025).

[71] Natalie Schwartz, *U of Rochester Names Sarah Mangelsdorf as its First Woman President*, HIGHER ED DIVE (Dec. 18, 2018), https://www.highereddive.com/news/u-of-rochester-names-sarah-mangelsdorf-as-its-first-woman-president/544566/ (last visited Oct. 15, 2025).

[72] Justin Murphy, *UR Settles Federal Sexual Misconduct Lawsuit for $9.4 Million*, DEMOCRAT & CHRONICLE (March 27, 2020), https://www.democratandchronicle.com/story/news/education/2020/03/27/university-rochester-federal-sexual-misconduct-lawsuit-settlement-9-4-million-jaeger-kidd-cantlon/2916365001/ (last visited Oct. 15, 2025).

remediation of situations reported to involve harassment and other forms of discrimination, as well as retaliation for reporting such matters."[73]

471.    In September of 2020, Title IX Coordinator Morgan Levy resigned, citing budget concerns and an inability to access a certain database she allegedly needed to ensure UR was appropriately responding to reports.[74]

472.    After this article came out, the Vice President of the Office of Equity and Inclusion told *Campus Times* that there had been no budget cuts to the Title IX Office or inability to access data Levy needed to do her job, thus calling into question why she actually resigned.[75]

473.    Rachel Koegel was appointed as the Interim Title IX Coordinator in Levy's absence in September 2020.

474.    Upon information and belief, Ms. Levy trained Ms. Koegel before her departure.

475.    Julia Green—who had been a partner at the Rochester law firm Harter Secrest & Emory LLP—took over as UR's Title IX Coordinator in June of 2023.

476.    In April of 2021, it was reported that UR experienced a major spike in reported sexual violence—a 129% increase between 2018 and 2019—while its neighbor, the

---

[73] *Id.*

[74] Ashley Yoon, *Title IX Coordinator Morgan Levy Resigns*, CAMPUS TIMES (Nov. 2, 2020), https://www.campustimes.org/2020/11/02/title-ix-coordinator-morgan-levy-resigns/ (last visited Oct. 15, 2025).

[75] Ashley Yoon, *Office of Equity and Inclusion Responds to Levy's Resignation*, CAMPUS TIMES (Nov. 8, 2020), https://www.campustimes.org/2020/11/08/office-of-equity-and-inclusion-responds-to-levys-resignation/ (last visited Oct. 15, 2025).

Rochester Institute of Technology, actually had a decrease in the number of reports made.[76]

477.    In 2019, there were 142 reported incidents, making UR the university with the sixth highest number of reported incidents out of over 200 colleges in New York.[77] Local news in Rochester reported that of 142 reported incidents, only two students faced expulsion.[78]

478.    UR proved yet again its sensitivity to public pressure by removing that data from its website, along with the 2019-2020 data, despite it posting the data from 2017-2018 and 2020-2021 through the present.[79] Beginning with the 2020-2021 data, UR stopped reporting on how many students were expelled as a result of reports made against them.[80]

479.    In October 2021—four years after the initial accusations were made against Professor Jaeger—UR continued to experience pressure on that issue. Students were still enraged at his continued employment at UR, despite his being exonerated by three different investigations. Roughly 40 people started a protest "with the goal to bring awareness to new students who had never heard of the incident."[81] One of the protestors said they accomplished their goal of "breaking this cycle where problems were forgotten

---

[76] Sean Mickey, *Major Spike in Reported Sexual Violence at the U. or R.*, ABC 13 WHAM (Apr. 25 (2021), https://13wham.com/news/local/major-spike-in-reported-sexual-violence-at-university-of-rochester (last visited Oct. 15, 2025).
[77] *Id*.
[78] *Id*.
[79] https://www.rochester.edu/oee/resources/reports-update-2025/ (last visited Oct. 15, 2025).
[80] *Id*.
[81] Haven Worley, Anti-Jaeger Protest Held Over Mel Weekend, Jaeger Responds, Campus Times (Oct. 17, 2021), https://www.campustimes.org/2021/10/17/anti-jaeger-protest-held-over-mel-weekend-jaeger-responds/ (last visited Oct. 15, 2025).

when students who witnessed them were graduating" and showing that "they won't allow [the, *sic*] administration to be silent on issues they no longer want to face."[82]

## CAUSES OF ACTION

### COUNT ONE: VIOLATION OF TITLE IX (20 U.S.C. § 1681)
### (Deliberate Indifference)

480.    John Doe repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

481.    The University receives federal funding and is subject to the requirements of Title IX.

482.    Title IX prohibits sex discrimination in the educational setting.

483.    When a funding recipient is deliberately indifferent to sex-based harassment, it engages in sex discrimination in violation of Title IX.

484.    Because Jane's allegations were of *sexual* assault, they were based at least in part on John's sex. *See, e.g.*, *Schiebel v. Schoharie Central School Dist.*, 120 F. 4th 1082, 1097 (2d Cir. 2024).

485.    The University was deliberately indifferent to the truth or falsity of Jane's allegations against John. The process by which it investigated and adjudicated her claims was so objectively deficient that it cannot be said to have aimed at uncovering the truth. Among other things, the University:

a.    Failed to confront Jane with her inconsistent statements while pressing John on irrelevant topics to discredit him;

b.    Issued the preliminary investigation report in accordance with Jane's wishes despite normal practice and despite John and his advisor's objecting for good cause to the timing of its release;

---

[82] *Id.*

100

c.  Made biased credibility findings against John;

d.  Inserted biased evidence on Jane's behalf and excluded relevant evidence from the final investigation report;

e.  Refused to allow Jane to be questioned about A.D.;

f.  Refused to provide John a copy of Jane's opening statement before the conclusion of her cross-examination;

g.  Made findings about Jane's incapacitation despite John's never being charged with that;

h.  Made credibility findings against John for speaking to witnesses, but not against Jane for doing the same;

i.  Failed to pursue evidence that would help John but hurt Jane;

j.  Failed to address a host of other exculpatory evidence; and

k.  Required John to affirmatively prove his innocence in violation of the presumption of non-responsibility.

486.  Likewise, the rationale for finding John responsible was inexplicable and irrational, and thus further betrayed that the University's process cannot be said to have been aimed at uncovering the truth. Among other things:

a.  The rationale nonsensically found the sexual intercourse to be consensual but not the alleged biting and choking that preceded it or the digital penetration that followed it.

b.  It made no attempt whatsoever to account for the fact that the two people in the room heard or saw nothing suggesting nonconsensual activity of any kind was going on.

c.  It made no attempt whatsoever to explain how Jane's telling J.L. she had not shaved her vaginal area—and nothing else—could possibly be reconciled with a finding that nonconsensual biting and choking had already occurred by that point.

d.  It pointed to no evidence—none—as to why the acts John was found responsible for could be deemed *non-consensual*, but instead flipped the burden of proof and deemed them so because John had not affirmatively proven they were consensual.

e.  It failed to address a host of other exculpatory evidence.

487.   The University, through its Title IX Coordinator and other agents, had actual knowledge of the discrimination against John, intentionally acted in clear violation of Title IX by subjecting John to discriminatory conduct, and was deliberately indifferent to those facts.

488.   As a direct result of UR's violation of Title IX, and as a direct and proximate cause thereof, John has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of UR's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

489.   John is entitled to damages in an amount to be determined at trial, plus attorneys' fees.

490.   Accordingly, UR is liable to John for violations of Title IX and for all damages arising out of that violation.

## COUNT TWO: VIOLATION OF TITLE IX (20 U.S.C. § 1681)
### (Erroneous Outcome)

491.   Plaintiff repeats and realleges each of the above-stated paragraphs of this Complaint as if fully set forth herein.

492.   Unlawful discrimination exists when gender bias is a motivating factor in a student's discipline.

493.    Gender bias is a motivating factor in a student's discipline if it motivates an outcome or sanction at least in part.

494.    In the Second Circuit, plaintiffs may challenge university disciplinary proceedings on the basis of sex discrimination for "erroneous outcomes" in which gender bias was a motivating factor in crafting the outcome of a proceeding.

495.    John is innocent, and the facts of his case demonstrate at least an articulable doubt regarding the accuracy of the outcome.

496.    The finding against John Doe was the product of gender bias at least in part, as exhibited by the following things, each of which courts have recognized as supplying evidence of gender bias:

    a.  Extreme pressure on UR by the federal government to implement a gendered view of Title IX enforcement exhibited by nationwide enforcement of the Dear Colleague Letter;

    b.  Extreme pressure on UR from its student body, alumni, and national news sources to enforce a gendered view of Title IX;

    c.  The University's responsiveness to that gender-biased pressure, including:

        i.   President Seligman's apology for making comments about the importance of due process and the presumption of innocence;

        ii.  President Seligman's resignation;

        iii.  Morgan Levy's resignation;

        iv.  Placing Professor Jaeger on leave after clearing of him of wrongdoing;

        v.   President Seligman's apology for supporting the promotion of Professor Jaeger;

        vi.  UR's creation of the Office of Equity and Inclusion and updating of its policy on discrimination and harassment in response to the public outcry over Professor Jaeger;

vii. UR's issuance of a public statement about Professor Jaeger that "people can learn and improve throughout their lives," despite all investigations having cleared Professor Jaeger of wrongdoing;

viii. UR's placing Professor Blickman on leave after the complaint against him was filed, learning from its experience with Professor Jaeger;

ix. UR's settlement of the lawsuit with Kidd and Cantlon for $9.4 million;

x. UR's issuance of a public statement commending Kidd and Cantlon; and

xi. UR's implementation of new trainings for its Title IX staff that were biased towards complainants.

a. The statements and actions of biased investigators and a hearing officer who, among other things:

i. Failed to confront Jane with her inconsistent statements while pressing John on irrelevant topics to discredit him;

ii. Issued the preliminary investigation report in accordance with Jane's wishes despite normal practice and despite John and his advisor objecting to the timing of its release for good cause;

iii. Made biased credibility findings against John;

iv. Inserted biased evidence on Jane's behalf and excluded relevant evidence from the final investigation report;

v. Refused to allow Jane to be questioned about A.D.;

vi. Refused to provide John a copy of Jane's opening statement before the conclusion of her cross-examination;

vii. Made findings about Jane's incapacitation despite John's never being charged with that;

viii. Made credibility findings against John for speaking to witnesses, but not against Jane for doing the same;

ix. Failed to pursue evidence that would help John but hurt Jane; and

x. Required John to affirmatively prove his innocence in violation of the presumption of non-responsibility.

    d.  A rationale that explained, with respect to the acts John was found responsible for, only why those acts were believed to have occurred, and *not* why they could be deemed *non-consensual*.

    e.  A rationale that entirely failed to address significant exculpatory evidence, including that two eyewitnesses in the room did not see or hear any nonconsensual behavior occurring.

    f.  A permanent, disclosable sanction that will gravely impact John's future and which is disproportionate to the violation he was (wrongly) found to have committed.

497. The facts alleged in this complaint also demonstrate that the process used to investigate Jane's complaint was not substantially fair in nature, in violation of Title IX.

498. John was subjected to this treatment at least in part due to his sex as a male.

499. As a direct result of UR's violation of Title IX, and as a direct and proximate cause thereof, John has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of UR's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

500. John is entitled to damages in an amount to be determined at trial, plus attorneys' fees.

501. Accordingly, UR is liable to John for violations of Title IX and for all damages arising out of that violation.

## COUNT THREE: BREACH OF CONTRACT

502. John Doe incorporates by reference all of the preceding paragraphs of this complaint as though fully set forth herein.

503.    At all times relevant hereto, a contractual relationship existed between UR and John Doe. The University's Title IX Policy, SSMP, and Code of Conduct were parts of that contract.

504.    Under that contract, UR was required to act in accordance with these publications in resolving complaints of misconduct, in the investigation of those complaints, in the process of adjudicating those complaints, in the process of sanctioning students, and in resolving appeals.

505.    The Title IX Policy promises, among other things, that allegations of sexual misconduct will be investigated "thoroughly," and that students have a right to "a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard."

506.    The University breached that promise and several others in its contract with John, by failing to comply with the Title IX Policy in at least the following ways:

   a.   Failing to post all of the materials used to train its Title IX staff for the past seven years;

   b.   Training its Title IX staff in gender-biased ways;

   c.   Allowing an appeals officer with a conflict of interest to decide John's appeal;

   d.   Allowing a Title IX Coordinator with a conflict of interest to oversee John's case;

   e.   Investigating the allegations of Jane's claimed incapacitation without providing John with notice of that charge;

   f.   Failing to update the notice of allegations when the investigators began investigating Jane's claimed incapacitation;

   g.   Investigating whether the bruises on Jane's neck were caused by alleged choking despite not providing John with notice of that charge;

h.  Failing to update the notice of allegations when the investigators began investigating whether the bruises could have been caused from alleged choking;

i.  Failing to interview the two other female students who were kicked out of the room despite the burden of gathering evidence being on the University;

j.  Failing to interview Jane's friend from home with whom she spoke the day after the incident;

k.  Failing to gather text messages from the night of the incident and about the incident;

l.  Making adverse credibility findings against John for speaking to witnesses despite the policy's clearly allowing him to do so, while not making similar findings against Jane for doing the same thing;

m.  Allowing Jane to submit evidence after the deadline to do so;

n.  Including new evidence in the Final Investigative Report that the parties did not have an opportunity to review beforehand;

o.  Including new evidence after the Final Investigative Report was issued;

p.  Allowing new evidence to come into the record mid-hearing;

q.  Failing to interview A.D. or allow Jane to be questioned about A.D.;

r.  Failing to adhere to the 45-day deadline to complete the investigation and the 75-day deadline to conclude the case;

s.  Failing to notify the parties of the delays in the investigation and case; and

t.  Failing to provide John with Jane's opening statement before the conclusion of her cross-examination.

507.  The University also breached the contract when it flipped the burden of proof and found John responsible because there was a *lack* of evidence proving consent. The Policy says that accused students are "presumed not responsible" and that they may be found responsible only if a "preponderance of the evidence" affirmatively shows there was not consent. A lack of such evidence means the presumption of non-responsibility has not

been overcome. But John was found responsible because of a "lack of" evidence *showing consent*, thus flipping the presumption and breaching the Policy.

508.    As a proximate and foreseeable consequence of the foregoing breaches, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of UR's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

509.    As a result, John is entitled to damages in an amount to be determined at trial.

510.    Accordingly, UR is liable to John for UR's breach of contract and for all damages arising out of that violation.

## COUNT FOUR: BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

511.    John Doe incorporates by reference all of the preceding paragraphs of this complaint as though fully set forth herein.

512.    Inherent in UR's contract with John was an implied covenant of good faith and fair dealing. That covenant required the University to execute the contract in a way that did not have the effect of destroying or injuring John's right to receive the fruits of the contract. The covenant required the University to implement the contractual provisions identified below in ways that were not arbitrary, capricious or without reasoned basis, that did not ignore evidence to the contrary, and that did not steer John's disciplinary proceeding to a predetermined conclusion.

513.    Based on the aforementioned facts, UR breached its contract with Doe.

108

514.    UR executed the contract in a way that destroyed or injured John's rights to receive the fruits of the contract, including by 1) finding him responsible for nonconsensual digital penetration, choking, and biting Jane's neck on the basis of an inexplicable and irrational decision that went against the preponderance of the evidence, and 2) failing to disclose the conflicts of interest between Jane's advisor, Morgan Levy, and the appeals officer Rachel Koegel, as well as the conflict of interest between Morgan Levy and the Title IX Coordinator, Julia Green.

515.    As a proximate and foreseeable consequence of the foregoing breaches, John Doe has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of UR's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

516.    As a result, John is entitled to damages in an amount to be determined at trial.

517.    Accordingly, UR is liable to John for UR's breach of the covenant of good faith and fair dealing and for all damages arising out of that violation.

### COUNT FIVE: NEGLIGENCE

518.    John Doe incorporates by reference all of the preceding paragraphs of this complaint as though fully set forth herein.

519.    In conducting its investigation and adjudication of Roe's complaint against Doe, UR owed a common law duty to Doe to exercise reasonable care, with due regard for the truth and to apply procedures evenhandedly, with due consideration of the important and

irreversible consequences of its actions, as well as Doe's various liberty and property rights and interests generally.

520. Through the acts set forth above, UR, acting through its agents and/or employees, breached that duty by negligently performing its assigned duties and facilitating a process that violated the rights of John.

521. In particular, UR negligently hired, trained and supervised the people it employs to investigate and adjudicate claims of sexual misconduct or otherwise implement its policies and procedures as described above.

522. By way of example, and upon information and belief, those people are trained on:

    a. How to protect "survivors";

    b. To assume all allegations are true when considering whether to offer a respondent informal resolution;

    c. That it is "rare" for a person to lie or falsely accuse someone of sexual assault;

    d. That most victims don't "fight or flee" while being sexually assaulted;

    e. That victims are often polite, passive, or submissive to perpetrators;

    f. That investigators should not make judgments if a complainant was an active participant;

    g. That two-thirds of alleged college rapists are repeat offenders;

    h. That memory gets better over time;

    i. That investigators should just get the "gist" from complainants, and not press them on specific details;

    j. That fear can "break through" an alcohol-induced blackout;

    k. That if a victim only remembers a "fragment" of a memory, it is usually because she was experiencing fear or pain;

l.   That if investigators push complainants for details, it can cause them to give inconsistent memories or even lie.

523.   As a direct result of UR's negligence, and as a direct and proximate cause thereof, John has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

524.   Accordingly, the University is liable to John Doe for negligence and for all damages arising out of that violation.

## COUNT SIX: VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### (New York State Human Rights Law § 296(4))

525.   John Doe incorporates by reference all of the preceding paragraphs of this complaint as though fully set forth herein.

526.   UR is an educational corporation operating under the laws of the State of New York.

527.   The New York State Human Rights Law § 296(4) prohibits unlawful discriminatory practices in an educational corporation that permit harassment of a student on the basis of his sex.

528.   As outlined in this Complaint, UR permitted, authorized, and/or condoned discrimination against John on the basis of his sex in the terms, conditions, and privileges of his school attendance, and the rights and privileges of his school attendance.

529.   UR knew or should have known of the existence of the discriminatory conduct occurring against John.

111

530.   UR failed to undertake action to prevent the discriminatory conduct against John.

531.   As a direct and proximate cause of UR's actions, John has been seriously and irreparably damaged in the following ways, among others: he has been falsely branded a sexual assailant, which he will have to report to many future schools and future employers; endured extreme emotional and psychological suffering as a result of the University's one-sided treatment of the false sexual misconduct charges against him; and will suffer a permanent reduction in lifetime earnings.

532.   As such, UR is liable to John for violation of the N.Y. State Human Rights Law and for all damages arising out of that violation.

DATED: January 23, 2026

Respectfully submitted,

By: /s/ Brian Melber

Brian Melber (N.Y. Bar No. 2789840)

Personius Melber LLP
2100 Main Place Tower
350 Main St.
Buffalo, NY 14202
(716) 855-1050
bmm@personiusmelber.com
*Attorney for Plaintiff John Doe*

/s/ Justin Dillon
Justin Dillon (D.C. Bar No. 502322) (motion for admission *pro hac vice* forthcoming)
Christopher C. Muha (D.C. Bar No. 987116) (motion for admission *pro hac vice* forthcoming)
Kimberly Blasey (D.C. Bar No. 90003791) (motion for admission *pro hac vice* forthcoming)
Dillon PLLC
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-5872

jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

*Attorneys for Plaintiff John Doe*

# Exhibit 1

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure                                    Revised: 8/8/2023


## I.     **Prohibition of Sexual Harassment**

Sexual Harassment, including sexual assault and other forms of discrimination based on sex, is unacceptable and prohibited by the University of Rochester [University]. The University takes all complaints of this nature seriously and has several policies pertaining to or created for the purpose of ensuring all complaints of sex-based harassment are responded to efficiently, thoroughly, and in accordance with relevant laws. Together, these various policies reflect the University's strong commitment to preventing and appropriately responding to all complaints of sex-based harassment.


## II.     **Scope of this Policy**

The University complies fully with Title IX of the Education Amendments of 1972, which prohibits discrimination based on sex in connection with the University's education programs and activities. Regulations issued by the United States Department of Education require the University to adopt specific grievance procedures to address complaints of Sexual Harassment, as that term is defined in the Title IX Regulations (34 C.F.R. Part 106) and in this policy. The procedures described in this policy are intended to comply with those regulations.

In addition to Title IX, the University is governed by multiple state and federal laws that prohibit discrimination based on sex and this policy is intended to comply with all of them.

This policy describes how the University will respond to reports and Formal Complaints of Sexual Harassment as defined by Title IX. If a report filed under this policy cannot be addressed by this policy, it may be responded to with other University policies that address sex-based harassment.

This policy applies to all members of the University of Rochester community reported to be Complainants or Respondents involved in Sexual Harassment. As used in this policy, "members of the University of Rochester community" includes staff, faculty, students, contractors, visitors, and patients. As mentioned above, the University has multiple policies for addressing allegations of sex-based harassment. Many allegations of sex-based harassment, however, will be more appropriately addressed pursuant to the University's Policy against Discrimination, Harassment, and Discriminatory Employment/Service Practices ( e.g., for complaints by employees about other employees).

Examples of Sexual Harassment covered under this policy include sexual harassment, sexual assault, dating and domestic violence and stalking (as defined below in section IV).

Questions regarding the application of Title IX can be made to the Title IX Coordinator or the U.S. Department of Education's Office of Civil Rights (OCR) at:

Office for Civil Rights, National
Headquarters
U.S. Department of Education
(800) 421-3481; TTY: 800-877-8339
www.ed.gov/ocr
ocr@ed.gov

The University of Rochester
University Policy/Procedure

Policy: University Title IX

### III.    Key Terms:

a.   Complainant: an individual who is alleged to have been subjected to conduct that could constitute Sexual Harassment. If the Title IX Coordinator submits a complaint on behalf of an individual alleged to have been subjected to conduct that would constitute Sexual Harassment, that individual, and not the Title IX Coordinator, is considered the Complainant for purposes of this policy.

b.   Respondent: an individual who has been reported to have engaged in conduct that could constitute sexual harassment.

c.   Party(ies): refers to the Complainant or the Respondent or both the Complainant and the Respondent.

d.   Title IX Coordinator: Julia Green serves as the University Title IX Coordinator and can be reached at:
Phone: 585-275-1654
Email: julia.green@rochester.edu or titleix@rochester.edu
   The Title IX Coordinator oversees and provides leadership for the staff members who carry out investigations, compliance-related responsibilities, and reporting of Sexual Harassment. Any student, applicant, faculty, or staff member who has concerns about Sexual Harassment is encouraged to seek the assistance of the Title IX Coordinator or a school's Deputy Title IX Coordinator. In addition to the Title IX Coordinator, Deputy Title IX Coordinators have been designated in each of the schools of the University. Deputy Title IX Coordinators are chosen to reflect the diversity of University of Rochester community and help increase access to University Title IX programs and processes. Please see Appendix B for contact information for each of the Deputy Title IX Coordinators. Information about the Deputy Title IX Coordinators can also be found online at:
   https://www.rochester.edu/sexualmisconduct/. The Title IX Coordinator works with other professionals in the Title IX Office to ensure institutional compliance with Title IX by ensuring effective and prompt response to reports as well as reviewing and implementing plans for education, prevention, and training. The term Title IX Coordinator in this document refers to Julia Green or her designee.

e.   Formal Complaint: a document filed by a Complainant or signed by the Title IX Coordinator alleging sexual harassment against a Respondent and requesting that the University investigate the allegation of sexual harassment. At the time of filing a Formal Complaint, a Complainant must be participating in or attempting to participate in the education program or activity of the University in which the Formal Complaint is filed. A Formal Complaint may be filed with the Title IX Coordinator in person, by mail, or by electronic mail.

f.   Hearing Officer: individual(s) who makes determinations regarding responsibility when a Formal Complaint is filed.

g.   Day: for the purposes of this policy the word "day" means a calendar day.

h.   Employee: for the purposes of this policy the word "employee" includes regular, full-time and part-time faculty and staff, student employees, volunteers, TAR staff and officers, trustees and agents of the University.

### IV.    Prohibited Behaviors[1]

A Respondent found responsible for engaging in any of the following prohibited behaviors may be subject to discipline, up to and including permanent separation from the University.

   a.   **Sexual Harassment** means conduct on the basis of sex that meets one or more of the following descriptors:
      1.   Conduct by an Employee of the University that conditions the provision of an aid, benefit, or service of the University on an individual's participation in unwelcome sexual conduct (quid pro quo harassment);

The University of Rochester                                          Policy: University Title IX
University Policy/Procedure

   2. Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the University's education program or activity; or
   3. Conduct that meets the definitions of sexual assault; dating violence; domestic violence; or stalking as indicated below.

Examples of behavior that could be considered Sexual Harassment:

Behaviors which could constitute sexual harassment or lead to complaints of sexual harassment include, but are not limited to:

- Physical acts of a sexual nature, such as:
   o Sexual violence (as defined below) or attempts to commit sexual violence; oUnwanted and intentional touching, pinching, patting, kissing, hugging, grabbing, brushing against another person's body or poking another person's body or clothing.
- Sexual advances or propositions that are unwanted, such as:
   o Requests for sexual favors by an employee accompanied by implied or overt threats/promises that an individual's refusal or willingness to submit will impact the individual's status, wages, advancement, performance evaluation, promotion, or other benefits or detriments;
   o Subtle or obvious pressure for unwelcome sexual activities;
   o Sexual flirtations (including leering or ogling);
   o Sexually oriented gestures, noises, remarks, jokes or comments about a person's sexuality or sexual experience.
- Display of sexual or sexually demeaning material anywhere in the workplace. oExamples include (but are not limited to) pictures, posters, calendars, graffiti, objects, text or other materials that are sexually demeaning or pornographic.
   o This includes displays on workplace computers, cell phones, or any other area visible to other members of the University community.
- Hostile actions taken against an individual because of that individual's sex, sexual orientation, gender identity or expression, or the status of being transgender, either in person or through other means, such as:
   o Interfering with, destroying or damaging a person's workstation, tools or equipment, or otherwise interfering with the individual's ability to perform their job or access the educational program;
   o Making comments about an individual's body, clothing or lifestyle that have sexual implications or demean the individual's sexuality or gender;
   o Sabotaging an individual's work;
   o Bullying, yelling, or name-calling.

---

[1] In order to ensure compliance with various federal and state laws, the University has several policies prohibiting sex-based harassment and discrimination. Prohibited behaviors on the basis of sex may be defined slightly differently in each of those policies. The following definitions only apply in this, The University Title IX policy

b. **Sexual Assault** is any sexual act directed against another person, without the consent of that person, including instances where the person is incapable of giving consent. Sexual assault includes:

1. Rape – the penetration, no matter how slight, of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of that person,
2. Fondling – the touching of the private body parts of another person for the purpose of sexual gratification, without the consent of that person,
3. Incest – sexual intercourse between persons who are related to each other within the degrees wherein marriage is prohibited by law,
4. Statutory rape – sexual intercourse with a person who is under the statutory age of consent. In New York, the statutory age of consent is 17 years old.

**Important Definition – Consent**

Consent as used in this policy, means affirmative consent. Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.

Silence or lack of resistance, in and of itself, does not demonstrate consent. The definition of consent does not vary based upon a participant's sex, sexual orientation, gender identity, or gender expression. Whenever the word "consent" is used in this policy, it should be understood to mean affirmative consent as defined here.

There are several important principles to keep in mind:

- Relying solely upon non-verbal communication can lead to miscommunication. It is important not to make assumptions and if confusion or ambiguity on the issue of consent arises anytime during the sexual interaction it is essential that each person stops and clarifies, verbally, willingness to continue.

- Consent to any sexual act or prior consensual activity between or with any party does not necessarily constitute consent to any other sexual act.

- Consent is required regardless of whether the person initiating the act is under the influence of drugs and/or alcohol.

- Consent may be initially given but withdrawn at any time and consent terminates upon the individual's loss of capacity to consent.

- Consent cannot be given when a person is incapacitated, which occurs when an individual lacks the ability to knowingly choose to participate in sexual activity. Incapacitation may be caused by the lack of consciousness or being asleep, being involuntarily restrained, or if an individual cannot otherwise consent. Depending upon the degree of intoxication, someone who is under the influence of alcohol, drugs or other intoxicants may be incapacitated and therefore unable to consent.

- Some indicators of incapacitation may include, but are not limited to, lack of control over physical movements, lack of awareness of circumstances or surrounds,

The University of Rochester                                          Policy: University Title IX
University Policy/Procedure

or the inability to communicate for any reason. Among other circumstances, individuals may experience a blackout state in which they appear to be giving consent, but do not actually have conscious awareness or the ability to consent. It is especially important, therefore, that anyone engaging in sexual activity be aware of the other person's level of intoxication.

- When a person's incapacitation is in question, the relevant standard that will be applied is whether the individual(s) knew, or a sober reasonable person in the same position should have known, that the other party was incapacitated and therefore could not consent to the sexual activity.

- Consent cannot be given when it is the result of any coercion, intimidation, force, or threat of harm. Coercion and intimidation include (1) using physically or emotionally manipulative conduct against the complainant or (2) expressly or implicitly threatening the complainant or a third party with negative actions that would compel or induce a reasonable person in the complainant's situation to engage in the sexual activity at issue.

  o Examples of sexual coercive statements include those such as; "I will ruin your reputation"; "I will tell everyone"; "your education at UR will be over" or "I will post an image of you naked." Examples of force or a threat of harm include:

    ➢ (1) using physical force or;

    ➢ (2) a threat, express or implied, that would place a reasonable person in the complainant's situation in fear of physical harm to, or kidnapping of, themselves or another person. Coercion is evaluated based on the intensity, frequency and duration of the comments or actions.

- When consent is withdrawn or can no longer be given, sexual activity must stop.

- According to New York State law, an individual cannot give valid consent if the individual is under 17 years old.

c. **Dating Violence** means violence committed by a person:
  1. who is or has been in a social relationship of a romantic or intimate nature with the victim. The existence of such a relationship shall be determined based on a consideration of the following factors:
     o The length of the relationship,
     o The type of relationship, and
     o The frequency of interaction between the persons involved in the relationship.

d. **Domestic Violence** includes felony or misdemeanor crimes of violence committed by

- a current or former spouse or intimate partner of the victim,

- a person with whom the victim shares a child in common,

- a person who is cohabitating with or has cohabitated with the victim as a spouse or

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

intimate partner,

- a person similarly situated to a spouse of the victim under the domestic or family violence laws of the jurisdiction receiving grant monies, or

- any other person against an adult or youth victim who is protected from that person's acts under the domestic or family violence laws of the jurisdiction.

e. **Stalking** means engaging in a course of conduct directed at a specific person that would cause a reasonable person to

- fear for their safety or the safety of others; or

- suffer substantial emotional distress.

f. **Retaliation** is adverse action taken against an individual by the University or by a member of the University community because the individual has engaged in protected activity. Protected activities are defined as the following: (1) personally complaining of or opposing perceived discrimination or harassment; (2) testifying, assisting, or participating in an investigation, proceeding, hearing, or legal action involving a claim of discrimination or harassment, or (3) exercising rights afforded to them pursuant to this policy or a law related to sex based harassment.

Retaliation includes actions that would dissuade a reasonable person from engaging in these types of protected activities. Retaliation can be committed by an individual or a group of individuals.

Retaliation can take many forms, including threats, intimidation, interference, continued abuse, violence, or other forms of harm to others, and in varying modes, including in person and in electronic and online communication.

Retaliation can also include adverse employment or educational actions made or taken against an individual because of their good faith participation in the reporting, investigation, and/or resolution of an alleged violation of this policy and/or any conduct that would discourage a reasonable person from engaging in further protected activity.

Depending on the circumstances, examples of retaliation could include, but are not limited to the following if taken because the individual engaged in protected activity:

- Threats of termination, transfers, and changes in work location, poor performance reviews, the denial of a promotion or tenure, denial of job benefits, demotion, suspension, or termination,

- An escalation of harassing behavior in response to a complaint,

- Making false reports to governmental authorities (e.g., law enforcement, licensing agencies),

- Threats of deportation, initiating action with immigration authorities,

- Adverse academic actions against a student could include a reduced grade, negative recommendation, negative comments about the student at academic meetings or conferences or limiting access to an academic

opportunity.

- Adverse actions within co-curricular student life could include a student organization denying membership to an interested student due to their participation as a witness in a sexual harassment investigation process or, a student starting an online petition encouraging other students to avoid another student because they made a sexual harassment complaint.

## V.    Reporting Statement

The University regularly engages in activities to prevent Sexual Harassment in our educational programs and activities. If an incident of Sexual Harassment occurs the University can only act to prevent it from reoccurring, and to remediate the impact of the conduct, if it is made aware of it. The University encourages individuals to report incidents of Sexual Harassment so steps can be taken to remediate and prevent such conduct from occurring again.

All members of the University community are encouraged to report any instances or claims of Sexual Harassment, to the Title IX Coordinator. Responsible Employees who receive or learn of reports or concerns of Sexual Harassment as defined within this policy must promptly (as soon as practical as and no later than forty-eight hours) report to the University Title IX Coordinator.

**"Responsible Employees"** are student and non-student employees of the University who
- Supervise University employees, including student employees and faculty members,
- Have been designated as a Campus Safety Authority pursuant to the Clery Act[2],
- Serve as a Deputy Title IX Coordinator at one of the University's schools or within the Department of Athletics,
- Have a job title with the word "dean" in it, or
- Work in any of the following departments/offices:
  - Department of Public Safety,
  - Office of Equity and Inclusion,
  - Student life offices in each of the University's schools, or
  - Department of Residential Life

Only the employees listed above are required by this Title IX Policy to report Sexual Harassment, but other University policies may mandate reporting by certain people and everyone is encouraged to report it.

## VI.    Procedures

A. **Reports of Sexual Harassment:** Individuals have the right to file a report of sexual harassment, sexual assault, domestic violence, dating violence, and/or stalking and to consult the Title IX Coordinator or any of the confidential or private resources included in Appendix C.

---

[2] If you are unsure if you are a Campus Safety Authority please contact the Title IX Office via email at TitleIX@rochester.edu to inquire about your designation.

a.   Initial Assessment: Upon learning of a potential incident of Sexual Harassment the Title IX Coordinator will promptly reach out to the Complainant, if their identity is known, inform them of their rights and options, and request a meeting with the Complainant. During this meeting an initial assessment of the report will be made to determine whether the alleged behavior may be addressed utilizing the procedures in this policy or if another policy is more appropriate.

For example if a report alleges behaviors that are not prohibited by this Title IX Policy but are prohibited by the University's Student Sexual Misconduct Policy or it's Policy against Discrimination, Harassment, and Discriminatory Employment/Service Practices ("PADH/106"), the University will refer the report to the administrator/office responsible for implementing the policy that governs that behavior. If a request for a meeting is declined, the Title IX Coordinator will conduct an initial assessment utilizing the information available.

b.   Supportive Measures: During the initial assessment process conversation the Title IX Coordinator will share with the Complainant information regarding supportive measures that may be implemented. Supportive measures are non-disciplinary, non-punitive individualized services offered as appropriate, as reasonably available, and without fee or charge to the Complainant or the Respondent before or after the filing of a Formal Complaint or where no Formal Complaint has been filed. These measures are designed to restore or preserve equal access to the University's educational program or activity without unreasonably burdening the other Party.

Supportive measures include those designed to protect the safety of all Parties or the University's educational or work environment or deter sexual harassment. Supportive measures may include access to counseling, extensions of deadlines, or other course-related adjustments, modifications of work or class schedules, campus escort services, issuance of Active Avoidance Orders requiring mutual restrictions on contact between the Parties, changes in work or housing locations, leaves of absence, temporary reassignment of work, increased security and monitoring of certain areas of the campus, and other similar measures.

Any individuals who would like to request a supportive measure can contact the University Title IX Coordinator by e-mail at titleix@rochester.edu or the Deputy Title IX Coordinator for their school. (See Appendix B for a list of Title IX Coordinators) The Coordinator assesses the request for a supportive measure and informs the individual whether it has been granted. If a request is denied, the requesting individual is afforded a prompt review, reasonable under the circumstances, of the need for, and terms of, the supportive measure and is able to submit evidence in support of their request. Information about how to make a request for a review of the decision is provided in the letter discussing the resolution of the request.

c.   Emergency Removal: When a Respondent is determined to be an immediate threat to the physical health or safety of any individual the University may, in its discretion, initiate emergency removal/temporary suspension of the Respondent from campus and/or from other settings in which the Respondent poses such a threat. Prior to making any decisions about removal, the University conducts an individualized safety and risk analysis to aid in determining whether removal is an appropriate step. If the University decides to remove the Respondent, the University provides the Respondent and the Complainant

with written notice of the removal decision and information regarding their opportunity to appeal the decision. Specific information about the appeal process is included in the written notice. If the emergency removal decision is altered both Parties will be notified in writing.

**B. Formal Complaints and Investigation:**

The Formal Complaint process articulated below <u>only</u> applies to members of the University of Rochester community (as defined above) when:

1. The Complainant has made an allegation of prohibited behavior defined above; AND
2. The Complainant is participating or attempting to participate in the University's educational program or activity; AND
3. The actions alleged occurred in a location, at an event, or in circumstances over which the University exercised substantial control over both the Respondent and the context in which the sexual harassment occurred; AND
4. The actions occurred in the United States.

If a Formal Complaint does not contain all four elements, the University is required by law to dismiss the Formal Complaint. In such cases, the matter will be referred to another University policy/practice for resolution if one applies.

a. <u>Written Notice</u>: Upon receipt of a Formal Complaint, the Title IX Coordinator ensures that notice is given, in writing, to the Complainant and Respondent of:
   i. the existence of the grievance process,
   ii. the allegations of Sexual Harassment, including a reference to the specific code of conduct provisions alleged to have been violated and possible sanctions with sufficient details known at the time (which include the identities of the Parties involved if known, the date and location of the alleged incidents, if known) and with sufficient time to prepare before any initial interview,
   iii. a statement that the Respondent is presumed not responsible until a determination is made at the conclusion of the grievance process,
   iv. the availability to each Party of an advisor of their choice, who may be an attorney (but is not required to be) and who may inspect, and review evidence gathered in the investigation. If a party does not have an advisor, the University will provide an advisor of its choice.

   If, during the investigation, the University decides to investigate additional allegations not included in the initial notice or to pursue investigation of the conduct under other policies, it will give notice of additional allegations and the other relevant policies to the Parties.

b. <u>Dismissal of Complaint</u>: At any time after a Formal Complaint is submitted, the University may dismiss the Formal Complaint if:
   i. the Complainant notifies the Title IX Coordinator in writing that they wish to withdraw the Complaint (or withdraw the allegations that would require it to be investigated under this policy),
   ii. the Respondent is no longer employed by or enrolled in the University, or
   iii. specific circumstances prevent the University from obtaining sufficient information to

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

reach a determination of the Formal Complaint's truth. Examples of such circumstances include but are not limited to when the Complainant refuses to participate in the investigation process but has also not sent notice withdrawing their complaint and where the Respondent is not under the authority of the University (because they are not a student or employee).

As referenced above in Section II "Scope of the Policy" if a report made under this policy cannot be resolved pursuant to this policy due to a lack of jurisdiction the University is required to dismiss the Formal Complaint under this policy. In such cases, Parties may appeal the dismissal as noted in (c) below.

c. Notice of Dismissal/Appeals: In the event of mandatory or voluntary dismissal, the Title IX Coordinator will promptly notify the Complainant and Respondent in writing. Either the Complainant or the Respondent may appeal the dismissal of the Formal Complaint. Information regarding how to appeal dismissal of the complaint is provided in the written notice of dismissal.

d. Consolidation of Complaints: To the extent permitted by law, the University may consolidate multiple complaints where the allegations of Sexual Harassment arise from the same facts and circumstances. For example the University may consolidate a Formal Report with one Complainant and multiple Respondents, multiple Complaints against one Respondent and a Formal Report involving multiple incidents between one Complaint and one Respondent.

e. Informal Resolution[3]: At any time after the filing of a Formal Complaint and prior to a determination being made, the University may facilitate an informal resolution, including but not limited to mediation; provided, that:
    i. All Parties voluntarily consent to informal resolution, in writing;
    ii. The University has given the Parties written notice disclosing the requirements of the informal resolution process and the extent to which a resolution reached through this process precludes the Parties from resuming a Formal Complaint arising from the same allegations; and
    iii. At any time before agreeing to a resolution, any Party may withdraw from the informal resolution process and resume the grievance process to address the allegations stated in the Formal Complaint, as it may be amended.

Note that individuals who facilitate informal resolution processes will not serve as witnesses in hearings on matter(s) in which they served in this facilitator role.

f. Investigation of Formal Complaints: Investigations are conducted by individuals with appropriate training and experience investigating allegations of Sexual Harassment.
    i. *Party Communication with Witnesses*: While the University is responsible for gathering sufficient evidence about the allegations in the Formal Complaint to reach a determination of responsibility, Parties may discuss the allegations, speak to potential witnesses, and gather evidence if they choose. Please note that any behaviors against witnesses that could be considered retaliation, as defined in this policy, are prohibited.

---

[3] Informal resolution is not be available for Formal Complaints alleging that a faculty or staff member has Sexually Harassed a student.

10 | P a g e

ii.   *Meeting Notices*: Investigators provide Parties and witnesses written notice of the date, time, location, and purpose of any interviews or meetings related to the Formal Complaint at least one day prior to the interview or meeting to allow the witness/Party to prepare. Parties and witnesses can elect to waive the one- day notice so long as they do so in writing.

iii.  *Advisors in Investigative Meetings*: Parties may have an advisor of their choice present during interviews or meetings, provided that the advisor may not speak for the Party nor disrupt the interview in any way.

iv.   *Evidence*:

1.  Each Party is expected to provide the investigator with any evidence they wish to be considered within ten days after receiving the Written Notice (defined above) notifying the Party of the Formal Complaint.

2.  Before the investigator has completed the investigative report, each Party is given the opportunity to inspect and review all directly relevant evidence gathered, whether or not the University intends to rely on it at the hearing.  The investigator will ensure evidence is shared in hard copy or electronic format and each Party has ten days to provide a written response regarding the evidence to the investigator for the investigator's consideration.

3.  After the period for Party evidence review has ended, the investigator prepares a report fairly summarizing the relevant evidence gathered and shares a copy of the report with each Party and their advisors (if any), in electronic or hard copy format. Each Party has ten days to provide a written response regarding the report for the investigator to consider before the report is finalized.

4.  Prohibitions on Inclusion of Certain Evidence

a.  Evidence that is subject to a legally recognized privilege, such as the right of confidentiality in medical records, attorney-client privileged communications, and the like, cannot be included for consideration in the report unless the Party entitled to the privilege has waived their right.

b.  Parties can prohibit information about their own mental health diagnosis and treatment from inclusion in the investigation and adjudication process.

c.  Evidence of a Party's prior sexual predisposition or history shall not be deemed relevant; however, evidence of the Complainant's prior sexual behavior may be offered to prove that someone other than the Respondent committed the alleged Sexual Harassment and evidence of the Complainant's prior sexual behavior toward Respondent may be offered to prove consent.

g.  <u>Hearings</u>: Hearings are conducted by a Hearing Officer responsible for reaching a determination regarding whether the alleged Sexual Harassment occurred and, if so, what the University's response should be.

i.  *Hearing Set Up*:

1.  The Title IX Coordinator will notify the Parties in writing of the time and location of the hearing at least five days prior to the hearing date.

2.  The Parties and the Hearing Officer are situated in different rooms and

     able to simultaneously see, hear, and otherwise perceive all questions, answers and statements of the participants, any advisors, and the Hearing Officer.

3. All evidence directly related to the investigation (as determined by the investigator and articulated in the investigation report) is made available in hard copy or electronic format to the Parties and their advisors during the hearing.

4. An audio recording of the hearing will be made by the University and made available to the Parties, Hearing Officer, and Appeal Board for inspection and review. The audio recording is the property of the University.

  ii. *Questioning*:

1. In addition to the Hearing Officer, each Party's advisor is permitted to ask questions of each witness and Party. No party may ask questions directly of the other Party or any witness; only the advisor may ask questions.

2. To avoid unnecessary delays during the hearing, Parties are encouraged to submit a list of questions their advisor plans to ask the other Party and any witnesses to the Hearing Officer at least three days prior to the hearing. Submitting questions in advance of the hearing allows time for the Hearing Officer to discuss with each Party separately any concerns about relevancy that may arise in the questions. No Party is permitted access to these questions submitted by another Party in advance of the hearing for the purpose of determining relevancy.

3. If questions have not been pre-submitted to the Hearing Officer during the hearing, after each question is asked, the Hearing Officer must determine whether it is relevant before the witness or Party answers. If the Hearing Officer determines that a question is not relevant the question may not be answered.

4. The Hearing Officer explains its reasoning when it determines that a question is not relevant.

5. There is no opportunity to object or further argue about the appropriateness of a question after the Hearing Officer has made and communicated its decision regarding the relevancy of a question.

  iii. *Advisors*:

1. A Party may not serve as their own advisor during a hearing. If a Party does not have an advisor at the hearing, the University provides one of its choice to the Party, without charge. The University is not obligated to provide legal representation to any Party.

2. Advisors must refrain from asking questions in an abusive, intimidating, or disrespectful manner. The hearing officer is authorized to enforce this prohibition.

3. If a Party chooses not to attend a hearing, their advisor may still appear and question the other Party and witnesses on their behalf.

4. Advisors may only ask questions as described in section VI(B)(g)(iii)(2) above. They may not otherwise speak, object, or argue. The hearing officer can suspend a hearing if it determines that an advisor or any participant is disruptive or violating the above rules.

The University of Rochester                                      Policy: University Title IX
University Policy/Procedure

     5. Advisors may have private conversations with the Party they are advising during the hearing. If an advisor seeks to have such a conversation, they may request a break from the Hearing Officer.

    iv. *Statements*

     1. Each Party may submit an impact statement for the Hearing Officer's consideration when the Hearing Officer is deliberating on sanction.

h. <u>Determinations, Remediation, and Corrective Measures</u>: The Hearing Officer determines whether the alleged Sexual Harassment occurred using a preponderance of the evidence standard; that is, whether it is more likely than not that Sexual Harassment occurred. The hearing officer issues its findings in a written determination, provided simultaneously to each Party no later than twenty-one days of the conclusion of hearing. The determination letter includes:

    i. the allegations potentially constituting Sexual Harassment,

    ii. a description of the procedural steps taken from the receipt of the Formal Complaint through the Hearing Officer's determination, including any notifications to the Parties, interviews with Parties and witnesses, site visits, methods used to gather other evidence, and hearings held,

    iii. findings of fact supporting the determination,

    iv. conclusion regarding the application of the Title IX Policy to the facts,

    v. a statement of and rationale for the result as to each allegation, including a determination regarding responsibility, any disciplinary sanctions to be imposed on the Respondent, and the rationale for the sanction imposed as well as whether remedies designed to restore or preserve equal access to the University's education program or activity are be provided to either Party, and

    vi. the procedures and permissible bases for appeal.

If the decision maker determines that a Respondent is responsible for violating this Policy, the consequences imposed are dependent upon the specific findings and details of the case. Disciplinary, remedial, or corrective measures imposed can include, but are not limited to:

**<u>Staff</u>**

Termination
Demotion
Suspension without pay
Written warning
Mandatory training
Non-renewal of contract (if applicable)
Reporting a violation of this Policy to the appropriate grant making or licensing authority, if required

**<u>Faculty</u>**

Termination
Demotion
Presentation to the University Committee on Tenure and Privileges for revocation of tenure or abrogation of contract
Non-renewal of contract

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

> Reassignment/change in assignment
> Revocation or suspension of clinical privileges
> Revocation of administrative duties or assignments
>
> Documentation of violation and consequences in faculty/employee file
> Mandatory training
> Supervision or ongoing monitoring
> Reporting a violation of this Policy to the appropriate grant making or licensing authority, if required

**Students**

> Expulsion
> Probation
> Suspension
> Revocation of privileges
> Restriction of privileges
> Mandatory training

i.  Appeals: Both the Complainant and the Respondent may appeal the determination of the Hearing Officer. Appeals must be submitted via email to titleix@rochester.edu within seven days of the delivery of the notice of the determination.
    a.  Permissible bases for appeal are:
        1.  procedural irregularity that affected the outcome,
        2.  new evidence that was not reasonably available at the time of the determination and could have affected the outcome is now available,
        3.  the Title IX Coordinator, investigator, or any Hearing Officer had a conflict of interest or bias for or against complainants or respondents generally or the individual Parties that affected the outcome, or
        4.  the sanction imposed was inappropriate.
    b.  Once either Party submits an appeal, the University notifies the other, providing a copy of the appeal submission, and allowing the other Party an opportunity to respond in writing, within seven days. Responses should be submitted to titleix@rochester.edu.
    c.  Appeals are decided by a three-person appeal board that is not composed of any of the individuals who made the initial determination.
    d.  Within fourteen days of meeting and reviewing all appeal submissions and the record of the hearing, the appeal board issues a written determination describing the result and the rationale for that result and delivers it simultaneously to the parties.

j.  Timeline
    i.  Formal Complaints of Sexual Harassment made under this policy are typically resolved within seventy-five days of the filing of the Formal Complaint. Specific timelines of the process are as follows
        1.  Written Notice of Allegations: Sent to Parties as soon as practical and within seven days after receipt of the Formal Complaint.
        2.  Investigations: Completed within forty-five days. If the investigation is not completed within the first forty-five days following the filing of the Formal Complaint, the investigator notifies the Parties of the delay and the expected

The University of Rochester                                          Policy: University Title IX
University Policy/Procedure

             date upon which the investigation will be completed.

    3. Hearings: Hearings will last no longer than approximately nine hours on any given day and will last for no more than three days total.

    4. Determinations: The Hearing Officer will deliver its determination simultaneously to each Party no later than twenty-one days after the conclusion of the hearing.

    5. Appeal Determination: The appeal board delivers will deliver its determination simultaneously to each Party no later than fourteen days after the appeal board meeting.

  k. Records

    i. The materials used to train Title IX Coordinators, investigators, decision-makers, and any person who facilitates an informal resolution process, are maintained for a period of seven years and available on the University website for the same period.

    ii. For each report of Sexual Harassment, the University creates and maintains for a period of at least seven years, records of any actions, including supportive measures, taken in response. These records document how the University's response was not deliberately indifferent to the report and that it has taken measures designed to restore or preserve equal access to the University's education program or activity. For Respondents who are employees of the University, records are be maintained for seven years or a period of six years from the end of employment, whichever is longer.

    iii. Disclosure of Records: The University will only disclose information regarding the outcome of a Formal Complaint of Sexual Harassment under this policy as follows:

        1. For allegations against students, as articulated in the Standards of Student Conduct section labeled "Conduct Records".

        2. For allegations against employees, as articulated in University Policy Against Discrimination, Harassment, and Discriminatory Employment/Service Practices (PADH)

## C. Fundamental Fairness in TIX Process

  a. All rules and restrictions relating to the conduct of hearings, appeals, interviews, and witness gatherings apply equally to both Parties.

  b. All Parties have equal opportunity to present witnesses, fact and expert, and other inculpatory and exculpatory evidence.

  c. Investigators, Hearing Officers, facilitators of informal resolution processes and Title IX Coordinators are evaluated for potential conflicts of interest or general bias and precluded from participation in the process outlined in this policy if conflicts of interest or bias is found to exist.

  d. All individuals accused of violating this policy are presumed not responsible for violating the policy until determination is made at the conclusion of the process indicated in this policy.

  e. Temporary delay or extensions of time may occur. If a delay is expected, all Parties are given written notice explaining the delay, the reason for the delay and the period of time the delay will last. Delays may only be permitted if reasonable and for good cause. Examples of permitted delays include, but are not limited to, the impossibility of a Party, a Party's advisor, or a witness to be present, concurrent law enforcement activity, or the need for accommodation of disabilities.

  f. Parties may disclose the outcome of a hearing or appeal process to others.

15 | P a g e

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

**D. Important Information for Students**:

    a. University of Rochester Transcript Notation Policy: Any undergraduate or graduate student who is charged with a non-academic disciplinary violation may have the phrase "disciplinary charges pending" added to any transcript issued after charges are formally brought by the University. If the student is found not responsible for the violation, the notation will be removed. If the student is found responsible and suspended or expelled, the transcript will say the sanction was imposed "after a finding of responsibility for a code of conduct violation." Notations of expulsion shall be permanent. Notations for suspension may be removed one year after the suspension period has ended unless the suspension was for conduct that would be a "Crime of Violence" under the Clery Act (crime of violence definitions appear in the University publication Think Safe). Students who withdraw with pending, unresolved disciplinary charges will have a permanent notation on their transcript that they withdrew with conduct charges pending.  The full Transcript Notification Policy can be found on page 19 of the Standards of Student Conduct.

    b. Policy for Alcohol and/or Drug Use Amnesty: The health and safety of every student at the University of Rochester is of utmost importance. The university recognizes that students who have been drinking and/or using drugs (whether such use is voluntary or involuntary) at the time that violence, including but not limited to domestic violence, dating violence, stalking, or sexual assault occurs may be hesitant to report such incident due to fear of potential consequences for their own conduct. The university strongly encourages students to report domestic violence, dating violence, stalking, or sexual assault to institution officials. A bystander acting in good faith or a reporting individual acting in good faith that discloses any incident of domestic violence, dating violence, stalking, or sexual assault to university officials or law enforcement will not be subject to university code of conduct action for violations of alcohol and/or drug use policies occurring at or near the time of the commission of the domestic violence, dating violence, stalking, or sexual assault.

    c. Seeking Confidential Medical Care:

In **Monroe County, New York,** designated Sexual Assault Forensic Examination Centers (SAFE) provide medical treatment and forensic exams at:

- Emergency Department at Strong Memorial Hospital, 601 Elmwood Ave., Rochester, NY 14642
- Emergency Department at Rochester General Hospital, 1425 Portland Ave., Rochester, NY 14621
- Emergency Department at Unity Hospital, 1555 Long Pond Road, Rochester, NY 14626

*In New York, it is the consenting patient's choice whether to involve law enforcement personnel or not. However, medical providers who treat a physical injury sustained from an assault, physical or sexual, are required by state law to report the assault to law enforcement.* A SANE is a registered nurse specially trained to provide care to patients who have experienced sexual assault.

Note that medical office and insurance billing practices may reveal information to the insurance policy holder, including medication and/or examinations paid for or administered. The New York State Office of Victim Services may be able to assist in compensating victims/survivors for health care and counseling services, including emergency compensation. Options can be explored at this website: https://ovs.ny.gov/help-crime-victims, or by calling 1-800-247-

The University of Rochester                                                Policy: University Title IX
University Policy/Procedure

8035.

d. <u>Disclosures to Parents Pursuant to FERPA</u>: FERPA defines an eligible student as a student who has reached 18 years of age or is attending a postsecondary institution at any age. This means that, at the secondary level, once a student turns 18, all the rights that once belonged to their parents transfer to the student. However, a secondary school or postsecondary institution may still provide an eligible student's parents with access to education records, without the student's consent, if the student is claimed as a dependent for IRS tax purposes. In addition, the University may disclose to a parent personally identifiable information from an education record to appropriate parties, including parents of an eligible student, in connection with an emergency if knowledge of the information is necessary to protect the health or safety of the student or other individuals. For more information, see the <u>Family Educational Rights and Privacy Act Regulations, 34 CFR §99.31(a)(8) & (a)(10)</u>.

e. <u>Student Bill of Rights</u>: Under New York State law, all students have the right to:

1. Make a report to local law enforcement and/or State Police;

2. Have disclosures of domestic violence, dating violence, stalking, and sexual assault treated seriously;

3. Make a decision about whether or not to disclose a crime or violation and participate in the judicial or conduct process and/or criminal justice process free from pressure by the institution;

4. Participate in a process that is fair, impartial, and provides adequate notice and a meaningful opportunity to be heard;

5. Be treated with dignity and to receive from the institution courteous, fair, and respectful healthcare and counseling services where available;

6. Be free from any suggestion that the reporting individual is at fault when these crimes and violations are committed, or should have acted in a different manner to avoid such crimes or violations;

7. Describe the incident to as few institution representatives as practicable and not be required to unnecessarily repeat a description of the incident;

8. Be protected from retaliation by the institution, any student, the accused, and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the institution;

9. Access to at least one level of appeal of a determination;

10. Be accompanied by an advisor of choice who can assist and advise a reporting individual, accused, or respondent throughout the judicial or conduct process including during all meetings and hearings related to such process; and

11. Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial or conduct process of the institution.

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

## Appendix A
## Examples of Prohibited Behaviors

a. Alex meets Ryan at a social gathering on campus hosted by a student organization. Both individuals consume alcohol and smoke marijuana at the party, although Ryan consumes much more than they normally do when at parties and it is their first time combining both substances. Since Ryan lives off campus, Alex offers to have Ryan stay over in their room in Anderson. When they get to Alex's room, the two engage in sexual intercourse. Upon waking up the following morning Ryan is disoriented, unsure of where they are, and does not recall anything after leaving the party. Ryan quickly leaves Alex's room and calls their friend to ask what happened the night before. Their friend describes to Ryan how Ryan was clearly intoxicated spilling their drink and tripped down the stairs at the party. Ryan's friend assumed they went home after they did not see Ryan at the party. *This is a violation of the Title IX policy if it is determined that Ryan was incapacitated due to alcohol and other drugs and was unable to consent to sexual intercourse. Ryan would not need to worry about being charged with student conduct violations based on their own consumption of alcohol and marijuana due to the University's Medical Amnesty Policy. As one of the options afforded to complainants, Ryan could choose to file a formal complaint and resolve this case through an investigation and hearing process.*

b. A faculty member tells a student in their lecture, Riley, they will only allow them to make up a missed assignment if they agree to go out to dinner/drinks with them. Riley, uncomfortable with the situation, laughs and leaves the classroom. Riley then goes to his on-campus job where his supervisor, Amaya can tell that Riley is upset by something. Riley tells Amaya, about his interaction with his faculty member and how uncomfortable he is with this situation. Amaya expresses her concern and explains to Riley she must report this issue to the Office of Equity and Inclusion given their role as a mandated reporter. Amaya offers to fill out the form with Riley together or go to the Office together. Riley agrees to fill out the online reporting form with Amaya together. *This is a violation of the Title IX policy as the faculty member is engaging in quid pro quo sexual harassment. Amaya as a supervisor appropriately articulated their need to have to report this situation to the Office of Equity and Inclusion. Riley can evaluate their options after a meeting with the Office of Equity and Inclusion however Riley will not be able to handle this situation through mediation or an informal resolution.*

c. Ramona is attempting to join an acapella organization. The students representing the group tell Ramona they may not join because they are "not a good fit" for the organization. When Ramona presses the organization more, the students tells tell Ramona that they find them to be too "manly" and not "feminine" enough to really represent them. The group explains further that they have an image they try to project and just really don't think Ramona will live up to the image standard. Ramona is angry and upset by the groups comments and decides to post about their experience on social media. Ramona receives hundreds of demeaning and threatening messages about how they "don't look like a girl." *This is a violation of the Title IX policy because Ramon was harassed and discriminated against due to their gender for failure to conform to societal expectations of gender/gender stereotypes. In reviewing their options Ramona decides to handle the complaint through an informal resolution with the acapella group leadership. The leadership voluntarily agrees to go through the informal resolution process as well.*

d. Marco complains to his supervisor, Nadia, that he has been experiencing sexual harassment from his co-workers for the past three months and that has just had enough of it and needs her to help stop it. When asked for additional details, Marco shares that the women he works with are constantly commenting on his body and asking him out even though he has been very clear that he is in a relationship and not interested. Nadia responds by telling him that he really needs to dress more conservatively and be less friendly around the office. Marco is surprised and taken aback by

The University of Rochester                                        Policy: University Title IX
University Policy/Procedure

Nadia's statement and asks her to elaborate on why she is engaging in this conversation. Nadia explains that since they work in a predominantly female department it would be in Marco's best interest to not distract his female colleagues by giving them attention and by dressing in tight outfits. Marco argues that it is unfair to ask him to change his behavior because the women in department are treating him like a sex object. Nadia says fine and backs down, and Marco thinks issue is resolved. Two weeks later Marco is abruptly transferred to a new position with a lower pay rate. *This is a violation of the Title IX Policy as Marco was sexually harassed by members of his department and may have been retaliated against for making a complaint. Marco decides to file a formal complaint with the Office of Equity and Inclusion and bring the matter to a formal hearing.*

The University of Rochester
University Policy/Procedure

Policy: University Title IX

## Appendix B
## Title IX Coordinators



**Julia Green**
**(She/Her/Hers)**

**Title IX Coordinator and
Assistant Vice President for Civil
Rights Compliance**
Wallis Hall 147A
585-275-1654
**julia.green@rochester.edu**



**John Hain**
**(He/Him/His)**

**Eastman School of Music -
Deputy Title IX Coordinator**
26 Gibbs Street
ESM 111
585-274-1020
**jhain@esm.rochester.edu**



**Dawn Bruner**
**(She/Her/Hers)**

**Arts, Sciences, and Engineering -
Deputy Title IX Coordinator**
510 Wilson Commons
585-275-4085
**Dawn.Bruner@rochester.edu**



**Carla DeLucia**
**(She/Her/Hers)**

**School of Nursing - Deputy Title
IX Coordinator**
Helen Wood Hall 3w139
**Carla_DeLucia@urmc.rochester.
edu**



**Dennis P. Proulx**
**(He/Him/His)**

**Simon School of Business
- Deputy Title IX Coordinator**
Schlegel Hall 202M
585-275-2937
**dproulx@simon.rochester.edu**



**Carol St. George**
**(She/Her/Hers)**

**Warner School of Education -
Deputy Title IX Coordinator**
LeChase Hall 454
(585) 275-0967
**cstgeorge@warner.rochester.ed
u**



**Kristine Shanley**
**(She/Her/Hers)**

**Athletics - Deputy Title IX
Coordinator**
1115 Goergen Athletic Center
585-275-6277
**kristine.shanley@rochester.edu**



**Stephen P. Burke**
**(He/Him/His)**

**School of Medicine and
Dentistry - Deputy Title IX
Coordinator**
585-208-5717
**stephen.burke@rochester.edu**

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

**Appendix C**
**Confidential and Private Resources**

Confidential Resources:

Individuals who are confidential resources can connect individuals to helpful resources and will not report information shared with them to law enforcement or college officials without the Complainant's permission, except in extreme circumstances, such as a health and/or safety emergency, imminent threat to self or others, or where there is a mandatory reporting of suspected child abuse. Accordingly, sharing information with a confidential resource will not result in an investigation or disciplinary action, except in such extreme circumstances. In order to initiate an investigation or disciplinary action, a report must be made through one of the non-confidential options described in this policy.

Private Resources:

University offices and employees that are not confidential resources can connect individuals to helpful resources and will maintain privacy at all times, meaning that the personally identifiable information you provide will be relayed only as necessary to investigate and/or seek a resolution or as required by law.

The University will seek consent from Complainants prior to conducting an investigation. Complainants may decline to consent to an investigation, and that determination will be honored unless the University determines that failure to investigate may result in harm to the Complainant or other members of the University community. **Please note that the University must respond to reports of sexual harassment involving employee Respondents.** If the University determines that an investigation is required, Complainants will be notified and immediate action necessary to protect and assist the Complainant will be taken.

If Complainants disclose an incident to a non-confidential resource, but wish to maintain confidentiality or do not consent to the institution's request to initiate an investigation, the Title IX Coordinator will weigh Complainants' request against the University's obligation to provide a safe, non- discriminatory environment for all members of our community, including the Complainant.

The factors to be considered include, but are not limited to:

- whether the Respondent has a history of violent behavior or is a repeat offender,
- whether the incident represents escalation from previously noted behavior,
- the increased risk that the Respondent will commit additional acts of violence,
- whether the Respondent used a weapon or force,
- whether the Complainant is a minor,
- whether the University possess other means to obtain evidence such as security footage,
- whether the report reveals a pattern of perpetration at a given location or by a particular group, and
- whether the respondent is an employee of the University.

The University of Rochester                                    Policy: University Title IX
University Policy/Procedure

## University of Rochester: Confidential Resources

**University Counseling Center (UCC)**
Phone: 585-275-3113
UHS building, 3rd Floor
738 Library Road
Susan B. Anthony Circle

**UCC Eastman School Location**
Phone: 585-275-3113
ESM Living Center, Room 107
A limited number of appointments available.

**University Health Service (UHS)**
*Licensed medical professionals acting in accordance with their professional responsibilities*
Phone: 585-275-2662
UHS River Campus Office
UHS Building, 1st Floor
738 Library Road, River Campus

**UHS Medical Center Office**
Phone: 585-275-2662
Room 1-5077, UR Medical Center (The entrance is at 250 Crittenden Blvd.)

**UHS Eastman School Office**
Phone: 585-274-1230
Room 106, ESM Student Living Center

**Employee Assistance Program: 585-276-9110**
496 White Spruce Blvd.
Non-professional counselors and advocates
*These individuals can also assist you without sharing information that could identify you. At the University of Rochester, they include:*

**University Chaplains**
Phone:585-275-4321
500 Wilson Blvd.

The University of Rochester                                         Policy: University Title IX
University Policy/Procedure

## University of Rochester: Private Resources

**University Title IX Coordinator**
Julia Green (she/her/hers) | AVP for Civil Rights Compliance and Title IX Coordinator
Phone: 585.275.1654
Email: julia.green@rochester.edu
Office Location: Wallis Hall 147A, within the Office of Equity & Inclusion Suite located on the first floor
Box: 270016 | Rochester, NY 14627

**Deputy Title IX Coordinators in each of the schools** or refer to Appendix B.

**Center for Student Conflict Management**: 585-275-4085

**The Care Network:** www.rochester.edu/CARE

**The Department of Public Safety:** 585-275-3333

**Human Resource Business Partners:** http://www.rochester.edu/working/hr/contact/

**For a list of additional Rochester, New York State, and National Resources, most of which are confidential, you may visit: https://rochester.edu/sexualmisconduct/resources/**