## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF NEW YORK

**JOHN DOE**,
Plaintiff,

-vs-

**UNIVERSITY OF ROCHESTER**,
Defendant.

**Civil Action No. 6:26-cv-06103**

**The Honorable Meredith A. Vacca**

## JOHN DOE'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Justin Dillon
Christopher C. Muha
Kimberly Blasey
Dillon PLLC
1717 K Street, Suite 900
Washington, DC 20005
(202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

Brian Melber (N.Y. Bar No. 2789840)
Personius Melber LLP
2100 Main Place Tower
350 Main St.
Buffalo, NY 14202
(716) 855-1050
bmm@personiusmelber.com

*Attorneys for Plaintiff John Doe*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. i

INTRODUCTION ............................................................................................................1

FACTUAL BACKGROUND .............................................................................................2

ARGUMENT ..................................................................................................................9

I. The Complaint Amply States a Title IX Claim Under Two Distinct Theories .................10

A. The Complaint States a Claim for Deliberate Indifference.............................................10

1. The Hearing Officer's Decision Was Inexplicable, Both On Its Own Terms and In Light of the Evidence....................................................................................................11

2. The Deficiencies in the Process Supply Further Evidence of Indifference .................16

B. The Complaint Also States a Claim for Erroneous Outcome.........................................18

II. John Adequately Pleads a Violation of New York's Human Rights Law .......................22

III. The Complaint Also States a Claim For Breach of Contract.........................................22

IV. John's Covenant Claim Is Not Duplicative ..................................................................24

V. John Adequately Pleads a Negligence Claim................................................................25

CONCLUSION..............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cianciotto on behalf of D.S. v. New York City Dep't of Educ.*,
   600 F. Supp. 3d 434 (S.D.N.Y. 2022) ................................................................................. 11

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ................................................................................................ 18

*Doe v. New York Univ.*,
   438 F. Supp. 3d 172 (S.D.N.Y. 2020) ............................................................................... 20

*Doe v. Oberlin Coll.*,
   963 F.3d 580 (6th Cir. 2020).............................................................................. 14, 15, 16, 19

*Doe v. Regents of Univ. of California*,
    23 F.4th 930 (9th Cir. 2022)............................................................................... 2, 18, 19

*Doe v. Rochester Institute of Technology*,
   2024 WL 1051953 (W.D.N.Y. Mar. 11, 2024)........................................... 1-2, 11, 12, 22

*Doe v. Siena Coll.*,
   2023 WL 197461 (N.D.N.Y 2023) ..................................................................................22-23

*Doe v. Stonehill Coll.*,
   55 F. 4th 302 (1st Cir. 2022)............................................................................................. 15

*Doe v. Syracuse Univ.*,
   440 F. Supp. 3d 158 (N.D.N.Y. 2020) ........................................................................ 22, 23

*Doe v. Syracuse Univ.*,
   2020 WL 2513691 (N.D.N.Y. 2020) ................................................................................. 20

*Doe v. Syracuse Univ.*,
   2023 WL 4105481 (N.D.N.Y. 2023) ................................................................................. 23

*Doe v. Trs. of Hamilton Coll.*,
   2024 WL 1675130 (N.D.N.Y. 2024) ................................................................................. 21

*Doe v. Trs. of the Univ. of Pa.*,
   270 F. Supp. 3d 799 (E.D. Pa. 2017) ................................................................................ 21

*Doe v. Univ. of Ark.*,
  974 F.3d 858 (8th Cir. 2020)......................................................................................13, 15-16

*Doe v. Univ. of Denver*,
  1 F.4th 822 (10th Cir. 2021) ......................................................................................... 17, 19

*Doe v. Univ. of Miss.*,
  2018 WL 3570229 (S.D. Miss. 2018)................................................................................ 21

*Menaker v. Hofstra Univ.*,
  935 F.3d 20 (2d Cir. 2019)..................................................................................... 9, 10, 19, 20

*Oirya v. Brigham Young Univ.*,
  854 F. App'x 968 (10th Cir. 2021)............................................................................... 15

*Olsen v. Butler*,
  227 A.D.3d 916 (N.Y. App. Div. 2d Dep't 2024) ....................................................... 25

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
  633 F.3d 81 (2d Cir. 2011)............................................................................................. 25

*Richmond Shop Smart, Inc. v. Kenbar Dev. Ctr., LLC*,
  32 A.D.3d 423 (N.Y. App. 2d Dept. 2006) ................................................................. 24

*Roe v. St. John's Univ.*,
  91 F.4th 643 (2d Cir. 2024)................................................................................. 10, 11, 19, 21

*Schiebel v. Schoharie Cent. Sch. Dist.*,
  120 F.4th 1082 (2d Cir. 2024)..............................................................................*passim*

*Tesoriero v. Syosset Cent. Sch. Dist.*,
  382 F. Supp. 2d 387 (E.D.N.Y. 2005)................................................................... 10, 11

*Vengalattore v. Cornell Univ.*,
  36 F.4th 87 (2d Cir. 2022)................................................................................................ 18

**INTRODUCTION**

Jane Roe's story that she was subjected to a lengthy sexual assault just a few feet away from her best friend and another guy—both of whom saw nothing, heard nothing, and to whom Jane said nothing—never made sense. Compl. ¶5. And by the end of the University of Rochester's (UR) hearing on the matter, the evidence overwhelmingly showed it was false. Jane either couldn't keep her story straight or said things that contradicted almost every other witness—including about how the encounter started, how her clothes came off, when and how John supposedly choked her, the order in which they had intercourse, *whether she verbally objected to it*, and how the episode ended.

Despite all of that, the Hearing Officer bent over backwards to avoid calling Jane "not credible" and found in her favor on three of her charges: that John bit, choked, and digitally penetrated her—but not that (among other things) she failed to consent to intercourse that happened right in the middle of those things. *Id*. ¶¶318, 325, 328. Many errors led to that result, but one stands above the rest: the Hearing Officer's decision to flip the burden of proof and require John to prove his innocence. *Id*. ¶¶ 353, 355-57, 486. Under UR's Title IX Policy, John was presumed not responsible unless a preponderance of evidence supported a violation. *Id*. ¶19. But the Hearing Officer said that he found against John because there was a "'*lack* of evidence'" of affirmative consent on those charges—in other words, because John had not *proven* his innocence. *Id*. ¶20. That is textbook burden-shifting. And—despite what UR claims—you can't get away with it by relabeling it "affirmative consent."

UR is not the first school to have made that mistake: another court in this District recently addressed the same error at a nearby school that uses the same definition of "affirmative consent" as UR. *Doe v. Rochester Institute of Technology*, 2024 WL 1051953, at *2 (W.D.N.Y.

Mar. 11, 2024). And it rejected the exact same arguments UR makes here, holding that the school had flipped the burden of proof and breached its contract with the plaintiff. *Id.* at \*7 ("A reasonable factfinder could infer that the panels instead 'flip[ped]' the burden of proof—to use Smith-Schubart's phrasing—onto Plaintiff and required that he prove affirmative consent."). So too here. Indeed, in John's case, that burden-flipping not only amounts to breach of contract, but it also suffices to plead his deliberate indifference and erroneous outcome claims under Title IX.

It is far from the only reason those claims are adequately pled: UR also engaged in widespread unfairness towards John in the way that it collected and evaluated the evidence in this case. UR asks the Court to overlook all of that because it found in John's favor on some of Jane's charges. ECF No. 20-1 ("Mem.") at 6, 10, 12. But baby-splitting is no defense to bad process, especially when the evidence overwhelmingly shows that someone is innocent. *Cf. Doe v. Regents of Univ. of California*, 23 F.4th 930, 941 (9th Cir. 2022) ("The fact that the Regents ultimately found Doe not responsible for twelve of the thirteen allegations made against him does not make the allegations of irregularities in the proceedings any less relevant to our inquiry."). John has more than adequately pled facts sufficient to proceed to discovery.

## FACTUAL BACKGROUND

Jane accused John of violently assaulting her on November 18, 2023. Compl. ¶30. She said he did so while her best friend, J.L., was in bed with another man just a few feet away. *Id.* ¶2. Perhaps even more remarkably—and the sequence of events really matters here—she said that *after* John had violently bitten her, choked her, and removed her shirt and pants, she 1) got out of bed, 2) told J.L. she was embarrassed she hadn't shaved her vaginal area, then, after J.L. assured her it was no big deal, 3) willingly climbed back into bed with John. *Id.* ¶¶ 115-16. The room was lit with string lights, and no music was playing. *Id.* ¶¶4, 264. Yet neither D.S. nor J.L.

2

heard or saw a single concerning thing. The night ended when John made the admittedly insensitive decision to say he was going to the bathroom and then never came back. *Id*. ¶42. A witness subsequently saw Jane laughing as she exited the room, and J.L. herself even left Jane behind to go party at another school the next day. *Id*. ¶¶45, 147.

Soon after, Jane told a few people—J.L., her friend I.F., a SANE nurse, and police officers—that John had assaulted her. *Id*. ¶ 49. Many of her claims to those people would later be disproven, which is what happens when you rush a lie. Two months later, on January 19, 2024, she filed a report with UR, which conducted an investigation that took more than a year yet somehow failed to interview several relevant witnesses (including a friend Jane spoke with about the incident the very next day and two women who would have seen Jane laughing right after she left the room). *Id*. ¶¶51 149, 223, 250. It finally held a hearing in February of 2025. *Id*. ¶273.

By the end of that hearing, Jane had contradicted herself on almost every part of her story, sometimes repeatedly so. To take just a few examples from the Complaint:

- Biting: Jane claimed that John "repeatedly bit her neck and nipples" (*id*. ¶96) but told the investigators John was "just a teethy kisser but not that he actually bit her" (*id*. ¶97).

- Removal of Her Shirt: Jane told three different stories about this (*id*. ¶90) and even flip-flopped about whether it was consensual. *Id*. ¶¶92-94).

- How Her Pants Came Off: Jane told four different stories about this. *Id*. ¶107-11.

- First Intercourse: Jane told *at least* four different stories about this. Id. ¶124-128.

- Second Intercourse: Jane admitted at the hearing that John "'freaked out'" when he realized the condom had broken and continued only after she reassured him she had an IUD—precisely what John had said from the start. *Id*. ¶132. But she'd told Officer Hooper that she'd had to "beg[]" John to use a condom initially (*id*. ¶125)—which can't be squared with her later admission that John "'freaked out'" when the condom broke.

- What Jane Did Afterwards: Jane claimed that afterwards, she immediately told J.L. "that the encounter 'did not feel good.'" *Id*. ¶144. But A.M. saw her "laughing and joking" on the way out. (*id*. ¶6). Jane also claimed she told J.L. "everything that happened" right

3

after they left the room. *Id.* ¶146. But J.L. testified they "'really didn't talk more about it'" that night (*id.*) and admitted she left to party at another school the next day (*id.* ¶163).

Despite those and her many other changes—most of which Jane made before the hearing itself—the investigators would, incredibly, summarize Jane's testimony *as though she had told only one version of her story*. *Id.* ¶242. That was consistent with their training, which repeatedly referred to complainants as "'victims,'" "'survivors'" and the "'harmed party,'" and to respondents as "'offenders.'" *Id.* ¶¶373, 398. The training said it was "'rare' for a person to lie or falsely accuse someone of sexual assault." *Id.* ¶375. It cautioned investigators against "making judgments [based] on the fact that a complainant" was an "'active participant'" in the sexual activity. *Id.* ¶379. It included an excerpt from an article entitled, "Repeat Rape by College Men." *Id.* ¶380. It said investigators should not "'jump to conclusions,'" not because it was important to get all of the facts first, and not because it was important to hear both sides, but because "complainants 'need to be truly heard and understood.'" *Id.* ¶¶382-83. It instructed administrators to consider a number of factors that might salvage a complainant's otherwise-unbelievable story: that "[t]he details of a complainant's attack are 'highly vulnerabl[e] to distortion'" (*id.* ¶388), that "'fragment[ed]'" memories are usually due to "fear, horror, or pain" (*id.* ¶393), and that seeking a "sequence of events" might actually "*cause* inconsistencies, even lies" (*id.*, emphasis added).[1] It instructed administrators that traditional investigative processes were often "'incompatible with the needs of victims/survivors'" and were reluctant to truly punish "'offender[s].'" *Id.* ¶¶ 399-400. And it warned that respondents, but not complainants, may participate in restorative justice processes in bad faith. *Id.* ¶406.

---

[1] Indeed, Jane Roe's counsel, who served as UR's Title IX Coordinator until 2020, argued in this Court that questioning the truthfulness of a sexual assault claimant's story amounts to "blaming the victim" and "slut shaming." *See* ECF No. 22 at 17-18.

Consistent with that training, the investigators conducted a lopsided investigation that heavily favored Jane. They refused to interview A.D., a student with whom Jane had made out *earlier that very night* and therefore could have been the source of the faint marks on Jane's neck. *Id.* ¶31. They refused to interview a friend of Jane's from home with whom she said she discussed the incident the day afterwards. *Id.* ¶170. They refused to interview two female witnesses who had been in the room with Jane, John, D.S. and J.L., and who saw Jane leave the room. *Id.* ¶149. They refused to even ask Jane to share all of her messages about the incident, or at least just the ones from the days immediately after the incident, telling her instead to simply submit whatever "'you'd like to share with us.'" *Id.* ¶232. They repeatedly asked A.S. if he spoke with John "about the case" but never asked that of J.L. *Id.* ¶ 215. And, as the Hearing Officer would also ultimately do, they expected John to prove his innocence, repeatedly asking *him* to explain why Jane would make something like this up (*id.* ¶153)—even though her repeated contradictions and so much contrary evidence were staring them in the face.

Like the investigation itself, the investigators' Final Report was heavily skewed in Jane's favor. As noted above, it made it appear as if she had told only one version of her story. *Id.* ¶242. It left out that she'd said her nipples were "red and swollen" because the SANE nurse saw no such thing. *Id.* ¶243. It said Jane couldn't recall how her jeans came off, ignoring where she'd said the opposite. *Id.* ¶244. It said Jane's testimony was that John had pulled her underwear to the side, leaving out that she had told the police John had "completely removed" them. *Id.* ¶245. It said Jane's testimony was that she had gotten on top of John, but left out that she never said that to the police. *Id.* ¶246. It said her testimony was that she "walked" over to J.L. and D.S. during the incident, leaving out that she told Officer Shuman she "ran." *Id.* ¶247. And it even

5

omitted Jane's ridiculous claim to Officer Taskett that J.L. was about to be assaulted, too—something that J.L. herself never claimed. *Id.* ¶268.

It also omitted a number of other things unfavorable to Jane. It said nothing about the fact that "Jane had also hooked up with A.D.—which could have been where she got the hickeys." *Id.* ¶234. It omitted the fact that I.F. had helped J.L. find Jane after Jane disappeared with A.D., and instead affirmatively *misled* on that front, stating only that I.F. "didn't spend much time with Jane at the party." *Id.* ¶235. And it said nothing about the friend from home whom Jane claimed to have disclosed the incident the day after, and whom they had refused to interview. *Id.* ¶170.

The Final Report went on to find Jane more credible than John by claiming that she had provided "the most specific details" about the incident, *id.* ¶252, *without mentioning that those details repeatedly changed and contradicted each other*. It speculated that alcohol "*may* have" impaired her memory and baldly asserted she was "mostly consistent" in her stories (*id.* ¶254), without actually acknowledging any of her contradictions. It said John was less credible because his friends purportedly contradicted him (*id.* ¶259) on incredibly minor things they could easily have failed to notice (*id.* ¶260), while saying nothing about the *major* ways J.L. contradicted Jane. It also said that John may not have been forthcoming because he "'clearly understands the seriousness of these allegations and the potential consequences of this process'" (*id.* ¶263), which is true of *every* respondent and is thus systemic bias against accused students—and yet another example of UR's flawed and biased training.

It also went to great lengths to hide the worst evidence for Jane: the fact that her best friend and D.S. were hooking up just feet away and neither heard nor saw anything troubling. It stated as *fact*, six separate times, that the reason J.L. didn't see or hear anything was "'because music was on and it was dark.'" *Id.* ¶264. It omitted that S.R.—one of the female students who

6

had been in the room—testified it was "'bright enough'" and "'wasn't . . . dark.'" *Id*. It omitted a picture John submitted showing the room's brightness as it was lit that night. *Id.* It omitted pictures showing how close the beds were to each other, instead using a misleading diagram hand-drawn by the investigators that made the beds seem much farther apart. *Id.* And it omitted the fact that both D.S. and John said no music was playing. *Id.* Jane herself would eventually put the lie to the investigators' whitewashing: She would testify at the hearing that *she* could see that *J.L.* was "relaxed, smiling, and communicating with ease" while in bed with D.S., *id.* ¶159— meaning that J.L. would have been able to see Jane with that same level of detail.

The hearing—run by a Hearing Officer selected by UR and given the same biased training, *see* Compl. Ex. 1 at 15—was just as heavily skewed in Jane's favor. He "never pressed Jane on any topic that would have seriously undermined her credibility." *Id.* ¶287. He instead told her she could take breaks and review her prior statements before answering any questions. *Id.* ¶281. The investigators had done just the opposite for John, holding it *against* his credibility when he took breaks during his interview to speak with his advisor before answering questions. *Id.* ¶257. And when John asked the Hearing Officer if he could see a specific page of the report during his questioning, he was denied. *Id.* ¶282. The Hearing Officer also probed John on the timing and content of his post-incident discussions with D.S. (John's main witness) but refused to do the same with J.L. (Jane's main witness). *Id.* ¶306. Worse yet, John was not allowed to ask Jane any questions about A.D., including whether A.D. had kissed her on the neck, because the Hearing Officer said it "wasn't relevant." *Id.* ¶291. But then—after there was no longer a chance she could be questioned about it—Jane presented a verbal closing statement about what supposedly happened with A.D. *Id.* ¶293. And the Hearing Officer, despite having said the issue was "not relevant," allowed Jane to testify about it uninterrupted. *Id.*

7

Perhaps most strangely of all, UR allowed Jane to submit an "opening" statement *after* the hearing, without first delivering it *at* the hearing (as contemplated by the Pre-Hearing Meeting Agenda and the Title IX Formal Hearing Script (*id.* ¶¶271-72)), let alone at the "opening." *Id.* ¶275. When John specifically asked to see the statement before the hearing concluded so that he could question Jane about it, he was denied. *Id.* Yet the Hearing Officer questioned John about his own opening statement. *Id.* ¶278. And when Jane's advisor asked for a courtesy copy of the first day's hearing testimony in order to prepare *her* questions for *John* on day 2, it was given to her, even though the Policy nowhere provides for that. *Id.* ¶299.

The Hearing Officer's findings defied credulity. And again, the *sequence* is important: He found that the initial kissing was consensual, that the biting and choking that followed soon after were not, but the removal of Jane's shirt soon after the biting and choking *was*, the subsequent removal of her pants *may* have been, and both acts of sexual intercourse that then followed *were*. *Id.* ¶325. And somewhere in there (the Hearing Officer couldn't say where) John had digitally penetrated Jane, and *that* was nonconsensual. *Id.* But he found insufficient evidence that John bit Jane's nipples, choked her to the point of dizziness, bit or slapped her butt, or had intercourse with her a third time—all things that Jane had repeatedly claimed, from the time of her earliest reports. *Id.* ¶¶325, 339. He also *affirmatively* found that Jane was the one who kicked the other women out of the room at the beginning, *id.* ¶17, that *all* of the intercourse was consensual, *id.* ¶¶318, 325, 336, and that the encounter ended when John left for the bathroom and never came back—all *highly material facts* that John had alleged but Jane had denied. *Id.* ¶325. Yet despite repeatedly finding that so many critical parts of Jane's story did not hold up, he nonetheless bent over backwards to find her at least partially credible. He said that her "'tendency to be evasive'" at the hearing "'was somewhat detrimental to her overall credibility.'" *Id.* ¶326. He said this

8

"'should not be construed to imply that [Jane] was being deceitful,'" only that it "'distracted from her overall credibility,'" whatever that means. *Id.* In short, despite having rejected the most important parts of Jane's story—including whether she *verbally objected to intercourse*—the Hearing Officer could not bring himself to state the obvious: She was making it all up. He instead tried to split the baby in a way that made no sense at all. *Id.* ¶¶318-361.

And in a textbook example of burden-shifting, he "never actually pointed to any evidence suggesting" that the biting, choking and digital penetration "were nonconsensual," but rather found them to be so because of the *lack* of evidence establishing consent. *Id.* ¶20. He relied partly on Jane's "nearly contemporaneous reporting to medical staff" to find that biting and choking *occurred*, *id.* ¶¶342, 343, 345, even though (as explained below) Jane provably lied about several other things in that report. But his only stated basis for finding they were *nonconsensual* was the "the '*lack* of evidence demonstrating affirmative consent'" (for the biting, *id.* ¶342, emphasis added); and that there was "'*no* evidence that affirmative consent was obtained'" (for the choking, *id.* ¶353, emphasis added). As for the digital penetration, the Hearing Officer thought it occurred only because he believed A.M. seemed to think that John had told A.M. there had been digital penetration. *Id.* ¶¶355-56. But the Hearing Officer said nothing at all about why he could conclude any digital penetration was *nonconsensual*, *id.* ¶360, and John had always characterized the *entire encounter* as consensual (to A.M. and to everyone else), *id.* ¶357. In short, as to all three acts, he had required John to prove his innocence.

## ARGUMENT

On a motion to dismiss, courts must accept the allegations in a complaint as true and "draw all inferences" in the plaintiff's favor. *Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019). "The plausibility standard" does not require that wrongdoing "be *the most plausible*

9

explanation of the defendant's conduct. It is sufficient if the inference of [wrongdoing] is plausible." *Schiebel v. Schoharie Cent. Sch. Dist.*, 120 F.4th 1082, 1106 (2d Cir. 2024) (quotation marks omitted, emphasis in original). John plausibly pleads six causes of action.

## I.    THE COMPLAINT AMPLY STATES A TITLE IX CLAIM UNDER TWO DISTINCT THEORIES.

"Title IX claims for monetary damages fall into two categories": when a school "affirmatively discriminates through an official action or official policy," and when a school is "deliberately indifferent" to acts of discrimination it "has actual knowledge of." *Schiebel*, 120 F.4th at 1093. The Complaint amply pleads both kinds of claims.

### A.  The Complaint States a Claim for Deliberate Indifference.

When one student accuses another of sexual misconduct, and a school is indifferent to the truth or falsity of the allegations, the school violates Title IX. That is because a sexual misconduct allegation is made at least in part on the basis of the respondent's sex, and "[t]he malicious accuser's sex-based discriminatory 'intent may be imputed to [the recipient]' when the recipient 'controlled . . . the very complaint process by which she sought to effectuate her allegedly discriminatory intent.'" *Id.* (quoting *Menaker*, 935 F.3d at 33). "[A] respondent may show deliberate indifference" in two ways, both of which this Complaint pleads: an "'objectively deficient'" grievance process that "cannot be said to have aimed at uncovering the truth"; and a decision "so 'inexplicable' that the same inference can be drawn." *Schiebel*, 120 F.4th at 1097 (quoting *Roe v. St. John's Univ.*, 91 F.4th 643, 655 (2d Cir. 2024). Reckless conduct suffices. *See, e.g.*, *Tesoriero v. Syosset Cent. Sch. Dist.,* 382 F. Supp. 2d 387, 398 (E.D.N.Y. 2005) ("deliberate indifference" is "satisfied by something less than acts or omissions for the purpose of causing harm or with knowledge that harm will result"). "Because '[d]eliberate indifference will often be a fact-laden question,' it is ill-suited for disposition on a motion to dismiss."

10

*Cianciotto on behalf of D.S. v. New York City Dep't of Educ.*, 600 F. Supp. 3d 434, 452 (S.D.N.Y. 2022) (quoting *Tesoriero*, 382 F. Supp. 2d at 398-99).

### 1. The Hearing Officer's Decision Was Inexplicable, Both on Its Own Terms and in Light of the Evidence.

First, the Hearing Officer's decision was utterly inexplicable. *See Schiebel*, 120 F.4th at 1097-98, 1101 (holding that "[a] respondent states a deliberate indifference claim when he plausibly alleges facts that raise 'grave doubts as to the merits of the decision itself'" and finding that the adjudicator's rationale for punishment "was so unconvincing as to render her decision inexplicable") (quoting *St. John's Univ.*, 91 F.4th at 656). It also committed perhaps the most fundamental error of all—flipping the burden of proof. The Policy states that respondents are "'presumed not responsible'" and may be disciplined only if "'a preponderance of the evidence' shows that a violation has occurred." Compl. ¶414 (quoting Compl. Ex. 1 at 13, 15). As another court in this District has said, interpreting identical provisions at a nearby school, "[I]t must be emphasized that it was not affirmative consent that had to be proven, but the lack thereof." *RIT*, 2024 WL 1051953, at *7. But UR punished John because (in the Hearing Officer's view) affirmative consent had not been proven. It found him responsible for biting because of a "*lack* of evidence demonstrating affirmative consent." *Id.* ¶342 (emphasis added). It found him responsible for choking because there was "*no evidence* that affirmative consent was obtained." *Id.* ¶353 (emphasis added). And it found him responsible for digital penetration based solely on John's supposed admission (through A.M.) *that the act itself occurred*, without even bothering to analyze why it wasn't consensual (as John claimed everything was). *Id.* ¶¶355-56. By its own terms, the decision was inexplicable at the most fundamental level.

The Hearing Officer committed the exact same error as the adjudicator in *RIT*. There, the school "'flip[ped] the burden of proof'" by issuing an "explicit rationale" that found the plaintiff

11

responsible because his reasons for believing he had consent did not themselves amount to "'affirmative consent' under RIT policy." *RIT*, 2024 WL 1051953, at *7. He was disciplined because he had *not proven consent*—even though, "[a]gain, it was not affirmative consent that had to be proven, but the opposite." *Id.* John's Hearing Officer—explicitly—did the same thing.

UR offers two responses, both of which fail. The first is that "affirmative consent" means that "the absence of indicia of consent equates to non-consent." Mem. at 22-23 (citing N.Y. Educ. L. § 6441(1) and page 4 of the Policy). Neither of the cites UR provides actually say that, which is probably why UR doesn't quote them. They both provide the exact same definition of "affirmative consent," which defines it as a *decision*, not a communication:

> Affirmative consent is a knowing, voluntary, and mutual decision among all participants to engage in sexual activity. Consent can be given by words or actions, as long as those words or actions create clear permission regarding willingness to engage in the sexual activity.

Compl. Ex. 1 at 4; N.Y. Educ. L. § 6441(1). Indicia are *evidence* of consent, and it is not a respondent's burden to provide evidence of consent; he is presumed not responsible unless the school finds a preponderance of evidence of *non*-consent.

But even if "the absence of indicia" *did* "equate[] to non-consent," Mem. at 22, it wouldn't change the analysis. Even if a respondent were required to obtain indicia of consent, it still would not be *his burden at a hearing to prove that he did so*. Otherwise, that would mean that every time a respondent were accused of not obtaining affirmative consent, he would be guilty until proven innocent—*i.e.*, the burden would be on him to prove his innocence. That is precisely the argument that *RIT* rejected. *RIT*, 2024 WL 1051953, at *7. Not only did UR make the same mistake here, but it now tells the Court that this is how it actually interprets and applies its Policy—to *require* respondents to prove consent. It is an admission that at UR, burden-flipping is intentional and systematic. That is its complainant-centered training on steroids.

UR's second response is that there was not "a complete lack of evidence regarding the topic of consent" because there were "police reports, medical records . . ., and other materials relevant to the topic of affirmative consent." Mem. at 23. But that mischaracterizes the findings of the Hearing Officer, who—by his own words—*did not rely on those things* as his basis for finding a lack of affirmative consent. He relied on one of them (the medical report) *only* in finding that two acts in question—biting and choking—had happened at all. Compl. ¶¶343, 345. As to whether they were consensual, he repeatedly and explicitly relied only on the "*lack* of" evidence of affirmative consent. *Id.* ¶¶20, 353. He did not say the acts were nonconsensual because there was positive evidence demonstrating that; he said they were nonconsensual because John had failed to produce evidence showing otherwise. *Id.* That is what his decision said, it is what the Complaint alleges in detail, and it is textbook burden-shifting.

But even if the Hearing Officer *had* relied on Jane's reports in making his consent finding, his decision would still be inexplicable, because any reliance on those things—or on any of Jane's testimony—would have been "against the substantial weight of the evidence." *Doe v. Univ. of Ark.*, 974 F.3d 858, 864 (8th Cir. 2020); *Schiebel*, 120 F.4th at 1102 (quoting this language as indicative of decisions that are "inexplicable" and thus indicate deliberate indifference). For example, there was no reasonable basis for the Hearing Officer to rely on Jane's "'nearly contemporaneous reporting to medical staff'" as a basis for concluding that biting (Compl. ¶343) or choking (*id.* ¶345) happened *at all*, and it would have been even less reasonable to rely on that reporting to conclude that they were *nonconsensual*. That is because Jane repeatedly contradicted what she said in that "reporting," which even the Hearing Officer seemed to recognize (while still refusing to come right out and say she'd just lied):

- Jane told the SANE nurse that the choking made her lightheaded (Compl. ¶83); the Hearing Officer found that was not supported by the evidence (*id.* ¶344).

13

- Jane told the SANE nurse her shirt came off consensually, but she discarded that "nearly contemporaneous" report at the hearing and said it wasn't consensual (*id.* ¶¶93-94).

- Jane told the SANE nurse that John merely pushed underwear to the side to initiate intercourse (*id.* ¶124), but later told Officer Hooper he fully removed them (*id.* ¶125).

- She told the SANE nurse she did *not* consent to sex (*id.* ¶49); the Hearing Officer found she did, ***and said her repeated claim to have said no was not believable*** (*id.* ¶¶336, 337).

- Jane told the SANE nurse that John "bit her butt" during intercourse (*id.* ¶135); the Hearing Officer acknowledged that was physically implausible (*id.* ¶339).

There was evidence that Jane lied "nearly contemporaneously" to I.F., too. She told I.F. the day after the incident, and would later tell others, a detailed story about how John had "huddled" with D.S. and schemed to get her and J.L. alone. *Id.* ¶¶213, 328. The Hearing Officer expressly found that *Jane* was actually the one who got them alone, by kicking three other women out of the room. *Id.* ¶325. That is effectively a finding that Jane lied. Jane also claimed that the encounter ended when she asked D.S. to kick John out, but the Hearing Officer found that it ended when John left for the bathroom and never came back, *id.* ¶17—another finding that effectively says she lied. But inexplicably, the Hearing Officer failed to explain why these lies didn't diminish Jane's credibility. *Cf. Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) (panel's failure "even to comment on the flat contradiction" told by complainant was evidence of bias).

The Hearing Officer also made *no* attempt to justify his findings in light of the *sequence* of alleged sexual activity. He found (as he had to, given the state of the evidence) that Jane consented to sexual intercourse with John—but that she did so *after* he supposedly choked and bit her nonconsensually. *Id.* ¶¶318, 319, 325. More remarkable still, he never explained why Jane might plausibly do that. *Id.* ¶319. Because there is no good answer for it: If Jane had just been assaulted by John, it is highly unlikely she would then have consented to sex with him minutes later. Recognizing how little sense this makes, UR's only response is to mischaracterize the point

14

by pretending that John's argument is that "if Jane was onboard with sex, of course she must have been willing to assent to physical harm from biting" and "violent choking." Mem. at 8. Obviously not: John denies that he ever choked or bit Jane *at all*. Compl. ¶¶348, 349. The consensual sex is thus powerful exculpatory evidence that he never bit her and choked her before the sex started—evidence the Hearing Officer never addressed. *See Doe v. Stonehill Coll.*, 55 F. 4th 302, 327 (1st Cir. 2022) (failure to address competing explanation in decision was evidence adjudicator had not applied preponderance of evidence standard); *Oberlin*, 963 F.3d at 587.

There was no basis to find Jane even partially credible, especially on the ground that she made a "nearly contemporaneous" report to the SANE nurse. Jane either abandoned or was implicitly found to have repeatedly lied about what she said there, and the Hearing Officer never explained why he could selectively credit other parts of her story there. He also claimed there were only "minor variations" in her story, when in fact there were massive ones, on some of the most critical issues. All of that is further evidence of deliberate indifference. *See also Oirya v. Brigham Young Univ.*, 854 F. App'x 968, 971 (10th Cir. 2021) (recognizing that "the element of deliberate indifference" would be met when a respondent shows that the recipient "ignored his allegations that the accuser had lied"); *Schiebel*, 120 F.4th at 1097 (quoting this language from *Oirya*). The inexplicable nature of the Hearing Officer's decision makes it plausible to infer deliberate indifference as to the truth of Jane's claims at the motion-to-dismiss stage.

UR suggests that, because the Hearing Officer's decision wasn't *quite* as unfounded as the one in *Schiebel*, it can't constitute deliberate indifference. Mem. at 8-9. But that's neither the correct reading of *Schiebel* nor how precedent works: *Schiebel* identified the decisions in *Oberlin* and *Arkansas* as examples of the kinds of decisions that are "inexplicable" (*Oberlin*) or "against the substantial weight of the evidence" (*Arkansas*) and thus establish deliberate indifference.

15

*Schiebel*, 120 F.4th at 1097, 1102. In *Oberlin*, the decision was "inexplicable" because the school found the complainant had been "incapacitated" when the evidence clearly showed she was not. *Oberlin*, 963 F.3d at 588. And in *Arkansas*, the decision was "against the substantial weight of the evidence" for the same reason: It didn't show that the complainant was so intoxicated as to be *incapacitated*. 974 F.3d at 864. What mattered in both is that the decision was clearly wrong and thus plausibly suggested that something else had motivated it.

So too here. The Hearing Officer indisputably flipped the burden of proof. On that basis alone, his decision is just as clearly wrong as the decisions at issue in *Schiebel*, *Oberlin*, and *Arkansas*. And when you add in his heavy reliance on Jane's "nearly contemporaneous" reporting, which even *he* implicitly found contained major lies, that is all the clearer.

### 2.   The Deficiencies in the Process Supply Further Evidence of Indifference.

UR's one-sided investigation and hearing provide still more evidence of deliberate indifference. Many of the same procedural errors present in *Schiebel* are present here, too.

First, UR was required by both the Policy and Title IX to give John an "equal opportunity to present witnesses, . . . and other inculpatory and exculpatory evidence." Compl. Ex. 1 at 15; *see Schiebel*, 120 F.4th at 1100 (noting same requirement under Title IX regulations). It utterly failed to do that. Most notably, UR refused to allow John to pursue any evidence of A.D., whose importance cannot be overstated: Jane said John gave her the faint marks on her neck. *Id*. ¶164. John denied it. *Id*. ¶¶ 348, 349. And A.D. was literally someone who could have given them to her, because he also made out with Jane that night. *Id*. ¶¶31, 164. But the investigators refused to interview him, they left him out of the Final Report, John's advisor was barred from asking Jane about him on the ground that it was "not relevant"—and then Jane, during her closing statement, was allowed to and testify uninterrupted about him. *Id*. ¶¶171, 234, 291, 293. The Hearing

16

Officer later found that John bit Jane, in part because of the mere existence of the neck marks (*id*. ¶342)—which could have been created by a witness UR refused to pursue. On the most important exculpatory evidence as to the biting charge, John was denied the chance to pursue evidence, yet Jane was allowed to offer it. That is not an "equal opportunity" to present "exculpatory evidence," and it is hard to get more deliberately indifferent to the truth than ignoring a potential source of "faint" neck marks, *id.* ¶105, that the parties dispute.

UR also failed to pursue other relevant witnesses. The investigators refused to interview a witness Jane literally discussed the incident with the next day. *Id*. ¶170. They refused to interview the other two female students who'd been in the room with Jane and John, who (unlike S.R.) were there when Jane left the room and was seen laughing. *Id.* ¶¶147, 149. They made no real effort to collect Jane's texts, including those from *the days after the incident. Id.* ¶232. All of that plausibly suggests discrimination. *Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021) ("John has raised a reasonable inference that the University's one-sided investigation establishes a prima facie case of sex discrimination."); *Schiebel*, 120 F. 4th at 1099 (quoting this language).

Second, as in *Schiebel*, UR was required to prepare a final report that "fairly summariz[ed] the relevant evidence gathered." *Id.* Ex. 1 at 11; *see Schiebel*, 120 F.4th at 1100 (identifying same duty under Title IX regulations). And as in *Schiebel*, its failure to do that is further evidence of deliberate indifference. As explained above, the Final Report was heavily skewed toward Jane, most notably in recounting her story as though she'd given only one version of it and calling her "mostly consistent." *See supra at* 5-7. That appears to have had (and it is certainly plausible to infer) a direct influence on the Hearing Officer, who said Jane's story contained only "minor variations." Compl. ¶329. The Final Report would be evidence of indifference even if it didn't have that effect; the fact that it did is all the more significant.

17

Third, the Complaint details a host of other unfair procedural decisions that all went against John. The Preliminary Report was released in an atypical way that hindered his review. *Id.* ¶¶217-22. He had to fight for his right to have a 10-day review period for the Final Report. *Id.* ¶¶227-29. He wasn't given notice when new allegations were added to the investigation, as required by the Policy. *Id.* ¶418. Evidence was improperly collected for Jane mid-hearing. *Id.* ¶¶307-09. Jane was allowed to give an entire chunk of "hearing" testimony—her "opening" statement—in a way that prevented John from hearing or questioning her about it. *Id.* ¶¶274-77. All while Jane's advisor was given access to the Day One hearing transcript to facilitate *her* questioning of *John*. *Id.* ¶¶298-99. All of this amply states a deliberate indifference claim.

*      *      *

UR asks the Court to ignore the above simply because the Hearing Officer didn't find John guilty of *all* the charges. Mem. at 7. But baby-splitting is no defense to unfair treatment. *Univ. of California*, 23 F.4th at 941. The Hearing Officer refused to call Jane "not credible" despite overwhelming evidence to the contrary. He relied on her "nearly contemporaneous" medical report despite clearly believing she had lied there. And he then found John responsible by literally flipping the burden of proof. Even if it were plausible that he did it all in good faith, it is also plausible he did so recklessly or intentionally. *Schiebel*, 120 F.4th at 1106 (discrimination need not be most plausible inference). The inference must be drawn in *John's* favor at this stage.

## B.  The Complaint Also States a Claim for Erroneous Outcome.

"To state an official action claim," such as an erroneous outcome claim, "the plaintiff's allegations must 'support a minimal plausible inference' that the recipient 'subjected [him] to discrimination on account of sex in the imposition of . . . discipline.'" *Schiebel*, 120 F.4th at 1104 (quoting *Doe v. Columbia Univ.*, 831 F.3d 46, 56 (2d Cir. 2016)). "A plaintiff may meet

18

this minimal burden by alleging clear procedural irregularity—which alone 'may suggest some form of bias'—and facts that 'permit a plausible inference that the bias was on account of sex.'" *Id.* (quoting *Vengalattore v. Cornell Univ.*, 36 F.4th 87, 107 (2d Cir. 2022)). When there are "clear procedural irregularities, . . . even *minimal* evidence of pressure on the university . . . will permit a plausible inference of sex discrimination." *Menaker*, 935 F.3d at 33.

John amply pleads that here. He pleads what courts identify as arguably the ultimate procedural irregularity: an inexplicable decision. *See, e.g.*, *Oberlin Coll.*, 963 F.3d at 587-88 ("merits of the decision itself," which were in "grave" doubt, were strongest evidence of sex bias in the case); *St. John's Univ.*, 91 F.4th at 655-56 ("in some cases an erroneous decision is sufficiently 'inexplicable' to warrant inferring that the university reached its decision due to sex-based bias"); *Menaker*, 935 F.3d at 34 (it is a "clear procedural irregularity" when "the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side"); *supra* at 11-16. He *also* pleads a series of procedural irregularities that *all* favored Jane. *See supra* at 16-18; *Univ. of California*, 23 F.4th 930 at 941 ("an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise"); *Univ. of Denver*, 1 F.4th at 831 (a "one-sided investigation establishes a prima facie case of sex discrimination"). And he alleges a history of sex bias on UR's campus that lives on in the training materials UR has chosen.

John also pleads sex-based pressure, the effects of which, according to the complaint, persisted at the time of Jane's allegation. From 2011 through 2016, the federal government pressured schools nationwide to resolve claims of sexual misconduct in sex-biased ways, as courts have recognized. Compl. ¶¶435-41. In the wake of that campaign, UR found itself at the center of the emerging #MeToo movement. Compl. ¶442. The response to that movement at UR

19

was to reject calls for due process in a way that ultimately led to the resignation of UR's president and a $9.4 million settlement with two students who had accused a professor who'd twice been exonerated of their allegations.  *Id*. ¶¶459, 469. UR even publicly admitted that the public pressure had changed its Title IX enforcement. *Id.* ¶470. Students continued to press the issue as late as October 2021 to make newer students aware of it. *Id*. ¶479. In the wake of that pressure, UR now trains its Title IX investigators and hearing officers to resolve claims through a lens that is similarly critical of due process, systemically favors complainants over respondents, and expressly relies on sources that take a gendered view of sexual assault. *See supra* at 4.[2]

Citing a single district court case, UR invites the Court to adopt a rule requiring that such pressure is irrelevant unless it occurs *amidst* the plaintiff's proceeding. Mem. at 12 (citing *Doe v. New York Univ.*, 438 F. Supp. 3d 172, 186 (S.D.N.Y. 2020)). But the Second Circuit has never adopted such a standard. *Menaker*, 935 F.3d at 33 (rejecting confinement of Title IX pressure claims to "cases where the public pressure on a university is particularly acute"; plaintiffs need not plead a "particular level of severity" since "even *minimal* evidence of pressure" is sufficient when procedural irregularities are clear) (emphasis in original). Nor have other district courts. *See Doe v. Syracuse Univ.*, 2023 WL 4105481, at *10 (N.D.N.Y. 2023) (in allegation from 2021, "Plaintiff describes conditions on the Syracuse campus in 2014 and 2016 that he alleges created an environment on campus that favored accusers in sexual assault complaints"); *Doe v. Syracuse Univ.*, 2020 WL 2513691, at *9 (N.D.N.Y. 2020) (rejecting university's argument that plaintiff's allegations of campus pressure "ignore[d] changes in the larger environment that have occurred

---

[2] UR suggests this history of pressure is irrelevant because the Hearing Officer was not a member of the UR community. Mem. at 13-14. But he was selected and trained *by* UR, *see* Compl. Ex. 1 at 15, which did feel that pressure. It's at least plausible that UR's biases affect its choice of hearing officers, and the bias in the training materials is clear. Compl. ¶¶367-408.

in the past few years"). UR's standard implies that university administrators somehow have no memory of the recent past when addressing subsequent Title IX allegations—even on campuses like UR, which faced overwhelming pressure from the Florian Jaeger affair.

Doe has alleged a final, independent source of sex bias: the training materials used by UR. Several pages of the Complaint discuss specific training that evinced bias against respondents or in favor of complainants. Compl. ¶¶367-408. Some sections of the training, moreover, were explicitly gendered. *Id.* ¶¶380, 403. Such detailed allegations about training bias have been more than enough to survive motions to dismiss in other Title IX cases. *Doe v. Trs. of the Univ. of Pa.*, 270 F. Supp. 3d 799, 824 (E.D. Pa. 2017) ("the Complaint's allegations regarding training materials and possible pro-complainant bias on the part of University officials set forth sufficient circumstances suggesting inherent and impermissible gender bias to support a plausible claim that Defendant violated Title IX under an erroneous outcome theory"); *Doe v. Univ. of Miss.*, 2018 WL 3570229, at *6, 11 (S.D. Miss. 2018) (finding that "training materials" there "might suggest bias," particularly because "this is a he-said/she-said case, yet there seems to have been an assumption under [the] training materials that an assault occurred").

UR offers only a token rebuttal to the allegations about training, combining irrelevancies (noting that while UR officials *used* the training, they didn't *develop* it, as if that matters) with an invitation to draw factual inferences in UR's favor (speculating, without evidence, that maybe the decisionmakers in John's case *disagreed* with the training). Mem. at 14, 25 n.6. The only citation provided for this portion of UR's argument is, "*See, e.g., St. John's Univ.,* 91 F.4th at 653." Mem. at 14. But the *St. John's* plaintiff never alleged biased training (the word "training" does not even appear in the opinion or the dissent), and nothing in *St. John's* suggests that universities that use sex-biased training materials are immune from Title IX lawsuits.

UR's inexplicable decision, combined with other procedural irregularities that *all* favored Jane, and a history of sex-based pressure that still manifests in its training materials, establishes the required "minimal plausible inference" of sex bias at the motion-to-dismiss stage.

## II. JOHN ADEQUATELY PLEADS A VIOLATION OF NEW YORK'S HUMAN RIGHTS LAW.

The University's only argument as to why John's human rights claim fails is that it "duplicates Plaintiff's Title IX claims" and should be dismissed for the same reasons. Mem. at 15. Its motion to dismiss this claim should therefore be denied.

## III. THE COMPLAINT ALSO STATES A CLAIM FOR BREACH OF CONTRACT.

The Complaint alleges in detail how UR breached its contract with John in several ways.

1. <u>Presumption of Non-Responsibility.</u> UR breached this promise by finding John responsible based on the "lack of" evidence of consent, rather than a preponderance of evidence of non-consent, as explained above. *See supra* at 11-13. That is a breach of both the presumption and the preponderance standard, as *RIT* held. *RIT*, 2024 WL 1051953, at *7.

2. <u>Preponderance of the Evidence.</u> In addition to flipping the burden, UR failed to substantially comply with this promise by "render[ing] . . . skewed credibility determinations," "disregard[ing] exculpatory evidence," and failing to consider "the entirety of the evidence with a neutral gaze." *Doe v. Princeton Univ.*, 30 F.4th 335, 347 (3d Cir. 2022) (school failed to substantially comply with preponderance standard). The Complaint shows how UR did each of those things. *See supra* at 8-9 (Jane's credibility assessment), 14-15 (same), 16-17 (ignoring A.D.). *See also Doe v. Syracuse Univ.*, 440 F. Supp. 3d 158, 179 (N.D.N.Y. 2020) (plaintiff plausibly alleged failure to apply evidentiary standard where adjudicator found complainant credible (1) without resolving discrepancies in her statements, and (2) despite having "made multiple untrue statements about her sex with Plaintiff"); *Doe v. Trs. of Hamilton Coll.*, 2024

WL 1675130, at *24 (N.D.N.Y. 2024) (allegations that college "failed to adhere to a preponderance of the evidence standard" are "sufficient to support a breach of contract claim"); *Doe v. Siena Coll.*, 2023 WL 197461, at *18 (N.D.N.Y 2023) (adjudicator's "hearing decision failed to assess the entirety of the record, ignored exculpatory evidence . . ., and relied heavily on photographic evidence whose reliability had been questioned, without explanation").

3. Equal Opportunity to Present Witnesses and Evidence. The Policy promises the parties an "equal opportunity to present witnesses, . . . and other inculpatory and exculpatory evidence." Compl. Ex. 1 at 15. UR breached that promise when it (i) denied John access to a highly exculpatory witness (A.D.) and refused to let him question Jane about him, but then allowed Jane to testify about him uninterrupted (*see supra* at 16-17); (ii) failed to pursue other witnesses (*see supra* at 3, 17); (iii) barred John from seeing and presenting evidence or questions in response to Jane's "opening" statement, while questioning John about his own opening statement (*see supra* at 8); and (iv) failed to make any real effort to collect relevant texts from Jane, leaving her as the only one with access to that potential "inculpatory and exculpatory evidence" (*see supra* at 17).

4. Biased Training Materials. UR also breached by using biased training materials that (among other things) encouraged overlooking complainants' inconsistencies. Compl. ¶¶374-93; *Syracuse Univ.*, 440 F. Supp. 3d at 179 ("trauma-informed" training materials that blessed inconsistencies by complainants supported breach of contract). UR responds by arguing that the Policy "merely states that" an investigator will have "'appropriate training and experience.'" Mem. at 17 (quoting the Policy). UR cannot seriously argue that even biased training is "appropriate." And hearing officers are required to undergo the training, too. Compl. Ex. 1 at 15.

5. Failure to Post the Training Materials. UR also maintains that it's not clear how the failure to post the training materials as promised could have harmed John. Mem. at 18-19. But

the answer is obvious: If John had known about the biased training, he could have requested replacements who had not been so trained—just as he demanded that UR follow the federal Title IX regulations when it refused to do so during the process. *See, e.g.*, Compl. ¶¶ 14, 228-29.

As to all of the breaches John alleges, UR strangely argues that the claim fails because it "does not contain any allegations of damages specific to any of the alleged breaches." Mem. at 17. But all of the breaches resulted in the same damage: unsupported findings that he had assaulted Jane and thus was "falsely branded a sexual assailant," with all that entails. Compl. ¶508. That is not a "threadbare" allegation: It identifies the specific nature of the damage and how it was inflicted. UR baldly asserts that this is "insufficient on its face," Mem. at 17, but cites no authority for the proposition that a complaint must link unique damages to each breach.

## IV.    JOHN'S COVENANT CLAIM IS NOT DUPLICATIVE.

UR seeks to have John's covenant claim dismissed solely on the basis that it is duplicative of his breach of contract claim. Mem. at 23-24. That is false: it is uniquely based on UR's failure "to disclose the conflicts of interest between Jane's advisor," on the one hand, and UR's "appeals officer" and "Title IX Coordinator," on the other. Compl. ¶514. That allegation does not form the basis of John's breach of contract claim. *See id.* ¶¶502-10. And it readily supports a breach of covenant claim. *See, e.g.*, *Richmond Shop Smart, Inc. v. Kenbar Dev. Ctr., LLC*, 32 A.D.3d 423, 424 (N.Y. App. 2d Dept. 2006) (covenant protects "reasonable expectations" of contractual parties). The Policy states that part of the "[f]undamental [f]airness" it promises students includes "evaluat[ing]" investigators, hearing officers and Title IX coordinators "for potential conflicts of interest or general bias" and "preclud[ing] [them] from participation" if biased. Compl. Ex. 1 at 15. It also makes the bias of any of those individuals a permissible basis of appeal. *Id.* at 14. A student cannot appeal on that basis without knowing of

24

the conflicts in the first place, and UR collects that information for the benefit of the parties. Parties reasonably expect to be told that information. That is enough to state a claim at this stage.

**V.    JOHN ADEQUATELY PLEADS A NEGLIGENCE CLAIM.**

Finally, in *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81 (2d Cir. 2011), the Second Circuit denied a motion for summary judgment, holding that the College there "had a duty to administer the Honor Code proceedings in a fair and impartial manner." *Id.* at 94. "A reasonable jury could conclude that the College was negligent . . . by permitting an unfit person to lead the disciplinary process." *Id.* Her "apparent conflict of interest" gave the school enough knowledge of risk to support a negligent supervision claim. *Id.*

John likewise alleges conflicts of interest sufficient to put UR on notice that key players in John's process—including the Title IX Coordinator and the appeals officer—ran an undue risk of running the process unfairly. Compl. ¶¶9-13; *see, e.g.*, *id*. ¶14 (detailing unfair decisions made by the Title IX Coordinator in favor of Jane's advisor, her predecessor). And John further alleges in detail how UR's training was systemically biased against respondents and furthermore was influenced by sex bias. *Id.* ¶¶ 367-408. As John explained above, those training materials had a direct effect on the outcome. *See supra* at 17; Compl. ¶329. John has adequately pled that UR "knew or should have known [that] the employees [had] a propensity for the conduct which caused" his injury. *Olsen v. Butler*, 227 A.D.3d 916, 918 (N.Y. App. Div. 2d Dep't 2024).

**CONCLUSION**

For the foregoing reasons, John Doe respectfully requests that this Court deny UR's motion to dismiss and allow this case to proceed to discovery.

25

DATED:  April 24, 2026

Respectfully submitted,

/s/ Justin Dillon
Justin Dillon
Christopher C. Muha
Kimberly Blasey
Dillon PLLC
1717 K Street, Suite 900
Washington, DC 20005
(202) 787-5858
jdillon@dillonpllc.com
cmuha@dillonpllc.com
kblasey@dillonpllc.com

/s/ Brian Melber
Brian Melber (N.Y. Bar No. 2789840)
Personius Melber LLP
2100 Main Place Tower
350 Main St.
Buffalo, NY 14202
(716) 855-1050
bmm@personiusmelber.com

*Attorneys for Plaintiff John Doe*

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 24, 2026, I caused the foregoing to be electronically filed through the Court's CM/ECF system, and thereby to be served upon all counsel appearing in this case.

/s/ Brian Melber
Brian Melber (N.Y. Bar No. 2789840)
Personius Melber LLP
2100 Main Place Tower
350 Main St.
Buffalo, NY 14202
(716) 855-1050
bmm@personiusmelber.com

*Attorney for Plaintiff John Doe*

Dated:  April 24, 2026

27